LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo (Bar No. 144074)
dalekgalipo@yahoo.com
Eric Valenzuela (Bar No. 284500)
evalenzuela@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
Telephone:   (818) 347-3333
Facsimile:    (818) 347-4118

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT FOR THE

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDRA RASEY-SMITH; GORDON GENE MACCANI; and JANET MACCANI, <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF LOS ANGELES; CALEB GARCIA ALAMILLA; and DOES 2-10, inclusive <br><br> Defendants. | Case No. 2:24-cv-03265-MWC-SSC <br><br> [*Honorable Michelle Williams Court*] <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> [Declaration of Eric Valenzuela and Exhibits in Support thereof; *filed concurrently herewith*] <br><br> Date:    January 16, 2026 <br> Time:    1:30 p.m. <br> Ctrm.:   6A |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................ 1

II.   STATEMENT OF FACTS ................................................................. 2

III.  LEGAL STANDARD ........................................................................ 9

    A.    Summary Judgment ............................................................... 9

IV.  ARGUMENT ...................................................................................... 9

    A.    Garcia's Use of Deadly Force was Unreasonable ............... 9

          1.    Severity of the Crime ................................................ 10

          2.    Decedent Did Not Pose an Immediate Threat of Death or Serious Bodily Injury ........................................ 10

               a.    Garcia's Credibility ........................................ 12

               b.    The Reasonableness of Garcia's Beliefs .......... 12

          3.    Whether Decedent was Resisting or Seeking to Evade Arrest ...................................................................... 14

          4.    Other Factors ............................................................ 14

    B.    There Are Several Disputed Issues of Material Fact ........... 16

    C.    Garcia Is Not Entitled to Qualified Immunity ..................... 17

    D.    Garcia Violated Plaintiffs' Fourteenth Amendment Rights ................. 23

    E.    Plaintiffs' State Law Claims ................................................ 24

V.   CONCLUSION .................................................................................. 26

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Bryan v. MacPherson,*
    630 F.3d 805 (9th Cir. 2010)...................................................................9

*Bui v. San Francisco,*
    61 F.Supp.3d 877 (N.D. Cal 2014) ..............................................20, 21

*Chien Van Bui v. Cty. and Cnty. of San Francisco,*
    699 Fed.Appx. 614 (9th Cir. 2017) .........................................................21

*Cruz v Cty. of Anaheim,*
    765 F.3d 1076 (9th Cir. 2014)...............................................................22, 23

*Deorle v. Rutherford,*
    272 F.3d 1272 (9th Cir. 2001).............................................9, 10, 14, 15

*Garlick v. Cnty. of Kern,*
    167 F. Supp. 3d 1117 (E.D. Cal. 2016)...............................................9, 24

*George v. Morris,*
    736 F.3d 829 (9th Cir. 2013) ...............................................................10, 22

*Glenn v. Washington County,*
    673 F.3d at 876 ...................................................................................15

*Gonzalez v. City of Anaheim,*
    736 F.3d 829 (9th Cir. 2013) ...............................................................9, 10

*Graham v. Connor,*
    490 U.S. 386 (1989) ............................................................................9, 10

*Greer v. City of Hayward,*
    229 F. Supp. 3d 1091 (N.D. Cal. 2017) ..............................................24

*Hayes v. County of San Diego,*
    736 F.3d 1223 (9th Cir. 2013)..........................................................13, 14, 25

*Hope v. Pelzer,*
    536 U.S. 730 (2002) ............................................................................18

*Kelley v. Borg,*
    60 F.3d 664 (9th Cir. 1995)...............................................................18

*Lowry v. City of San Diego*, 858 F.3d 1248 (9th Cir. 2017) (en banc) ....................10

*Mattos v. Agarano,*
    661 F.3d 433 (9th Cir. 2011) (en banc)..............................................21

*Mattos v. Agorano,*
    661 F.3d 433 (9th Cir. 2011) (en banc)..............................................10

*Morales v. City of Delano,*
  852 F. Supp. 2d 1253 (E.D. Cal. 2012)......................................................23

*N.E.M. v. City of Salinas,*
  761 F. App'x. 698 (9th Cir. 2019) ..............................................................14

*Nehad v. Browder*
  929 F.3d 1125 (9th Cir. 2019)..................................10, 11, 12, 13, 14, 15, 19

*Newmaker v. City of Fortuna,*
  842 F.3d 1108 (9th Cir. 2016) ....................................................................12

*Ochoa v. City of Mesa,*
  26 F.4th 1050 (9th Cir. 2022).....................................................................23

*Pearson v. Callahan,*
  555 U.S. at 231 ...........................................................................................22

*Penny v. Azmy,*
  No. 22-55572, 2024 WL 489287 (9th Cir. Feb. 8, 2024) ............................20

*Reese v. County of Sacramento,*
  888 F.3d 1030 (9th Cir. 2018) ....................................................................26

*S.B. v. City. of San Diego,*
  864 F.3d 1010 (9th Cir. 2017) ....................................................................14

*Scott v. Harris,*
  550 U.S. 372 (2007) ....................................................................................16

*Tennessee v. Garner,*
  471 U.S. 1 (1985) ..........................................................................................9

*Tolan v. Cotton,*
  572 U.S. 650 (2014) ....................................................................................18

*Torres v. City of Madera,*
  648 F.3d 1119 (9th Cir. 2011)...............................................................10, 12

*United States v. Lanier,*
  520 U.S. 259 ...............................................................................................22

*Vos v. City of Newport Beach,*
  892 F.3d 1024 (9th Cir. 2018) ..............................................................19, 20

*White v. Pauly,*
  580 U.S. 73 (2017) ......................................................................................18

*Wilkinson v. Torres,*
  610 F.3d 546 (9th Cir. 2010) ......................................................................23

*Williamson v. City of Nat'l City,*
  23 F.4th 1146 (9th Cir. 2022).....................................................................25

*Wilson v. Layne,*
    526 U.S. 603 (1999) ....................................................................................... 18

*Zetwick v. County of Yolo,*
    850 F.3d 436 (9th Cir. 2017) ........................................................................ 9

<u>Statutes</u>

Cal. Pen. Code § 835a(a)(2) ........................................................................... 24

Cal. Pen. Code § 835a(c)(1)(A) ...................................................................... 24

Cal. Pen. Code § 835a(e)(2) ........................................................................... 25

California Penal Code section 835a (PC 835a) ........................................... 24

Fed. R. Civ. P. 56(a) ................................................................................. 9, 16

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

On February 3, 2024, Defendant LAPD Officer Caleb Garcia fatally shot the Decedent, Jason Maccani, in the Skid Row area of Los Angeles. Decedent, who was only thirty-six years old, suffered from bipolar disorder and was experiencing a mental-health crisis. Garcia had information that Decedent may have a mental-health issue prior to the shooting, including reports that Decedent made bizarre statements about the world ending and observations of Decedent's appearance and conduct. Toxicology tests showed that Decedent was not under the influence of illegal drugs.

At the time of the shooting, there were seven officers at the scene attempting to take Decedent into custody and two of the officers were already hands-on with him. Decedent did not pose an immediate or imminent threat of death or serious bodily injury at the time of the shooting. Throughout the incident, Decedent held a white plastic fork that did not resemble a knife or a pointy or edged weapon. Decedent did not make a stabbing or slashing motion with the fork, he never raised it above his head, and the officers never gave any commands for Decedent to drop it or any other commands, as he approached them. The officers did not have any information that Decedent was armed with a gun or a knife, and prior to the shooting, the reporting parties told the officers that Decedent did not have any weapon on his person. Further, there is evidence that Garcia never subjectively believed he saw a knife: He did not yell out "knife," give commands to drop the knife or words to that effect, or warn Decedent that deadly force would be used prior to firing. A reasonable jury could find that, after shooting Decedent, he fabricated a story that he believed Decedent was holding a knife to justify using excessive deadly force.

At the time of the shooting, there were several less intrusive options available including going hands-on with the Decedent. There were seven officers present, and they could have given commands to drop the object or given a verbal warning that

deadly force would be used. The officers were also armed with tools such as a 40mm foam-projectile launcher, a "beanbag" shotgun, police batons, and pepper spray. Garcia struck both Decedent and a fellow officer with his single shot, and no one else was physically injured. Understandably, the City terminated Garcia's employment as a police officer because of the shooting. Plaintiffs' police practices expert Jeff Noble has opined that the use of deadly force was excessive and unreasonable, inappropriate, and in violation of police officer standards and training. The Court should deny Defendants' Motion for Summary Judgment with respect to the use of deadly force against Decedent because there are triable issues of material fact regarding the excessive force claim under the Fourth Amendment, Plaintiffs' claim for interference with familial relationship under the Fourteenth Amendment, and Plaintiff's state law claims for battery, violation of the Bane Act and negligence. Fed. R. Civ. P. 56(c).

Additionally, Garcia is not entitled to qualified immunity because there are disputed issues of material fact and the law with respect to the use of deadly force was clearly established at the time of the incident. There does not need to be a case directly on point to put Garcia on notice that it would be unlawful to use deadly force against a person who appears mentally ill, who is holding an object that is not a knife or a sharp or edged weapon, without giving any commands to drop it and without giving a verbal warning that deadly force would be used, especially when there are several less-lethal options available and numerous officers assisting. Accordingly, the Court should deny Defendants' Motion as to Plaintiffs' federal and state law claims as set forth below.

## II.    STATEMENT OF FACTS

On the afternoon of February 3, 2024, Officer Garcia was dispatched to a call for service at a commercial building in the Skid Row area of downtown Los Angeles. Defendants' Uncontroverted Fact ("DUF") No. 4. Garcia did not hear the original 911 call, and the information provided by dispatch did not represent that anyone had been injured or that the suspect had a gun or a knife. Plaintiffs

Additional Material Facts ("PAMF") No. 63.  Upon arriving on-scene, the involved officers, including Garcia, were told by the reporting parties that the suspect had told them to leave, he was saying weird stuff like the world is coming to an end, he did not hit anyone, he was being very antsy, he was talking nonsense, and he did not have a weapon on his person like a gun or a knife.  PAMF No. 64.  Sergeant Punzalan formulated a tactical plan that included a contact officer and the arrest team, two less-lethal options (40mm and beanbag shotgun), and a lethal-cover officer.  PAMF No. 65.  Garcia was not the lethal-cover officer; rather, he was part of the arrest team, which was tasked with going hands-on and placing handcuffs on the suspect.  PAMF No. 66.  Sergeant Punzalan made sure that Garcia understood his assignment because it was important that he understood and followed the tactical plan.  PAMF No. 66.  Garcia understood, based on his training, that if lethal force was necessary, then that responsibility was designated to a different officer.  PAMF No. 66.  More experienced officers are assigned as the lethal option; Garcia was still in his field training and probationary period as a new officer.  PAMF No. 67.

Officers are trained on the importance of formulating tactical plans and not deviating from them, for the safety of both the suspect and the officers.  PAMF No. 68.  According to police practices expert Jeffrey Noble, Garcia should have never deviated from the tactical plan and Garcia's deviation from the tactical plan was a significant factor in causing him to use deadly force against Decedent.  PAMF No. 68.  The arrest team would normally be at the back of the configuration and the lethal and less lethal options would be to the front.  PAMF No. 69.  Based on the information on the call, the location being in the Skid Row area where mental health calls are common, the information provided by the reporting party, and police officer training, the officers believed that they may be dealing with someone experiencing a mental health crisis.  PAMF No. 70.  The officers planned to arrest Decedent for misdemeanor trespass if he refused to leave the property, because they determined that an assault or a felony had not been committed.  PAMF No. 71.  The

1  plan was to safely take Decedent into custody with the minimal amount of force
2  possible. PAMF No. 72. The responding officers went to the end of the hall and
3  issued commands for the Decedent to exit from the unit. PAMF No. 73. Decedent
4  was initially compliant with the officers' commands. PAMF No. 73. The officers
5  believed that Decedent appeared mentally ill based on his appearance and behavior.
6  PAMF No. 74. During the morning roll call, there was a discussion with the
7  involved officers regarding using less-lethal options when feasible rather than lethal.
8  PAMF No. 75. After walking backwards with his hands in the air, as the officers
9  ordered, Decedent lowered his hands, turned around and began walking slowly
10 toward the officers. PAMF No. 76.

11         Decedent was holding a white plastic fork in his right hand with the handle of
12 the fork protruding a few inches from the bottom of his hand. PAMF No. 77. The
13 white plastic fork's handle did not have any point or sharp edge to it and it does not
14 look like a knife. PAMF No. 77. Neither Garcia nor any other officer ever yelled
15 "drop it" or "he has a weapon" or words to that effect, as officers are trained to do if
16 a suspect is holding a sharp, pointy or edged weapon so as to notify fellow officers
17 and to allow the suspect an opportunity to discard any weapon. PAMF No. 78.
18 Garcia claims to have seen the object for 3-4 seconds continuously yet he never told
19 anyone at the scene that he thought Decedent had a knife. PAMF No. 79. Garcia
20 never saw the color of steel or another metal. PAMF No. 80. Sergeant Punzalan
21 never saw what looked like a knife on Decedent. PAMF No. 81. Images of the
22 white fork confirm that it does not resemble a knife. PAMF No. 82. Police officers
23 like Garcia are trained on identifying and distinguishing objects and items in
24 people's hands and whether they are weapons or not. PAMF No. 83.

25         Decedent's arms and hands were down by his side as he initially slowly
26 walked toward the officers. PAMF No. 84. The officers then began to fire less-
27 lethal rounds at Decedent, including one 40mm round and one beanbag round.
28 PAMF No. 85. The officers did not give a verbal warning before firing any of these

less-lethal rounds.  PAMF No. 85.  The less-lethal rounds appeared to strike
Decedent.  PAMF No. 86.  In response to being struck, he moved his arms to his
abdomen and chest area, while continuing to slowly walk towards them.   PAMF
No. 87.  Then, a second beanbag round was fired at Decedent, which also appeared
to strike him.  PAMF No. 88.  The 40mm and beanbag rounds are intended for
subjects displaying a lower level of resistance than an immediate or imminent threat
of death or serious bodily injury, which is the standard for using deadly force.
PAMF No. 89.  At most, the officers should have used less-lethal force.  PAMF No.
89.  These less-than-lethal rounds were effective and assisted with the officers
taking Decedent into custody.  PAMF No. 90.

After the second beanbag round struck Decedent, he continued to briefly walk
toward the officers and, while near the wall, he pushed Officer Rodriguez, who was
holding the beanbag shotgun, away from him with his left hand while turning
clockwise away from her.  PAMF No. 91.  While this was occurring, t Rodriguez
side-stepped to the left, and stepped back to create distance, never losing her
balance.  PAMF No. 91.  Decedent made minimal physical contact with Rodriguez;
she recalls maybe Decedent touching her around her abdomen/midsection area but
does not actually recall any physical contact with Decedent.  PAMF No. 92.
Rodriguez does not recall Decedent making any physical contact with the barrel of
her shotgun.  PAMF No. 92.

As Decedent turned clockwise and away from Rodriguez, Sergeant Punzalan
saw an opportunity and went hands-on with the Decedent, grabbing his arm and
torso and bear-hugging him and pushing him toward the wall.  PAMF No. 93.
Rodriguez also used her left hand to help gain control of Decedent because she did
not want Punzalan going hands-on by himself.  PAMF No. 94.  Punzalan went
hands-on with Decedent to de-escalate the situation because he was dealing with a
mental health issue, which is part of police officer de-escalation training, and to
avoid the need for the additional or higher uses of force (including deadly force).

PAMF No. 95.  While Punzalan and Rodriguez were going hands-on with Decedent, Garcia fired a single gunshot which struck Punzalan in his hand and struck Decedent in the arm and chest. PAMF No. 96.

The last beanbag round and the gunshot were fired within approximately one second of each other.  PAMF No. 97.  Before firing, Garcia did not give any verbal commands, such as to drop it, or give a verbal warning that deadly force would be used if Decedent did not comply.  PAMF No. 98.  Garcia could not see Decedent's hands, or the fork in his hand, at the time he shot.  PAMF No. 99.  Decedent's hands were not in physical contact with any other officers or their weapons at the time. PAMF No. 100.  Garcia estimates he was six feet away from Decedent (out of arms' reach) when he fired.  PAMF No. 101.  Moreover, Decedent never held the white plastic fork above his head and he never made a stabbing or slashing motion while holding it.  PAMF No. 102.  The hallway where the incident occurred was well lit. PAMF No. 103.  Garcia saw the white plastic fork on the ground and figured that must have been what Decedent had in his hands.  PAMF No. 104.  Decedent never grabbed or held an officer, he never tried to kick, punch or strike an officer, he never verbally threatened anyone and he did not use any profanity.  PAMF No. 105.  The toxicology test results show that Decedent had no illegal drugs in his system. PAMF No. 106.

Garcia had several less-lethal options including a taser, pepper spray and a baton, giving a warning that deadly force would be used and issuing commands, including to drop it, with sufficient time to comply with the commands.  PAMF No. 107.  There were also several additional less-lethal options like allowing the officers to continue to go hands on with Decedent, as they had already begun to do prior to the shooting (especially since the officers outnumbered Decedent seven-to-one), the 40mm launcher and the beanbag shotgun.  PAMF No. 107.  Despite already seeing another officer with his gun drawn (per the tactical plan), Garcia still unholstered his gun and fired in the direction of fellow police officers.  PAMF No. 108.  Due to

crossfire concerns, Officer Chomuk yelled out "crossfire" to the other officers immediately after the gunshot.  PAMF No. 109.  According to the LAPD review board, by firing without a clear background/backdrop, Garcia placed the officers at greater risk of injury and/or death than the perceived threat posed by Decedent, even if he had been armed with an actual knife and not a plastic fork.  PAMF No. 110.  Other than Punzalan, whom Decedent shot in the hand, no officers were physically injured during the incident.  PAMF No. 113.

Despite all of the involved officers having firearms, only Garcia fired a lethal round.  PAMF No. 111.  Based on their observations, most of the officers did not even unholster their guns, and the other officers with guns drawn never put their finger on the trigger and never pointed their guns at Decedent.  PAMF No. 111.  Prior to the incident, as a police officer, Punzalan has seen approximately 65 suspects with knives in their hands and never fired his gun during those previous encounters.  PAMF No. 112.  Garcia had not finished his six-month field training at the time of the incident.  PAMF 114.  Garcia was fired from his job as an LAPD police officer as a result of firing his weapon during the incident.   PAMF 115.

Police officers like Garcia are trained that if they see a suspect with a weapon in their hand, such as a knife, to give a command to drop the weapon if feasible.  PAMF 116.  They are trained in the concept of situational awareness and on identifying and distinguishing objects in suspects' hands in order to determine if they are weapons or not.  PAMF 117.  They are also trained that there must be an immediate or imminent threat of death or serious bodily injury in order to use deadly force.  PAMF 118.  Officers are trained that deadly force is only to be used when there are no other reasonable options, as a last resort.  PAMF 119.  They are also trained that, in terms of imminent or immediate threat of death or serious bodily injury, there has to be an ability, an opportunity, and an apparent intent to immediately cause death or serious bodily injury and that all of those things must be present in order for the officer to shoot.  PAMF 120.  Officers are trained that an

-7-

imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm. PAMF 121. They are also trained that subjective fear is insufficient to use deadly force. PAMF 122. Officers are trained that a verbal warning should be given when feasible. PAMF 123. Officers are trained that seeing a weapon in someone's hand is not enough to use deadly force, there has to be more. PAMF 124. Officers are also trained to have a reverence for human life. PAMF 125. Police officers like Garcia are trained to give commands when feasible and to give the person an opportunity to comply with the commands when feasible. PAMF 126. They are also trained to make sure they have a clear foreground and backdrop/background before firing. PAMF 127. Officers are trained to control their emotions and to not panic when encountering situations similar to this incident. PAMF 128.

According to Noble, contrary to Garcia's claim that there was nothing between him and Decedent when he fired, Sergeant Punzalan was between Garcia and Decedent, Punzalan had already grabbed Decedent, and Punzalan was struck by Garcia's round. PAMF 129. Garcia's use of deadly force was excessive, objectively unreasonable and inconsistent with generally accepted police practices. PAMF 130. Moreover, a reasonable police officer would not believe that a common plastic fork was a knife or an edged weapon. A reasonable officer would have realized that the object in Decedent's hand was not a knife or a sharp-edged weapon. PAMF 131. Under these circumstances, Garcia should never have deviated from the tactical plan and a reasonable officer under similar circumstances would not have deviated from the tactical plan and would not have used deadly force as Decedent did not present an imminent threat of death or serious bodily injury and a reasonable police officer in Garcia's position would not have fired their handgun at Decedent when Punzalan was in his line of fire. PAMF 132-33.

### III.    LEGAL STANDARD

#### A.    *Summary Judgment*

Summary judgment is only appropriate when there is no genuine dispute as to any material fact, then the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party.  *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014) improper for the Court to resolve genuine factual disputes or make credibility determinations at the summary judgment stage. *Zetwick v. County of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citations omitted).

### IV.    ARGUMENT

#### A.    *Garcia's Use of Deadly Force was Unreasonable*

An excessive force claim is adjudicated under the Fourth Amendment's "objective reasonableness" standard.  *Graham v. Connor*, 490 U.S. 386, 388 (1989). Among the factors a court must consider are "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Id*. (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).  The *Graham* factors are not exclusive. Other relevant factors include the availability of less intrusive force, whether proper warnings were given, and whether it should have been apparent to the officers that the subject of the force used was mentally disturbed. See *Bryan v. MacPherson,* 630 F.3d 805, 831 (9th Cir. 2010); *Deorle v. Rutherford*, 272 F.3d 1272, 1282–83 (9th Cir. 2001).  A "simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern."  *Deorle* 272 F.3d at 1281.  Nor does "[a] desire to resolve quickly a potentially dangerous situation."  *Id.* at 1281.  "Not all errors in perception or judgment [] are reasonable" and while courts "do not judge the reasonableness of an officer's actions 'with the 20/20 vision of hindsight,' nor

does the Constitution forgive an officer's every mistake." *Glenn*, 673 F.3d at 871 (quoting *Graham*, 490 U.S. at 396); see also *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011).

### 1.    Severity of the Crime

The Ninth Circuit has interpreted the "severity of the crime" factor as relating to the initial crime prompting a response by law enforcement.  See *Lowry v. City of San Diego*, 858 F.3d 1248, 1257-58 (9th Cir. 2017) (en banc), cert. denied, 138 S.Ct. 1283 (2018).  Here, the preliminary investigation revealed that the severity of the crime was a potential misdemeanor trespass.  After speaking to the reporting parties, and prior to making contact with the Decedent, the officers determined that an assault had not occurred and they were only going to arrest Decedent for misdemeanor trespass if he refused to leave.  This factor weighs against finding that the use of deadly force was reasonable.  See *Nehad v. Browder* 929 F.3d 1125, 1136 (9th Cir. 2019) (holding that a particular use of force would be more reasonable when applied against a felony suspect than when applied against a person suspected of only a misdemeanor).

### 2.    Decedent Did Not Pose an Immediate Threat of Death or Serious Bodily Injury

"[T]he most important Graham factor is whether the suspect posed an immediate threat" to anyone's safety. *Mattos v. Agorano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) (cleaned up). Use of deadly force is reasonable only if an officer has probable cause to believe the suspect poses an immediate threat of death or serious bodily harm to himself or others.  *See Gonzalez* at 793; *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013).  A "statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern."  *Deorle* 272 F.3d at 1281.  Viewing the facts in the light most favorable to Plaintiffs, as required, Decedent was holding a white plastic fork which did not have a sharp edge or point and did not look like or resemble a knife or an

edged weapon, Decedent never made a stabbing or slashing motion, he never held the object above his head, the officers never told the Decedent to drop the object, Decedent never verbally threatened anyone and he never tried to punch, kick or strike any of the officers. Further, Decedent slowly walked towards the officers and the police officers outnumbered the Decedent seven-to-one. The facts that two officers fired less-than-lethal rounds, none of the other officers (accept Garcia) fired their guns, many of them never even unholstered their firearms, they never pointed their guns at Decedent, and Punzalan and Rodriguez both went hands-on with Decedent prior to the shooting, support a reasonable inference that Decedent did not pose an immediate threat of death or serious bodily injury that would justify the use of deadly force. Moreover, Decedent never physically injured anyone—the only injured parties were Decedent and Punzalan, from Garcia's shot.

Based on these facts, a reasonable jury could find that any potential threat posed by Decedent was insufficient to warrant the use of deadly force. A reasonable officer under similar circumstances, such as the six involved officers that never used lethal force, would not believe that Decedent posed an imminent threat of death or serious bodily injury. Even the LAPD review board found that by firing without a clear background/backdrop, Garcia placed the officers at greater risk of injury and/or death than the perceived threat posed by Decedent, even if he had been armed with an actual knife and not a plastic fork. PAMF 110. When the evidence is viewed in the light most favorable to the Plaintiffs, including all reasonable inferences therefrom, Decedent did not pose an immediate or imminent threat of death or serious bodily injury at the time of the shooting. At a minimum, "there is a genuine dispute as to whether [Decedent] posed a significant threat to [the officers'] safety" because a trier of fact "could find in [Plaintiffs'] favor. *Nehad v. Browder*, 929 F.3d 1125, 1133 (9th Cir. 2019).

Defendants argue that Decedent posed a threat sufficient to justify the use of deadly force because he was "engaged in a physical struggle with Officer

1  Rodriguez" and "attacked [her]" all while armed with what reasonably appeared to

2  be a knife.  See Def.s' Mot. (Doc. 51-1) at 10:27-12:6.  However, Decedent only

3  pushed Rodriguez away from him as she stepped to the side and away from

4  Decedent in order to create space between them.  Further, Decedent never tried to

5  punch, kick or strike her, she was not physically injured and Rodriguez felt it was

6  appropriate to go hands-on with Decedent so she used her left hand to try to control

7  Decedent, along with Sergeant Punzalan who also went hands-on with Decedent

8  prior to the shooting.  Further, a rational jury could find that the white plastic fork

9  does not look anything like a knife because its color does not look like metal or

10 steel, there is no sharp edge or point on it, and no one ever yelled out "knife" or

11 "drop it" prior to the shooting.

### a.    Garcia's Credibility

12

13 "Summary judgment is not appropriate in § 1983 deadly force cases that turn

14 on the officer's credibility that is genuinely in doubt."  *Newmaker v. City of Fortuna*,

15 842 F.3d 1108, 1116 (9th Cir. 2016).  Here, Garcia never yelled out "knife" or "drop

16 it" prior to the shooting, despite claiming to see the object in Decedent's hand for

17 approximately 4 seconds and he never told anyone at the scene that he believed had

18 a knife.  Several hours later, however, after consulting with his attorney and

19 reviewing footage of the incident, Garcia claimed that he thought Decedent had a

20 knife and was going to stab Officer Rodriguez.  "These possible inconsistencies,

21 along with video, eyewitness, and expert evidence that belies [Garcia]'s claim[s] . . .

22 are sufficient to give rise to genuine doubts about Garcia's credibility."  *Nehad*, 929

23 F.3d at 1133.

### b.    The Reasonableness of Garcia's Beliefs

24

25 When "an officer's particular use of force is based on a mistake of fact," the

26 Court is to "ask whether a reasonable officer would have or should have accurately

27 perceived that fact."  *See Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir.

28 2011). "[W]hether the mistake was an honest one is not the concern, only whether it

was a reasonable one." *Id*. at 1127.  Here, Defendants argue that it was "reasonable for Garcia to perceive the object in [Decedent]'s hand as a knife."  Defs.' Mot. at 11.  "A reasonable trier of fact could, however, conclude that [Garcia]'s mistake was not reasonable." *Nehad*, 929 F.3d at 1134.  The material, shape and color of the white plastic fork do not look like a knife, and the fork handle does not have a point or a sharp edge.  Further, Garcia was "trained to recognize what suspects are carrying and to distinguish" items in a suspect's hands to determine if they are weapons or not. *Id*.; see also PAMF 117.  Further, Garcia "had very sufficient time to determine that it was not a knife in Decedent's hand" since he saw item in Decedent's hands for approximately four seconds continuously, Garcia "testified that the lighting in the [hallway] was well lit" which is "sufficient to enable an observer to identify the color [white] in the [fork], [and] taking into account the distance between [Garcia] and [Decedent]," which was approximately six feet. *Nehad*, 929 F.3d at 1134; see also PAMF 79, 101.  Plaintiffs' police practices expert, Jeff Noble, opines that a reasonable officer would not have perceived the object as a knife or a sharp-edged weapon. See Ex. P, Noble Decl. at ¶20. A rational jury could find that it was unreasonable for Garcia to perceive that the white plastic fork was a knife, or at minimum, "[w]hether [Garcia] reasonably mistook the [fork] for a knife is [] a triable question of fact." *Nehad*, 929 F.3d at 1134.

Even if it were established that Garcia reasonably believed Decedent was carrying a knife, or even if Garcia had actually been carrying a knife, Garcia's use of lethal force was not necessarily reasonable as a matter of law.  That a person is armed does not end the reasonableness inquiry.." *Nehad*, 929 F.3d at 1134, citing *Hayes v. County of San Diego*, 736 F.3d 1223, 1233 (9th Cir. 2013) ("[T]he mere fact that a suspect possesses a weapon does not justify deadly force.") (alteration in original).  Courts in this Circuit have often denied summary judgment in excessive force cases to police officers who use force against armed individuals. *Nehad*, 929 F.3d at 1134, citing *N.E.M. v. City of Salinas*, 761 F. App'x. 698, 699–700 (9th Cir.

2019) (affirming denial of summary judgment to officers who shot garden shear-wielding suspect when he turned toward officers less than nine feet away, after having swung shears at officers); see also *S.B. v. City of San Diego*, 864 F.3d 1010, 1014 (9th Cir. 2017) (finding triable issue where decedent was armed with a knife); *Hayes*, 736 F.3d at 1233–34 (same). Here, Decedent never raised the fork above his head and he never made a stabbing or slashing motions. Further, Decedent "did not say anything" and he walked towards the officers "at a relatively slow pace.". *Nehad*, 929 F.3d at 1134. Further, Plaintiffs' "expert [Jeff noble], explicitly opined that [Decedent] was not a lethal threat to" the officers. *Id*. (Internal quotations omitted).

### 3.    Whether Decedent was Resisting or Seeking to Evade Arrest

Here, "video of the incident clearly shows that [Decedent] made no attempt to flee from [Garcia]. *Id*. at 1137. Decedent did not fully obey the officers' commands to walk toward them while facing away from them; however, the officers gave no additional commands and never ordered him to drop the object in his hand as he slowly walked toward them. A reasonable jury could find that any resistance on Decedent's behalf was insufficient to justify the use of deadly force against him. "Thus, whether [Decedent] resisted arrest by ignoring [the officers'] commands is, at best, a disputed issue of fact." *Id*.

### 4.    Other Factors

The absence of a warning or order to halt prior to using force may suggest that the force was unreasonable. *Deorle*, 272 F.3d at 1283–84. Here, "there is evidence that…[Decedent] was walking toward [the officers] at a slow, steady pace," and that Garcia "never ordered [Decedent] to halt or to drop whatever he was carrying," and these facts "support a conclusion that [Garcia's] decision to shoot [Decedent] was unreasonable. *Nehad*, 929 F.3d at 1137. Garcia also never gave Decedent a verbal warning that deadly force would be used prior to firing. "A jury

1  could consider [Garcia's] failure to provide such a warning as evidence of objective

2  unreasonableness." *Id.* at 1138.

3      Another relevant factor is "the availability of alternative methods of capturing

4  or subduing a suspect. *Id.* (internal quotations and citations omitted).  Police are

5  required to consider what other tactics if any were available, and if there were clear,

6  reasonable and less intrusive alternatives to the force employed, that militates

7  against finding the use of force reasonable." *Glenn*, 673 F.3d at 876.  Here, Garcia

8  "carried a taser," pepper spray, and "a collapsible baton in addition to his firearm."

9  *Nehad*, 929 F.3d at 1138.  Additionally, there was a 40mm launcher, a beanbag

10 shotgun, and the officers, who outnumbered Decedent seven-to-one, could have

11 continued to go hands-on with Decedent.  The availability of numerous less-lethal

12 options militates against finding that the use of deadly force was reasonable.  *Glenn*,

13 673 F.3d at 876.  At a minimum, this is a "question of fact best resolved by a jury.

14 *Nehad*, 929 F.3d at 1138.

15      Another relevant factor is whether it should have been apparent to the officers

16 that the subject of the force used was mentally disturbed.  *Deorle,* 272 F.3d at 1282-

17 83 (holding that the governmental interest in using deadly force is diminished by the

18 fact that the officers are confronted, not with a person who has committed a serious

19 crime against others, but with a mentally ill individual.").  Here, it appeared to the

20 involved officers that Decedent was mentally ill—the incident occurred in the Skid

21 Row area, the reporting parties told the officers Decedent was acting very bizarre

22 including saying that the world was coming to an end, and the Decedent's

23 appearance and conduct suggested a mental health issue.  PAMF 70, 74. Based on

24 the above factors, a rational trier of fact could find that the use of deadly force was

25 unreasonable.

26

27

28

PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT

### B.    There Are Several Disputed Issues of Material Fact

There are several disputed issues of material fact and summary judgment should be denied on this ground alone. Fed. R. Civ. P. 56(a).  "The mere existence of video footage" does not foreclose a genuine factual dispute."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Here, it is disputed whether Garcia ever saw what he believed to be a knife in Decedent's hands.  Neither Garcia, nor any of the involved officers, ever yelled out "knife" or ordered Decedent to drop the item he was holding.  Garcia never told anyone at the scene that he believed that Decedent was holding a knife. The first time Garcia ever mentioned Decedent holding a knife was during his interview with investigators, which occurred after he had consulted with his attorney.  A reasonable jury could find that Garcia manufactured a belief that he saw a knife in Decedent's hand to justify an unlawful shooting, in an attempt to keep his job and avoid criminal charges.  Further, it is disputed whether it was reasonable to mistake the white plastic fork for a knife.  The color of the fork is not the color of metal or steel, the plastic material is inconsistent with a knife, the handle of the knife does not have a sharp edge or point to it, the hallway was well lit, the officers were close enough to Decedent to distinguish the item, and Decedent never raised the object above his head or made a stabbing motion with the object in his hand. Further, police officers have training in distinguishing items from weapons in suspect's hands.  A rational jury could find that it was unreasonable to mistake the white plastic fork as a knife.

Garcia's version of the shooting is also disputed by video of the incident.  For example, Garcia alleges he fired because Decedent raised the item he was holding above his head and was making a stabbing motion with the item in his hand coming down like he was stabbing Rodriguez, trying to kill her.  Ex. H, Garcia Int. at 29-32, 34-35, 37, 56-57.  Garcia claims that, at the time of the shooting, Decedent was in a fight with Rodriguez, touching and attacking her, including throwing hammer fist

type punches at the officer.  *Id*. at 31-32, 35-36 45.  Garcia also claims that Decedent grabbed Rodriguez and would not let go of her at the time of the shooting and that none of the other officers were going hands-on with Decedent when he fired.  *Id*. at 32, 34, 36, 45; Garcia Depo. at 69.  However, video of the incident (and several officers) confirms that Decedent never raised the item in his hand above his head or made a stabbing motion with it.  PAMF 102.  Further, Decedent never tried to fight with any of the officers, he never tried to punch or kick any of the officers, and Decedent only made minimal physical contact with Rodriguez when he pushed her away from him then turned clockwise away from her.  Decedent never grabbed any of the officers and both Rodriguez and Punzalan were going hands-on with Decedent at the time of the shooting.  Garcia's credibility on the central issues in the case—his purported reasons for using deadly force—is called dramatically into question by objective video evidence, and summary judgment should be denied on this ground alone.

### C.    *Garcia Is Not Entitled to Qualified Immunity*

Garcia is not entitled to qualified immunity because when the evidence is viewed in the light most favorable to Plaintiffs, including all reasonable inferences therefrom, the officers' use of deadly force was unreasonable and violated clearly established law. There are disputed issues of material fact which must be resolved by a jury, and resolving those disputes in Plaintiffs' favor, his use of deadly force against Decedent was obviously excessive.  The issue on this motion is not whether Garcia should be held liable for Decedent's death but to whom the Constitution and Federal Rules of Civil Procedure give the power to assess liability where genuine disputes of material fact exist.  The Seventh Amendment and Rule 56 assign that task to the jury, which has yet to hear this case, not to the Court.

Garcia would have the Court undercut the first of these *dual* purposes by reducing the second, "clearly established" qualified-immunity prong to such a particularized level that no case could proceed to jury trial without an exact match to

a Supreme Court or Circuit case previously decided, a "rigid gloss on the qualified immunity standard" that is "not consistent with [High Court] cases." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Accordingly, the second prong of the qualified immunity analysis—whether the law was clearly established at the time of the defendant officer's alleged misconduct— "does not require a case directly on point." *White v. Pauly*, 580 U.S. 73, 79 (2017) (citation modified). "'The salient question is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged conduct was unconstitutional.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Hope*, 536 U.S. at 741) (citation modified).

Although the Supreme Court directs that "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established," *Wilson v. Layne*, 526 U.S. 603, 615 (1999), "casting an allegedly violated right too particularly, 'would be to allow [the instant defendants], and future defendants, to define away all potential claims.'" *Gordon v. Cnty. of Orange (Gordon II)*, 6 F.4th 961, 969 (9th Cir. 2021) (quoting *Kelley v. Borg*, 60 F.3d 664, 667 (9th Cir. 1995)) (brackets in original). In defining the right at issue, the Court must "strike a balance between defining the right specifically enough that officers can fairly be said to be on notice that their conduct was forbidden, but with a sufficient measure of abstraction to avoid a regime under which rights are deemed clearly established only if the precise fact pattern has already been condemned." *Id*. (citation modified). Defining rights too specifically upsets this balance and undermines the competing interests underlying qualified immunity: balancing accountability when power is exercised irresponsibly with immunity to "insubstantial" and unfair lawsuits.

Here, long-established precedent provided Garcia with clear notice that it was unlawful to use deadly force against a person likely to be having a mental-health episode when there are numerous officers present, multiple less-intrusive options readily available and no immediate threat of death or serious bodily injury—even

1  where the suspect holds an object the officers could have subjectively perceived to

2  be dangerous if used as a weapon.

3      The Ninth Circuit's decision in *Nehad v. Browder* 929 F.3d 1125, 1136 (9th

4  Cir. 2019) is instructive.  In *Nehad*, a police officer fatally shot a suspect in the chest

5  who was holding a metallic blue pen.  *Id*. at 1131.  In *Nehad*, the shooting officer

6  never told anyone while at the scene that he believed the decedent was armed with a

7  weapon, and it was only until after meeting with his attorney and during his

8  interview with homicide investigators that the officer mentioned for the first time

9  that he believed the suspect was carrying a knife.  *Id*.  Here, just as in *Nehad*, the

10  suspect appeared "like he wasn't all there," he slowly walked towards the officer

11  while holding an object near his midsection, the officer did not hear the decedent

12  say anything, no warning was given, and there was evidence that the officer did not

13  say anything at all, including yelling out knife or drop it.  *Id*.  Further, the officer

14  shot within seconds of making contact with the suspect, the officer claimed to have

15  fired because he thought the suspect was going to stab an officer, the officer never

16  told anyone at the scene that he saw the suspect holding a knife, and it was only

17  after meeting with his lawyer that the officer mentioned for first time that he

18  believed the suspect was armed with knife.  *Id*.

19      The *Nehad* court held that "a rational trier of fact could find that [the

20  officer's] use of deadly force was objectively unreasonable.  *Id*. at 1139.

21  Accordingly, as of 2019, the *Nehad* case would have put Garcia on sufficient notice

22  that, under these circumstances, his use of deadly force violates Decedent's Fourth

23  Amendment rights.

24      The facts in this case are also factually similar to the facts in *Vos v. City of*

25  *Newport Beach*, 892 F.3d 1024 (9th Cir. 2018).  In *Vos*, the officers fatally shot an

26  individual, whom they believed may be possibly mentally unstable and was

27  advancing toward them while holding a metal object in his hand that the officers

28  believed to be scissors, but ended up being a "pronged metal display hook."  *Id*. at

-19-                              Case No. 2:24-cv-03265-MWC-SSC

PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT

1029-31.  The object was found right next to the suspect's body immediately after

the shooting and it was not a sharp-edged weapon.  In *Vos*, similar to the facts here,

the suspect appeared agitated, the suspect was saying strange things and screaming,

the officers believed the subject might be mentally unstable, the officers believed

the individual was holding an edged weapon which they claim was held over his

head as he charged at the officers and the officers outnumbered the decedent eight-

to-one.  *Id.*   Further, a tactical plan was formulated prior to the shooting which

called for the use of the 40mm, the 40mm was deployed, there were also additional

less lethal options like the taser, the less-lethal round was fired within seconds of the

gunshot, the decedent was shot within seconds of coming out of the room, no verbal

warning that deadly force would be used was given prior to the shooting, and six

"other officers appear to have been aware [that the suspect was mentally unstable]

and [were] prepared to respond accordingly by employing only non-lethal weapons"

and options.  *Id.* at 1034 (internal quotations and citations omitted).  Thus, in light of

*Vos*, all reasonable officers would have known that it was impermissible to use

deadly force under these circumstances. *See id.* at 1034–35; *see also Penny v. Azmy*,

No. 22-55572, 2024 WL 489287, at *2 (9th Cir. Feb. 8, 2024) ("The decision in *Vos*

confirms that as of 2018, a reasonable police officer would have understood that the

use of deadly force against a possibly mentally ill suspect when there were

numerous officers present, multiple less intrusive options readily available, and no

immediate threat of serious physical injury—even where the suspect held an object

that officers could have perceived to be dangerous if used as a weapon—was

excessive force and so a Fourth Amendment violation.") (citing *Vos*, 892 F.3d at

1034–35).

The Ninth Circuit's decision in *Bui v. San Francisco*, 61 F.Supp.3d 877 (N.D.

Cal 2014) is also instructive.  In *Bui*, the officers fatally shot a suspect holding an X-

Acto knife which was held up near the suspect's chest and was being waved in an

aggressive manner as he advanced down the hallway towards the officers.  *Id.* at

886-89, aff'd in part, rev'd in part and remanded by *Chien Van Bui v. Cty. and Cnty. of San Francisco*, 699 Fed.Appx. 614 (9th Cir. 2017) (mem.). In *Bui*, just as in this case, when the officers contacted the reporting parties, they did not appear distressed, the officers had information that the suspect was possibly mentally ill, the involved officers had less than lethal options such as pepper spray, batons and beanbag rounds. *Id.* Further, the involved officers ordered the suspect come out of the room and he did so holding what the officers believed to be knife, the suspect disobeyed the officers' commands, the suspect advanced down the hallway towards the officers by slowly walking towards them, the suspect initially had object down by side but eventually moved the object up near his chest and took a protective posture. Moreover, the officers fired without first giving a verbal warning, they fired from approximately six feet away from the suspect, the officers fired approximately fifteen seconds after making contact with the suspect, the officers allege that the suspect was close enough to stab the officer and the officers allege to have fired because they thought the suspect was going to stab or seriously injure someone. *Id.* The facts in *Bui* are very similar to the facts in this case and the *Bui* case would have put Garcia on notice as of 2014, that his use of deadly force under these circumstances was unlawful. The facts in *Bui* are actually even more egregious than the facts in this case because the suspect in *Bui* actually had a knife and the officers had information that he had actually stabbed someone prior to the shooting. *Id.*

As will always be the case, there are minor factual differences between these cases and the facts here. But those differences either were immaterial or show that Garcia's shooting of Decedent was even more egregious. "If qualified immunity provided a shield in all novel factual circumstances, officials would rarely, if ever, be held accountable for their unreasonable violations of the Fourth Amendment." *Mattos v. Agarano,* 661 F.3d 433, 442 (9th Cir. 2011) (en banc). "That result would not properly balance the competing goals to 'hold public officials accountable when

they exercise power irresponsibly and the need to shield officials from harassment,

distraction, and liability when they perform their duties reasonably.'" *Id.* (quoting

*Pearson*, 555 U.S. at 231).

Moreover, even setting aside the above precedents, in some circumstances, "a

general constitutional rule already identified in the decisional law may apply with

obvious clarity to the specific conduct in question, even though the very action in

question has [not] previously been held unlawful." *United States v. Lanier*, 520

U.S. 259, 271 (internal quotation marks omitted).  Viewing the facts in the light

most favorable to Plaintiffs, Garcia's use of deadly force against Decedent was

obviously excessive because Decedent was not armed with a knife or anything that

looks like a knife, the officers did not believe that he was holding a knife, Decedent

never held the object above his head or made a stabbing motion, no one gave

Decedent a command to drop it, no warning that deadly force would be used was

given, Decedent never verbally threatened anyone, Decedent never punched or

kicked anyone, the officers had information that Decedent maybe mentally ill, the

officers were already going hands on with Decedent prior to the shooting, Decedent

did not physically injure anyone, the officers outnumbered Decedent seven to one

and there were several less lethal options, including tasers, 40mm rounds, beanbag

rounds, OC spray and batons.  Here, this is an obvious case, where the unlawfulness

of Garcia's use of deadly force is sufficiently clear.

Defendants rely on *George v. Morris*, 736 F.3d 829 (9th Cir. 2013), and *Cruz

v Cty. of Anaheim,* 765 F.3d 1076 (9th Cir. 2014), to argue that Garcia is entitled to

qualified immunity.  However, neither of those cases establishes qualified

immunity.  *George denied* qualified immunity after officers shot a domestic-

violence suspect who was holding a shotgun but never pointed it at the officers.

*George*, 736 F.3d at 832-33, 840.  The circumstances here were far less threatening.

In *Cruz*, the officers received information regarding a wanted suspect's

location and that he was armed with a handgun in his waistband, prior to the

shooting. *Cruz*, 765 F.3d at 1077-78. When the officers attempted to execute a traffic stop on the suspect, he emerged from his vehicle, ignored the officers' commands and reached into his waistband and the officers responded by firing approximately twenty shots. *Id*. at 1078. No gun was found on the suspect's person, but a handgun was found nearby on the passenger seat. *Id*. The court in *Cruz* actually found that the officers' use of deadly force was not reasonable as a matter of law and that a jury must first determine if the suspect actually reached for his waistband. Just as the court did in *Cruz*, this Court should deny summary judgement and allow a jury to first resolve any disputed issues of material fact. At the time of the incident in 2024, case law in this Circuit clearly established that using deadly force under these circumstances would violate an individual's Fourth Amendment rights and therefore, Garcia is not entitled to qualified immunity.

### D. Garcia Violated Plaintiffs' Fourteenth Amendment Rights

Under the Fourteenth Amendment, "official conduct that 'shocks the conscience' in depriving [family members] of [a liberty interest in the companionship and society of a family member] is cognizable as a violation of due process." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). As the wife and parents of the decedent, Plaintiffs possess constitutionally protected liberty interests in the companionship and society of their husband and son, respectively. *Morales v. City of Delano*, 852 F. Supp. 2d 1253, 1273–74 (E.D. Cal. 2012) (finding that spouses and children possess a constitutional interest in familial companionship with their spouse and parents). "There are two tests used to decide whether officers' conduct shocks the conscience, turning "on whether the officers had time to deliberate their conduct." *Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022). "On one hand, the deliberate-indifference test applies if the situation at issue evolve[d] in a time frame that permits the officer to deliberate before acting." *Id*. "On the other hand, the purpose-to-harm test applies if the situation at issue escalate[d] so quickly that the officer [had to] make a snap judgment." *Id*.

Here, the involved officers had time to deliberate because they were at the scene for several minutes prior to the shooting, Decedent slowly walked towards the officers and Decedent was not armed with a knife or anything that resembled a knife or sharp edged weapon. At a minimum, there is a genuine dispute as to whether Garcia had time to deliberate and this issue should be resolved by a jury.  See *Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1168 (E.D. Cal. 2016) ("In the face of genuine disputes of material fact, the Court is not compelled to find which of the standards applies as a matter of law."); *Greer v. City of Hayward*, 229 F. Supp. 3d 1091, 1108 (N.D. Cal. 2017) ("Here, there is evidence to support both standards, and the determination should be left to the jury.").  Even if the trier of fact were to find the purpose to harm standard to be appropriate, based on Plaintiffs' facts, a reasonable jury could still find that Garcia's use of deadly force was unlawful, especially when the evidence is viewed in the light most favorable to Plaintiffs, including all reasonable inferences therefrom.

### E.    Plaintiffs' State Law Claims

Defendants' Motion for summary judgment should also be denied as to Plaintiffs' state law claims for battery, negligence and violation of the Bane Act. "[T]he same reasonableness standard" applied to state law battery by a police officer no longer matches the reasonableness standard used for Fourth Amendment excessive force claims. See Defs.' Mot. at 19:6-13.  Pursuant to California Penal Code section 835a (PC 835a), the standard now differs.  Officers are to use deadly force only when necessary in defense of human life and shall use other available resources and techniques if reasonably safe and feasible to do so.  Cal. Pen. Code § 835a(a)(2).  An officer is justified in using deadly force upon another person only when the officer reasonably believes that such force is necessary to defend against an imminent threat of death or serious bodily injury to the officer or to another person.  Cal. Pen. Code § 835a(c)(1)(A).  A threat of death or serious bodily injury is "imminent" when the subject has the present ability, opportunity, and apparent

1  intent to immediately cause death or serious bodily injury to the peace officer or

2  another person.  Cal. Pen. Code § 835a(e)(2).   An imminent harm is not merely a

3  fear of future harm, no matter how great the fear and no matter how great the

4  likelihood of the harm.  *Id*.

5       Here, a rational jury could find that Decedent lacked the ability, opportunity

6  and apparent intent to immediately cause death or serious bodily injury because he

7  was holding a plastic fork that does not resemble a knife or sharp-edged weapon, he

8  never verbally threatened anyone, he never raised the object above his head or made

9  stabbing motions, the officers greatly outnumbered Decedent, the officers were

10 already going hands-on with Decedent, no other officer fired and Decedent never

11 tried to punch or kick or physically injure anyone.

12      A police officer's pre-shooting conduct is taken into consideration as part of

13 the totality of the circumstances and police officers have a duty to act reasonably

14 when using deadly force.  *Hayes v. County of San Diego*, 57 Cal. 4th 622, 637

15 (2013).  Here, Garcia was negligent in his pre-shooting conduct, including not

16 recognizing that Decedent was not holding a knife or edged weapon, allegedly not

17 recognizing that Decedent may be suffering from a mental health crisis, not

18 requesting a Mental Health Evaluation Unit, deviating from the tactical plan, not

19 giving commands, including to drop it and not giving a verbal warning that deadly

20 force would be used.  Garcia was also negligent in his use of deadly force and not

21 having a clear foreground and background/backdrop when he fired.

22      As discussed *supra* at Section IV.A, a jury could find that Garcia violated

23 Decedent's constitutional rights by using excessive and unreasonable deadly force

24 against Decedent.  See *Williamson v. City of Nat'l City*, 23 F.4th 1146, 1155 (9th

25 Cir. 2022) (holding that the Bane Act requires proof of an underlying constitutional

26 violation).  A reasonable jury could also find that Garcia showed a "reckless

27 disregard" for Decedent's Fourth Amendment rights when he shot the Decedent,

28 who was apparently experiencing a mental health crisis, while he was holding a

-25-

white plastic fork that did not look like a knife or a sharp edged-weapon, without ever giving any commands to drop it or giving a verbal warning that deadly force would be used prior to shooting. *Reese v. County of Sacramento*, 888 F.3d 1030, 1045 (9th Cir. 2018) (holding that reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of their rights). Accordingly, the Court should deny summary judgment as to Plaintiffs' Bane Act claim.

**V.    CONCLUSION**

For the reasons above stated, the Court should deny Defendants' Motion for Summary Judgment.

Respectfully submitted,

DATED: December 23, 2025         THE LAW OFFICES OF DALE K. GALIPO

By:  /s/ Eric Valenzuela
Eric Valenzuela
Dale K. Galipo
Attorneys for Plaintiffs