# EXHIBIT K

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                      --oOo--

4

5  ALEXANDRA RASEY-SMITH;
   GORDON GENE MACCANI; and
6  JANET MACCANI,

7          Plaintiffs,

8  v.                              Case No.
                                   2:24-cv-03265-PSG-SSC
9
   CITY OF LOS ANGELES; CALEB
10 GARCIA ALAMILLA; and DOES
   2-10, inclusive,
11
           Defendants.
12 _____/

13

14

15          STENOGRAPHIC REPORTER'S TRANSCRIPT OF

16             VIDEO REMOTE DEPOSITION OF

17               CALEB GARCIA ALAMILLA

18            WEDNESDAY, NOVEMBER 5, 2025

19

20

21

22 Reported Stenographically by:

23 KIMBERLY D'URSO, CSR 11372, RPR

24 Job No.  21080

25

```
 1              (Reporter clarification.)

 2   BY MR. GALIPO:

 3        Q.    Once in a while there may be a glitch on your

 4   side or my side, so if I break up, just let me know, so

 5   I can repeat it.  If you do, don't take it personally.

 6   The court reporter just has to take all your words down.

 7   Okay?

 8        A.    Understood.

 9        Q.    Did you have different field training officers

10   during that time?

11        A.    Yes.

12        Q.    And did you have some instruction on tactics

13   and use of force during field training?

14        A.    I did.

15        Q.    Was part of field training to become familiar

16   with some of the LAPD written policies?

17        A.    Yes.

18        Q.    Did that include, for example, use of force

19   policies?

20        A.    Yes, it did.

21        Q.    When, approximately, did you finish your field

22   training?

23        A.    I was not able to finish my field training.

24        Q.    Okay.  Did this incident that we're here to

25   talk about happen during your field training?
```

1       A.    It did.

2       Q.    Do you recall the date of the incident?

3       A.    I do.

4       Q.    What was the date?

5       A.    February 3rd of 2024.

6       Q.    And can you remind me again when your field

7   training started?

8       A.    Approximately, a week after the academy ended,

9   in end of August.

10      Q.    How much longer did you have on your field

11  training, if you recall?

12      A.    Approximately, a day or two.

13      Q.    You were almost to the end?

14      A.    Yes.

15      Q.    Is it approximately six months?

16      A.    That is correct.

17      Q.    So I'm thinking if you started at the end of

18  August, would it go to like the end of February?

19      A.    Roughly mid-February, I believe.

20      Q.    At the time of this incident, did you have a

21  field training officer?

22      A.    I did, yes.

23      Q.    Who was your field training officer?

24      A.    Officer Chomuk.

25      Q.    Can you spell that last name for the court

Caleb Dannamilla

```
 1        Q.   Did you ever see any suspect with any weapon in
 2   their hands, other than a knife, during your field
 3   training?
 4        A.   Yes, I did.
 5        Q.   What other weapons?  Can you give me some
 6   examples?
 7        A.   For example, a pole.
 8             (Reporter clarification.)
 9   BY MR. GALIPO:
10        Q.   Anything else you can think of?
11        A.   Not at this time, no.
12        Q.   Were one of the commands you were trained to
13   give, if you have time and you see a suspect with a
14   weapon in their hand, to drop it or put it down?
15        A.   Yes.
16        Q.   In terms of your training on commands, were you
17   trained to try to give commands in a clear voice, if you
18   can?
19        A.   Yes.
20        Q.   Were you trained to give the individual an
21   opportunity to comply with your commands, if feasible?
22        A.   If time permitted, yes.
23        Q.   Were you trained on the concept of
24   de-escalation?
25        A.   Yes, I was.
```

1      Q.    You fired one shot in this incident; is that

2   correct?

3      A.    Correct.  Yes.

4      Q.    What type of weapon did you fire the shot from?

5      A.    From a handgun.

6      Q.    Do you know was it a 9-millimeter or something

7   else?

8      A.    It was a 9-millimeter.

9      Q.    Did you give any specific command to the person

10   you shot before you fired?

11      A.    I did not personally.

12      Q.    Did you give any verbal warning that you were

13   going to shoot?

14      A.    No.

15      Q.    What would you estimate your distance to be

16   from the person that you shot when you fired?

17      A.    Approximately, 6 feet.

18      Q.    What part of the person's body was exposed to

19   you at the time you fired your shot?

20      A.    His chest area.

21      Q.    Was he directly facing you, or was one of the

22   sides more to you?

23      A.    More one of the side towards me.

24      Q.    What side was more towards you?

25      A.    The right -- his right side of his body.

Caleb Garcia Jaramilla

1    Q.   When you fired, were you essentially aiming

2  center mass?

3    A.   Yes.  I was.

4    Q.   Were you aware, based on your training, that

5  shooting someone center mass was likely to cause serious

6  injury or possibly death?

7    A.   We're trained that whenever you shoot that that

8  is a potential that can happen, yes.

9    Q.   Did you have any other less-lethal weapons on

10 your belt; for example, a Taser, OC spray, a baton?

11   A.   I did, yes.

12   Q.   All three?

13   A.   Yes.

14   Q.   Had you ever used your baton in the field

15 before this incident?

16   A.   No.

17   Q.   Had you ever used a Taser in the field before

18 this incident?

19   A.   No.

20   Q.   Had you ever used pepper spray in the field

21 before this incident?

22   A.   No.

23   Q.   And I'm assuming you never fired -- you never

24 used deadly force before this incident; is that correct?

25   A.   Correct.

1    Q.   You indicated that you were not able to

2    complete field training after this incident; is that

3    correct?

4    A.   That is correct.

5    Q.   Do you still work for the LAPD?

6    A.   I do not, no.  No.

7    Q.   Are you currently employed?

8    A.   Yes.

9    Q.   Who do you work for?

10   A.   The Freeway Service Patrol.

11   Q.   Do you have an understanding as to why you were

12   unable to continue on as an LAPD officer?

13       MS. COLEMAN:  Vague.

14       You can answer, if you know.

15       (Reporter clarification.)

16       THE WITNESS:  I believe it was due to the

17   background and foreground of my shooting.

18   BY MR. GALIPO:

19   Q.   Do you know if you struck the person you were

20   shooting at?

21   A.   I did.

22   Q.   And were you aware that he had died before you

23   gave your statement?

24   A.   Which "statement"?

25   Q.   I'm sorry.  The interview to FID.

 1        A.    I did know at that point, yes.

 2        Q.    Were you aware before you gave your statement

 3   to FID that the object the individual had in his hand

 4   was a plastic fork?

 5        A.    I had an idea.

 6        Q.    And how did you have that "idea"?

 7        A.    Before I left the location where the shooting

 8   occurred, I saw on the -- well, I observed on the floor

 9   there was a plastic fork.  And I just speculated it was

10   white, that must have been what I saw initially in the

11   suspect's hands that was clenched when he was charging

12   at officers.

13            MR. GALIPO:  Okay.  I'm going to show you

14   Exhibit 1.  Leslie De Leon is a legal assistant from my

15   office and she's going to assist, I think, in just

16   putting up a few exhibits for us on share screen.

17            (Exhibit Number 1 was marked.)

18   BY MR. GALIPO:

19        Q.    Are you able to see that on your screen?

20        A.    No.

21        Q.    You can't see it at all, or it's too small?

22        A.    I don't see anything on the screen.

23        Q.    Okay.

24        A.    Okay.  I see it now.

25        Q.    Oh, you do?

1        A.    I do.

2        Q.    Okay.  Does that look to be the plastic fork

3    that you saw before you left the scene?

4        A.    Yes.

5        Q.    And you mentioned it was white in color?

6        A.    Correct.

7        Q.    And I take it the object that you saw in his

8    hand was also white?

9        A.    The object was white in color, yes.

10       Q.    So just putting two and two together, before

11   you left the scene, you were thinking that he possibly

12   was holding that white plastic fork?

13       A.    That's where I speculated that was what had

14   occurred.

15       Q.    Okay.

16           MR. GALIPO:   Thank you, Leslie.  You can take

17   that down.

18   BY MR. GALIPO:

19       Q.    So let's talk a little bit about the incident.

20   At some point, you hear a call that's related to the

21   incident; is that correct?

22       A.    Yes.

23       Q.    And when you heard the call, were you in a

24   patrol call or somewhere else, if you remember?

25       A.    In a patrol car.

Caleb Camilla

1    Q.   Do you recall who was driving the car?

2    A.   Yes.

3    Q.   Who was?

4    A.   I was.

5    Q.   And was your training officer a front seat

6    passenger?

7    A.   Correct.

8    Q.   So your training officer would have been

9    monitoring the mobile digital unit in the car, the

10   computer?

11   A.   Yes.

12   Q.   And you would have been more listening to the

13   radio dispatches; is that fair?

14   A.   Yes.

15   Q.   Have you listened to the radio dispatches

16   recently, the recordings, in preparation for the

17   deposition?

18   A.   Not in preparation, no.

19   Q.   Had you ever heard them previously?

20   A.   As in the call that the person reporting made,

21   or as in the call that dispatch gave to police officers?

22   Q.   The call that dispatch gave to police officers.

23   A.   Yes, I have.

24   Q.   Okay.  I take it you didn't hear the call from

25   the reporting party.  You would have heard what the

1    dispatcher communicated?

2        A.    Right.   Correct.

3        Q.    And what do you recall as far as the

4    information that was communicated by the dispatcher?

5        A.    That there was another unit requesting a backup

6    for a male or ADW suspect, assault with a deadly weapon,

7    and he was holding a stick, threatening people.

8        Q.    Okay.   And other information you recall, such

9    as the description of the suspect?

10       A.    Description was a male, White, approximately 6

11   foot.   That's what I recall from that.

12       Q.    Do you recall if there was any clothing

13   description?

14       A.    No, I don't.

15       Q.    Was there any age, for example, that was given?

16       A.    There was, but I don't remember what was put

17   out at that time.

18       Q.    Do you recall if there was any height or weight

19   or identifying features communicated?

20       A.    Yes.   The 6-foot male, White, would be a good

21   description.

22       Q.    Well, you would agree there's a lot of male

23   Whites that might be around that height?

24       A.    I agree, yes.

25       Q.    Okay.   I just didn't know, for example,

Caleb Del Camilla

1    sometimes the person's wearing a particular color outfit

2    or a hat or specific tattoos or something more.

3            Do you recall anything more specifically being

4    communicated?

5        A.    No, I don't.

6        Q.    And then you were -- it was communicated that

7    he had a stick?

8        A.    Right.

9        Q.    Any other information you can recall having

10   before getting to the scene, other than what you have

11   told me?

12       A.    No.

13       Q.    Did you know the name of the individual?

14       A.    Before the call, no.

15       Q.    Did you know if the person had any criminal

16   history at all?

17       A.    That would not be something I could determine

18   before -- beforehand.

19       Q.    Did you have any information that anyone had

20   been injured specifically before you got to the scene?

21       A.    There was none, no.

22       Q.    I'm assuming you had some information as to the

23   location?

24       A.    Yes.

25       Q.    And what was the location, generally?

Caleb Carrillo

1    Q.    You did lose me?

2    A.    I did.

3    Q.    Okay.  Were there some female officers on

4    scene?

5    A.    There was, yes.

6    Q.    And the two officers that you named, were

7    either or both of those female?

8    A.    They were.

9    Q.    Both female?

10   A.    Correct.

11   Q.    Okay.  You understood they were the primary

12   officers?

13   A.    I understood after the fact, not at the time.

14   Q.    Did you, yourself, hear any of the conversation

15   with the reporting party?

16   A.    Yes, I did.

17   Q.    How far were you from where the reporting party

18   was speaking?

19   A.    Maybe anywhere 6 to 10 feet.

20   Q.    What, if anything, did you overhear?

21   A.    I understood that there wasn't much of a crime

22   for the assault with a deadly weapon.  And ultimately,

23   that it would be -- if we arrested, it would just be for

24   a trespass.

25   Q.    And -- sorry.  Go ahead.

1    A.   They -- they wanted that trespass -- they

2    wanted him trespassed.  So at that point, we decided --

3    they decided that a private person's arrest was going to

4    be filled out.

5    Q.   When you say there "wasn't much information or

6    evidence of assault with a deadly weapon crime," what

7    did you hear that led you to that belief?

8    A.   They didn't give the elements.  They didn't

9    clearly define that he had actually assaulted them with

10   what they -- what was on the radio call.  So at that

11   point, it just changes to:  What's the crime that we can

12   find -- determine that's occurred?  And it wasn't -- it

13   didn't meet the elements at the time.

14   Q.   Okay.  So it sounded to you, based on the

15   information you had, that it was a possible trespass?

16   A.   After speaking with the PR, yes, after

17   overhearing the conversation.

18   Q.   And is it your understanding that is a

19   misdemeanor?

20   A.   Correct.

21   Q.   And is that why you had to go through this

22   citizen arrest procedure, potentially?

23   A.   Yes.

24   Q.   And is that why they were asked whether they

25   wanted to press charges on that crime?

1        A.    Correct.

2        Q.    Any other information you recall hearing from

3   the reporting parties, other than what you've already

4   told me?

5        A.    They gave a description of what he was wearing.

6        Q.    What do you recall about that description?

7        A.    Mainly blue pants.  Again, male, White,

8   approximately 6-foot tall, with a red beanie.

9        Q.    Okay.  And you, at some point, learned it was

10  on the 4th Floor?

11       A.    Yes, we did.

12       Q.    Do you have an estimate as to how many officers

13  were there during this time frame you were overhearing

14  some of the comments from the reporting party that you

15  saw?

16       A.    Including myself, I believe it was nine

17  officers in total.

18       Q.    And at some point, was it decided that you were

19  going to go up to the 4th Floor to try to make contact?

20       A.    Yes.

21       Q.    And can you tell me a little bit about the

22  tactical discussion before going to the 4th Floor?  Who

23  was primarily talking, and what was the basic plan, as

24  you understood it?

25            MS. COLEMAN:  Objection.  Compound.  Calls for

```
 1    a narrative.

 2            But you can answer.

 3            MR. FORD:  Join.

 4            THE WITNESS:  I understood that the designated

 5    cover officer, which is the lethal, he was -- I don't

 6    remember his name either.  But Sergeant Punzalan would be

 7    more the -- he kind of assigned the roles for everyone.

 8    My P3 or FTO, he was one of the less lethal.  And then

 9    one of the other female officers, she was the bean bag

10    shotgun.  And I was the arresting with another male

11    officer.

12    BY MR. GALIPO:

13        Q.   How many officers altogether went up to the 4th

14     Floor, initially?

15        A.   Seven.  I'm going to say approximately seven.

16        Q.   Okay.  So I'm just trying to -- I'm going to go

17     through with you basically the different individuals --

18     I realize some of their names you remember and some you

19     don't, and that's fine -- and what their roles were --

20        A.   Okay.

21        Q.   -- as you understood it.

22             Was one of them the sergeant?

23        A.   Yes.

24        Q.   And were there some, as you understood it, that

25     you were assigned lethal?
```

1          A.    Yes.

2          Q.    And if you know, was one person or more than

3    one person assigned to be lethal cover?

4          A.    Two.  Two officers.

5          Q.    Okay.  Do you know the names of either one of

6    those officers or whether they were male or female?

7          A.    Yes.  One male, one female.

8          Q.    Okay.  Who was the male officer assigned

9    lethal?

10         A.    My apologies.  I misunderstood the question.

11         Q.    Oh.

12         A.    I believe --

13         Q.    That's okay.

14         A.    Uh-huh.

15         Q.    Go ahead and explain.

16         A.    The lethal officer was the one in the very

17   front of the team that was going in to take the suspect

18   into custody.

19         Q.    Okay.  And who was that person?

20         A.    I don't remember his name.

21         Q.    But it was a male?

22         A.    Correct.

23         Q.    And you -- and I know sometimes they refer to

24   it as a "stick," in other words, he was towards the

25   front.  Am I getting that; correct?

1        A.    Yes.

2        Q.    And you understood that the -- this male person

3   at the front was assigned lethal cover?

4        A.    Correct.

5        Q.    And your understanding of that, based on your

6   training, is that if lethal force is necessary, that

7   person is designated lethal?

8        A.    If the -- if the situation arises, yes.

9        Q.    And then were some officers designated less

10  lethal, if you know?

11       A.    Yes.

12       Q.    And I think you've told me this to some extent.

13  Was one officer assigned the bean bag shotgun?

14       A.    Yes.

15       Q.    Who was that, if you know?

16       A.    I believe her name is Desiree.

17       Q.    And was an officer assigned for the

18  40-millimeter, if you know?

19       A.    Yes.  My P3.

20       Q.    Your training officer?

21       A.    Right.

22       Q.    Did you know anyone -- any other officers that

23  were assigned less lethal or lethal, other than what you

24  have told me so far?

25       A.    No.

Caleb Camilla

 1    Q.   Do you know, for example, if anyone was

 2   designated to be assigned to the Taser?

 3    A.   No, nobody was assigned.

 4    Q.   And you were assigned to the arrest team or the

 5   hands-on team; is that correct?

 6    A.   Yes.

 7    Q.   And you would have been more towards the back

 8   of the line as you were proceeding forward on the 4th

 9   Floor?

10    A.   Correct.

11    Q.   Who else was assigned to the arrest team with

12   you?

13    A.   I believe his name is Gabriel.

14    Q.   To your knowledge, did all of the officers that

15   were approaching on the 7th [sic] Floor, including

16   yourself, have firearms on them?

17    A.   Yes.

18    Q.   Not necessarily out, but at least in their

19   holsters?

20    A.   Yes.

21    Q.   And to your knowledge, did some of the officers

22   also have Tasers?

23    A.   Some.  Yes.

24    Q.   And you did have a Taser?

25    A.   I did.

Caleb Gartenlaub Camilla

1    Q.   Okay.  Do you recall in your -- strike that.

2         Do you recall giving an estimate in this matter

3    that you were about 8 feet from the suspect when you

4    fired your shot?

5    A.   Yes.

6    Q.   And do you recall having training that 8 feet

7    is within the trained distance that a Taser can be used

8    in the probe mode?

9         MS. COLEMAN:  Assumes facts.  May call for

10   speculation.

11        You can answer, if you know.

12        THE WITNESS:  I -- I don't recall.  Like I

13   said, I'd have to look at some documents to give you a

14   better ans- -- a good answer.

15   BY MR. GALIPO:

16   Q.   Okay.  Did you have -- and this is prior to

17   going to the 4th Floor.  Did you have any information

18   from any source that the suspect had a gun?

19   A.   There was none.

20   Q.   Did you have any information from any source

21   prior to going to the 4th Floor that the suspect had a

22   knife?

23   A.   No.

24   Q.   Did you have any information from any source as

25   to whether the suspect was homeless or not, before going

```
1          A.    I am, yes.

2          Q.    Do you recognize this just by looking at the

3    clothing as the individual that you shot?

4          A.    That's him, yes.

5          Q.    And you can see, at least in this image, him

6    with his back towards the camera?

7          A.    At this time in the incident, yes.

8          Q.    And his hands up?

9          A.    Right.

10         Q.    Did you actually see this, though -- did you

11   see this individual in this position, or when you first

12   saw him, was it sometime after this?

13         A.    It was slightly after this.

14         Q.    Okay.

15         A.    But pretty close to the same image that I saw.

16         Q.    What we're looking at here in Exhibit 2?

17         A.    Yes.

18         Q.    Did you see any knife in his hands or any

19   object in his hands when he had his back to you with his

20   hands up?

21         A.    No, not at that time.

22         Q.    Did you hear any other officer reference that

23   he had a knife?

24         A.    I didn't hear that, no.

25         Q.    Did you hear any other officers say, "Drop it,"
```

1    or words to that effect?

2        A.    No.

3            MR. GALIPO:    And then could we look at Exhibit

4    3, please.

5            (Exhibit Number 3 was marked.)

6    BY MR. GALIPO:

7        Q.    Are you able to see this on your screen?

8        A.    Yes.

9        Q.    At some point, did he turn in the direction of

10    the officers with his hands up?

11        A.    I don't understand.

12        Q.    Did you see him at some point facing the

13    officers with his hands up?

14        A.    No.

15        Q.    So this image we're looking at, Exhibit 3, you

16    don't recall seeing him in this position; is that what

17    you're saying?

18        A.    I can't remember.

19            MR. GALIPO:    Can you we look at Exhibit 4,

20    please.

21            (Exhibit Number 4 was marked.)

22    BY MR. GALIPO:

23        Q.    Do you recall him at some point walking or

24    moving in the direction of the officers?

25        A.    I do.

Caleb Darris Camilla

```
 1        Q.    And in looking at  Exhibit 4 , were you observing
 2   him when he was approaching the officers?
 3        A.    I was, yes.
 4        Q.    As he was approaching the officers, did any of
 5   the officers indicate or say that he had a knife?
 6        A.    No.
 7        Q.    Did any of the officers tell him to "Drop it,"
 8   or words to that effect?
 9        A.    No.
10        Q.    At some point, did you hear less lethal being
11   deployed?
12        A.    I did.
13        Q.    And what less lethal did you hear being
14   deployed?
15        A.    The 40-millimeter.
16        Q.    How could you tell it was a 40-millimeter
17   instead of a bean bag round or lethal round?
18        A.    Well, that's -- now after reviewing everything,
19   I know that it was the 40-millimeter.
20        Q.    Did you know it was the 40-millimeter at the
21   time?
22        A.    Yes.
23        Q.    And how did you know that?
24        A.    I saw my field training officer step out to the
25   side and he fired one round.
```

1        Q.    Do you have an understanding as to who fired

2   those now?

3        A.    Yes, I do.

4        Q.    What is your understanding?

5        A.    I understand Officer Desiree fired two bean bag

6   shots at the suspect.

7        Q.    Did you hear something being fired after that

8   initial 40-millimeter, before you fired?

9        A.    I did, yes.

10       Q.    And did you hear -- with what you heard, was

11  that consistent with bean bag rounds, in your mind?

12       A.    It's very difficult to determine what loud bang

13  is -- belongs to what firearm or what less-lethal

14  munition.

15       Q.    Okay.  But is it fair to say you knew that

16  there was a 40-millimeter and a bean bag round; you knew

17  those assignments existed?

18       A.    Correct.

19       Q.    And in what you heard, did they at least sound

20  like less lethal to you?

21       A.    Like I said, it's difficult to -- to say.

22       Q.    Did you think that lethal rounds were being

23  fired?

24       A.    I -- I know it was a possibility.

25       Q.    Do you know where the person that was firing

1  bean bag rounds was in relation to you?

2       A.   I did not, no.

3       Q.   And how far was Mr. Maccani from you when you

4  heard the bean bag rounds?

5       A.   I'm not -- a best estimate would be 10 feet.

6       Q.   Did you ever hear Mr. Maccani verbally threaten

7  to harm anyone?

8       A.   Not a verbal threat, no.

9       Q.   Did you hear Mr. Maccani use any profanity?

10       A.   I did not, no.

11       Q.   Up to the time you heard the less lethal being

12  fired at Mr. Maccani, did you hear anyone say he had a

13  knife?

14       A.   I did not hear that, no.

15       Q.   Did you ever yell out, "He has a knife"?

16       A.   I did not.

17       Q.   Did you hear anyone say, "Drop it" at any time

18  prior to the less lethal being fired?

19       A.   No, I didn't.

20       Q.   Could you tell or did you have an impression as

21  to whether the bean bag rounds struck Mr. Maccani?

22       A.   No, I wasn't sure.

23            MR. GALIPO:   Okay.   We've been going about

24  slightly over an hour.   Is this a good time for everyone

25  to take a ten-minute break?

```
 1              MS. COLEMAN:  Sure.

 2              THE VIDEOGRAPHER:  Okay.  Going off record at

 3   11:06 a.m.

 4              (Break taken.)

 5              THE VIDEOGRAPHER:  We're back on record at

 6   11:22 a.m.

 7   BY MR. GALIPO:

 8       Q.   Okay.  So I think I asked you this, but when --

 9    before you went to the 4th Floor when you were

10    overhearing some of the PR's comments, did they ever

11    mention that the suspect had any weapons?

12              MS. COLEMAN:  Objection.  Do you mean the "PR"

13   or the "RP"?

14              MR. GALIPO:  Oh, the RP.  I sometimes call it

15   the "person reporting," the "reporting party."  I'm good

16   either way.

17   BY MR. GALIPO:

18       Q.   What do you refer to the person as?  The PR or

19    the RP?

20       A.   The PR.

21       Q.   Okay.  So we'll stick with PR.

22              MR. GALIPO:  I get mixed sometimes, Susan.

23   BY MR. GALIPO:

24       Q.   But the PR, when you overheard some of the

25    comments from the PR, did you ever hear the PR say that
```

Caleb Darré Jumilla

1    the individual had a weapon of any kind?

2         A.    No.  They kind tip-toed around the question.

3         Q.    Okay.  So -- okay.  So we're back to where we

4    were.  It sounds like -- well, let me verify.

5               When you first saw the individual, Mr. Maccani,

6    was he stationary or moving?

7         A.    Stationary.

8         Q.    Was he facing you, or did he have his back

9    towards you?

10        A.    His back was initially towards me.

11        Q.    Did you see him at some point with his back

12   towards you with his hands up?

13        A.    When I first saw him, yes.

14        Q.    And what would you estimate your distance to be

15   from him at that time?

16        A.    Approximately, 12 feet.

17        Q.    What were the lighting conditions like in that

18   hallway?

19        A.    They were well-lit.

20        Q.    And I take it, given your age, to your

21   knowledge, you have pretty good eyesight.

22        A.    I do.

23        Q.    Did you ever see Mr. Maccani at the time

24   wearing a red hat?

25        A.    I did, yes.

Caleb Garcia Zamilla

1     A.    Just one.

2     Q.    And which hand did you see over his head?

3     A.    The one holding the -- what looked like to be a

4  knife, the right hand.

5     Q.    It was the right hand?

6     A.    Yes.

7     Q.    And how -- did you see the right hand over

8  Mr. Maccani's head before or after you heard the

9  40-millimeter deployed?

10     A.    It was after.

11     Q.    And did you see Mr. Maccani's right hand over

12  his head before or after you heard the bean bag rounds

13  being deployed?

14     A.    In between.

15     Q.    In between the two bean bag rounds, or in

16  between the 40-millimeter and the bean bag rounds?

17     A.    In between the 40 and the bean bag.

18     Q.    How far were you from Mr. Maccani when you saw

19  his right hand over his head?

20     A.    Approximately, 6 feet.

21     Q.    How much time would you estimate passed from

22  you hearing the last bean bag round to you firing your

23  shot?

24     A.    Approximately, a second or two.

25     Q.    This item or object you saw --

Caleb Cruz Ramilla

```
 1              MR. GALIPO:  Thank you.  We can take that down,
 2     please.
 3   BY MR. GALIPO:
 4        Q.   This item or object that you saw in
 5     Mr. Maccani's right hand, what color was it?
 6        A.   White.
 7        Q.   Had how much of it could you see?
 8        A.   I would estimate 2 to 3 inches.
 9        Q.   Did you ever see any steel color or metal
10     color?
11        A.   No.
12        Q.   Did you ever see a sharp point to this object?
13        A.   The entire object itself appeared to be a
14     pointed, sharp-edged object.
15        Q.   Did you actually see a sharp point at the end
16     of the object?
17        A.   As in --
18        Q.   You know -- like, for example, you know how a
19     knife sometimes at the end has a sharp point at the end?
20        A.   Right.  Right.  That was not something that was
21     easily determined with so many moving parts.  People --
22     officers moving.  The suspect himself, his actions.
23     He's moving.  It's very difficult to determine whether
24     or not a small, 2-inch object was pointed or not.
25        Q.   Okay.  So is it fair to say that you could not
```

Caleb Cartagmilla

1   tell one way or the other whether it was pointed?

2       A.   I could tell it was edged.

3       Q.   What do you mean by that?

4       A.   That there was edges to it, giving me reason to

5   believe that it was a sharp object, whether or not there

6   was a point to it.

7       Q.   Okay.  Let me just try to explore this a little

8   bit so I'm understanding.

9            You're saying you don't recall seeing an actual

10  point to it.  Is that part correct?

11      A.   What I'm saying is that it's not easy to

12  determine that.  From what I remember, it looked like a

13  knife.

14      Q.   I'm just wondering whether you remember seeing

15  a point to it at the end?

16           MS. COLEMAN:  Asked and answered.

17           MR. GALIPO:  You may answer.

18           THE WITNESS:  I don't remember.

19  BY MR. GALIPO:

20      Q.   And are you saying that you saw 2 inches of it

21  or 2 or 3, or what's your best estimate?

22      A.   Approximately, 2 to 3.

23      Q.   I might have asked this.  If I did, I

24  apologize.  But did it appear to you that Mr. Maccani

25  was struck by the bean bag rounds?

```
 1              MR. FORD:  Misstates testimony.  Join.
 2   BY MR. GALIPO:
 3        Q.   You may answer.
 4        A.   I never -- I didn't think that.
 5        Q.   You didn't think what?
 6        A.   To answer your question, I didn't think that he
 7   was going to kill someone without a knife.  I didn't --
 8   that's not something I thought about.
 9        Q.   So when you fired your shot, your
10   understanding, there was how many officers there
11   altogether?  Would it be seven, including you?
12        A.   Right.  Yes.
13        Q.   And to your knowledge, are you the only one
14   that used deadly force?
15        A.   Yes.
16        Q.   And I think you've already told me this, but
17   you didn't give any commands or any verbal warning?  Is
18   that accurate?
19              MS. COLEMAN:  Asked and answered.  Vague as to
20   time.
21              (Simultaneous speakers.)
22              (Reporter clarification.)
23              THE WITNESS:  Could you ask the question again?
24   BY MR. GALIPO:
25        Q.   Sure.  At any time before you shot, did you
```

Caleb Dariramilla

```
 1    different objects, for example, distinguishing objects

 2    in people's hands from handguns, for example?

 3        A.   We were trained to determine if a suspect had

 4    things -- weapons in their hands, yes.

 5        Q.   Like, for example, were you taught that you

 6    know, sometimes people carry car keys or cell phones in

 7    their hands, and you need to be careful to distinguish

 8    those from handguns?

 9        A.   Yes.

10        Q.   Were you taught that sometimes people have

11    other items in their hands, other than knives, for

12    example?

13        A.   Yes.

14        Q.   And were you trained to try to distinguish

15    other items from actual weapons?

16            MS. COLEMAN:  Asked and answered.

17            THE WITNESS:  Yes.

18    BY MR. GALIPO:

19        Q.   When you saw Mr. Maccani, did you think he was

20    potentially homeless?

21        A.   Yes.

22        Q.   Did you think he was a transient?

23            MS. COLEMAN:  Objection.  Vague and relevance.

24            MR. GALIPO:  You may answer.

25            THE WITNESS:  It would be difficult to
```

Caleb Garciamilla

```
 1   determine where he resides.  Overall, though, it appeared
 2   he was unhoused.
 3   BY MR. GALIPO:
 4       Q.   Did you form the impression that he might have
 5    a mental illness?
 6       A.   I couldn't know that, no.
 7       Q.   Do you know now that your bullet also struck
 8    another officer?
 9       A.   I do.
10       Q.   And do you know where you struck that other
11    officer, what part of his body?
12       A.   Yes, I do.
13       Q.   Who was the officer again that you struck?
14       A.   Sergeant Punzalan.
15       Q.   And what part of his body did you strike?
16       A.   He was struck in the webbing between his index
17    finger and his thumb.
18       Q.   Do you know if that was from the right hand or
19    the left hand?
20       A.   His right hand.  He sustained a graze from the
21    bullet.
22       Q.   When you fired your shot at Mr. Maccani, did
23    you have the impression you struck him?
24       A.   I did.
25       Q.   And what did you observe that gave you that
```

```
 1    strike that.
 2            Did Officer Desiree fire some bean bag rounds,
 3    if you know?
 4        A.   Yes.
 5        Q.   And those were the two rounds you spoke about
 6    earlier?
 7        A.   Correct.
 8        Q.   And I think you indicated that you fired
 9    about -- was it one or two seconds after the bean bag
10    rounds?
11        A.   Yes.
12        Q.   So this attack on Officer Desiree, would it be
13    occurring before or after or during her bean bag rounds?
14        A.   It would be after.
15        Q.   After her two bean bag rounds?
16        A.   Yes.
17            MR. GALIPO:  Can we look at Exhibit 13, please.
18            (Exhibit Number 13 was marked.)
19    BY MR. GALIPO:
20        Q.   Can you see this on your screen?
21        A.   I can, yes.
22        Q.   And are you able to see Officer Desiree in this
23    image?
24        A.   Yes.
25        Q.   And is she the one that's pointing the bean bag
```

1    shotgun in the direction of Mr. Maccani?

2        A.    She is.

3        Q.    And then is this the sergeant that we see here?

4        A.    Yes.

5        Q.    And Mr. Maccani?

6        A.    Correct.

7        Q.    And you believe this would be after you shot

8    him?

9        A.    This is after, yes.

10        Q.    Other than the wound to the sergeant's hand

11    from your gunshot, did you see any visible injuries on

12    any of the other officers?

13        A.    No.

14             MR. GALIPO:   Can we look at Exhibit 14, please.

15             (Exhibit Number 14 was marked.)

16    BY MR. GALIPO:

17        Q.    Are you able to see this on your screen?

18        A.    I am.

19        Q.    And this again is the sergeant and Mr. Maccani

20    after you fired the shot?

21        A.    Correct.

22             MR. GALIPO:   Exhibit 15, please.

23             (Exhibit Number 15 was marked.)

24    BY MR. GALIPO:

25        Q.    At some point, was Mr. Maccani put up against a

```
 1                   MR. GALIPO:  And then Exhibit 17, please.
 2                   (Exhibit Number 17 was marked.)
 3    BY MR. GALIPO:
 4        Q.   Again, this shows another image of the sergeant
 5    holding Mr. Maccani against the wall after Mr. Maccani
 6    was shot?
 7        A.   Yes.
 8                   MR. GALIPO:  And finally, Exhibit 18, please.
 9                   (Exhibit Number 18 was marked.)
10    BY MR. GALIPO:
11        Q.   And this would have been after Mr. Maccani was
12    taken to the ground?
13        A.   Right.
14        Q.   Was he handcuffed, if you know?
15        A.   During this, at some point he was handcuffed.
16        Q.   Do you know who handcuffed him?
17        A.   I believe it was Officer Jauregui.
18                   MR. GALIPO:  We can take that down.  Okay.
19                   Could we possibly, Leslie, put Exhibit 1 back
20    up?
21    BY MR. GALIPO:
22        Q.   Are you able to see this on your screen?
23        A.   I am.
24        Q.   When did you see the white plastic fork after
25    the shooting?
```

1           A.    Right before I left the scene.

2           Q.    And you indicated that you saw a portion of

3     this item in Mr. Maccani's right hand?

4           A.    Right.

5           Q.    What portion, just looking at it, do you think

6     was sticking out of his right hand?  Because you

7     mentioned, I think, 2 or 3 inches.

8           A.    Right.  The -- the handle portion was sticking

9     out.  That was the visible portion of it.

10          Q.    Okay.  So as we're looking at this photograph,

11    it would be the portion on the left side?

12          A.    Yes.

13          Q.    How long did you stay at the scene after the

14    shooting, on the 4th Floor?

15          A.    I -- I don't have a good recollection of that.

16          Q.    Okay.

17                MR. GALIPO:  We can take that down, Leslie.

18    Thank you.

19    BY MR. GALIPO:

20          Q.    You obviously saw blood on Mr. Maccani at some

21    point?

22          A.    Yes, I did.

23          Q.    Initially, you thought it may be his arm, but

24    at some point, you realized it was his chest?

25          A.    Right.

Caleb Garcia Zamilla

```
 1              MR. GALIPO:  Some point after the shooting.
 2              THE WITNESS:  Something to the effect, yes.
 3   BY MR. GALIPO:
 4       Q.   Did you ever -- could you ever make out any
 5    words he was saying after the shooting?
 6       A.   I didn't hear any words from him.
 7       Q.   Did you see Mr. Maccani in physical contact
 8    with anyone at the time you fired?
 9       A.   Yes.
10       Q.   Who was he in physical contact with?
11       A.   Officer Desiree.
12       Q.   And what part of her body was he in physical
13   contact with, if you know?
14       A.   Her arm, chest area, roughly.
15       Q.   And what part of Mr. Maccani's body was in
16   physical contact with that part of Officer Desiree?
17       A.   Well, his hands and body, he -- it was sort of
18   a body slam that he did on Officer Desiree.
19       Q.   Did he take her down to the ground?
20       A.   No, he did not.
21       Q.   At the time you fired your shot, could you see
22   the white object?
23       A.   No.
24       Q.   When was the last time you saw the white object
25    before firing?
```

Caleb Darittmamilla

1    A.    When he was slamming into the other officer.

2    Q.    Which other officer?

3    A.    Officer Desiree.

4    Q.    You -- you -- in your interview -- you said

5    that you reviewed that recently?

6    A.    Right.

7    Q.    Do you recall mentioning several times in your

8    interview talking about "transients and homeless

9    people"?

10    A.    I do.

11    Q.    And do you recall stating that:  "Transients

12    and homeless people sometimes could have weapons"?

13    A.    Sure.

14    Q.    And do you recall saying:  "Transients and

15    homeless people sometimes have mental health issues"?

16    A.    Yes.

17    Q.    And you're saying that your impression at the

18    time is that Mr. Maccani may have been "unhoused"; I

19    think that's the term you used?

20    A.    His appearance gave that impression.

21    Q.    And when you say, "unhoused," I think I know

22    what you mean, but what are you trying to communicate?

23    A.    Not having a address, either renting or -- or

24    living at a residential area.  It could be living on

25    the -- on the street.

1    Q.    And do you know when it was turned off,

2  approximately, after the shooting?

3    A.    As in time, how much time elapsed?

4    Q.    Yeah.  How much time, approximately?

5    A.    I would say eight minutes.

6    Q.    Did someone tell you to turn it off at some

7  point?

8    A.    Yes.

9    Q.    And who was it?  Was that a supervisor?

10    A.    Correct.

11    Q.    Do you think -- if you recall, did you turn it

12  off after the shooting while you were still on the 4th

13  Floor or after you went down?

14    A.    I believe I was still on the 4th Floor.

15    Q.    And at some point before you left the 4th

16  Floor, you're saying that you saw that white plastic

17  fork?

18    A.    Yes.

19    Q.    Did you see -- so you would have seen the white

20  plastic fork before you gave your public safety

21  statement?

22    A.    Right.

23    Q.    And then after going downstairs, giving your

24  public safety statement, where did you go next?

25    A.    Back to Central Division.

1        A.    There was no time.

2        Q.    And where was this white object the last time

3    you saw it?

4        A.    In his -- clenched in his right hand.

5        Q.    And where was his right hand the last time you

6    saw it, before you fired?

7        A.    It was on -- in between -- somewhere in between

8    him and the -- Officer Desiree's body.

9        Q.    Could you actually see his right hand at that

10   time, or was his body blocking it?

11       A.    His -- a better description would be his body

12   was blocking.

13       Q.    So for how long before you fired was his right

14   hand out of your view?

15       A.    Less than a second.

16       Q.    Prior to his right hand going out of your view,

17   before you fired, did you ever see him make a stabbing

18   motion with that white object?

19       A.    No, not necessarily.

20             (Reporter clarification.)

21   BY MR. GALIPO:

22       Q.    I think you said, "No, not necessarily."  Is

23   that accurate?

24       A.    Yes.

25       Q.    So would you at least agree that you did not

1    see Mr. Maccani make a stabbing motion with the white

2    object before you fired?

3         A.    Right.

4         Q.    And would you also agree that you could not see

5    the white object at the moment you fired because it went

6    out of your view shortly before that?

7         A.    Right.

8         Q.    In terms of your training at the academy and

9    during field training as a law enforcement officer, were

10   you trained to control fear, when you can, and not

11   overreact?

12            MS. COLEMAN:  Objection.  Compound and vague.

13            MR. FORD:  Join.  Incomplete hypothetical.

14   BY MR. GALIPO:

15        Q.    Do you recall that training at the academy in

16   the POST chapters you were going over?

17        A.    I don't re- -- remember.

18        Q.    In terms of deadly force, were you trained that

19   deadly force should only be used if there's an immediate

20   or imminent threat of death or serious bodily injury?

21        A.    Yes.

22        Q.    And were you trained that deadly force should

23   only be used when there are no other reasonable options?

24        A.    That's accurate.

25        Q.    And were you trained in terms of the imminent

Caleb Cartmilla

1    or immediate threat of death or serious bodily injury,

2    there has to be an ability, an opportunity, and apparent

3    intent to immediately cause death or serious bodily

4    injury?

5        A.   Yes, I've been trained on that.

6        Q.   And you understand, based on that training,

7    there has to be all three of those:  the ability,

8    opportunity, and apparent intent?

9        A.   Right.

10       Q.   Were you trained that subjective fear is

11   insufficient to use deadly force?

12       A.   Right.

13       Q.   And were you trained that a verbal warning that

14   you're going to use deadly force, potentially, should be

15   given, when feasible?

16       A.   Yes.

17       Q.   Were you trained that seeing a weapon in

18   someone's hand, that fact alone, is not enough to use

19   deadly force; there has to be more?

20       A.   Correct.

21           MS. COLEMAN:  Objection.  Asked and answered.

22           (Reporter clarification.)

23   BY MR. GALIPO:

24       Q.   And I think you've already told me this

25   earlier, but you were trained to give commands, when

1    feasible, and give the person an opportunity to comply

2     with the commands, when feasible?

3            MS. COLEMAN:  Asked and answered.

4    BY MR. GALIPO:

5        Q.   Is that correct?

6        A.   When feasible, correct.  Yes.

7        Q.   For how long, altogether, do you think you saw

8     this white object before you fired?

9            MS. COLEMAN:  Calls for speculation.

10           THE WITNESS:  Approximately, three -- three to

11   four seconds.

12   BY MR. GALIPO:

13       Q.   Were you looking at this white object

14    continually from the time you first saw it to the time

15    it went out of your view, before you fired?

16       A.   Yes.

17       Q.   And you were aware that all the other officers

18    there had handguns on them?

19       A.   Yes.

20       Q.   And obviously with deadly force, you're also

21    trained to make sure your background and foreground is

22    clear?

23       A.   We are, yes.

24       Q.   Does LAPD, during your training, still train on

25    the reverence for human life?

```
 1        A.   It does.
 2        Q.   Does it still train that deadly force should be
 3   a last resort?
 4        A.   I'm no longer at the department, so I wouldn't
 5   it know what their newest directive is.
 6        Q.   When you were there, did they train on that
 7   being a last resort?
 8        A.   Yes.
 9             MR. GALIPO:  Okay.  I don't think I have any
10   more questions.  I don't know if the other attorneys
11   have any questions, so we're going to find out.
12             Ty, do you have any questions today?
13             MR. FORD:  No.
14             MR. GALIPO:  Susan, any questions today?
15             MS. COLEMAN:  No.
16             MR. GALIPO:  Kimberly --
17             (Simultaneous speakers.)
18             MR. GALIPO:  I'm sorry.
19             THE VIDEOGRAPHER:  I'm sorry.
20             I was going to say, Kimberly, if you wanted to
21   get copy orders on record?
22             THE CERTIFIED STENOGRAPHER:  Yes.
23             Ms. Coleman, are you ordering a copy?
24             MS. COLEMAN:  Yes.
25             THE CERTIFIED STENOGRAPHER:  Mr. Ford, are you
```

```
 1   STATE OF CALIFORNIA)
                        ) ss:
 2   COUNTY OF BUTTE    )

 3            I, KIMBERLY E. D'URSO, do hereby certify:
 4

 5            That the witness named in the foregoing

 6   deposition was present remotely and duly sworn to testify

 7   to the truth in the within-entitled action on the day and

 8   date and at the time and place therein specified;

 9            That the testimony of said witness was reported

10   by me in shorthand and was thereafter transcribed through

11   computer-aided transcription;

12            That the foregoing constitutes a full, true and

13   correct transcript of said deposition and of the

14   proceedings which took place;

15            Further, that if the foregoing pertains to the

16   original transcript of a deposition in a federal case,

17   before completion of the proceedings, review of the

18   transcript [ ] was [ ] was not requested.

19            That I am a certified stenographic reporter and

20   a disinterested person to the said action;

21            IN WITNESS WHEREOF, I have hereunder subscribed

22   my hand this 17th day of November, 2025.

23   _____

24   KIMBERLY D'URSO, CSR NO. 11372, RPR

25
```