# EXHIBIT L

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                      --oOo--

4

5    ALEXANDRA RASEY-SMITH;
     GORDON GENE MACCANI; and
6    JANET MACCANI,

7          Plaintiffs,

8    v.                              Case No.
                                     2:24-cv-03265-PSG-SSC
9
     CITY OF LOS ANGELES; CALEB
10   GARCIA ALAMILLA; and DOES
     2-10, inclusive,
11
          Defendants.
12   _____/

13

14

15        STENOGRAPHIC REPORTER'S TRANSCRIPT OF

16              REMOTE DEPOSITION OF

17                 COLLIN CHOMUK

18           MONDAY, NOVEMBER 10, 2025

19

20

21

22   Reported Stenographically by:

23   KIMBERLY D'URSO, CSR 11372, RPR

24   Job No.  21082

25

1    Q.   Okay.  And so Deputy Garcia -- strike that --

2    Officer Garcia was driving?

3    A.   Yes, sir.

4    Q.   Okay.  And did you receive radio communication

5    regarding this incident?

6    A.   Yes, sir.

7    Q.   Did you also receive information from your

8    onboard computer in the cruiser?

9    A.   Yes, sir.

10    Q.   Okay.  So you would be getting the information

11    both from the radio and from the computer; is that

12    correct?

13    A.   Yes, sir.

14    Q.   And do you recall, generally, what was the

15    nature of the dispatch or the information you received?

16    A.   Yes, sir.

17    Q.   And what was it?

18    A.   It was that there was an assault with a deadly

19    weapon suspect there now -- an individual described as a

20    male, White, approximately 6'2 -- was inside of a unit,

21    carrying a large stick, assaulting people.

22    Q.   Okay.  Did the 911 call indicate that anybody

23    had been injured?

24    A.   It did not.

25    Q.   Okay.  Did the 911 call indicate that the

1    individual had a gun or a knife?

2        A.    No.

3        Q.    Did the 911 call indicate that the individual

4    had verbally threatened anybody?

5        A.    No.

6        Q.    Okay.  Was part of the call a trespass call?

7        A.    That's not how it was broadcast, but there were

8    elements of trespass.

9        Q.    Okay.  And what part of town was the incident

10   occurring in?

11       A.    It was on 7th Street and Towne, in an area

12   known as Skid Row.

13       Q.    Okay.  Have you responded to calls in Skid Row

14   in the past, before the date of this incident?

15       A.    Yes, sir.

16       Q.    And in your experience in responding to calls

17   in Skid Row, is there a lot of mentally ill people in

18   that area?

19       A.    Yes, sir.

20       Q.    A lot of drug use in that area?

21       A.    Yes, sir.

22       Q.    Okay.  Did the radio communication about the

23   call or the incident indicate or identify who the

24   individual was?

25       A.    By name or?

1    A.    In regards to this particular incident, no.

2    Q.    Okay.  So you grabbed your 40-millimeter,

3  knowing if a tactical plan is formed, you would at least

4  have a less-lethal option?

5    A.    Yes, sir.

6    Q.    Okay.  And did you think, at least for you, it

7  was important to have a less-lethal option if a tactical

8  plan was formulated?

9    A.    Yes, sir.

10    Q.    Okay.  Do you have other weapons on you, like a

11  regular handgun?  A Taser?  Not in your cruiser, but on

12  your person?

13    A.    Yes, sir.

14    Q.    Can you please tell me what other items you

15  would have?

16    A.    A pistol.  Also have a Taser.  OC or pepper

17  spray.

18    Q.    Do you have a baton?

19    A.    I did not have my baton at the time of the

20  incident.  It was -- it was in the vehicle.

21    Q.    Okay.  And was the reason you grabbed your

22  40-millimeter, at least in part, because of the nature

23  of the call?

24    A.    Yes.

25    Q.    Okay.  And at some point, you said you entered

1      Q.    Okay.  Did you see the reporting parties?

2      A.    I did.

3      Q.    Was it two young Hispanic guys?

4      A.    Yes, sir.

5      Q.    Okay.  Did you see any physical injuries on

6  either of them?

7      A.    I did not.

8      Q.    Okay.  Did you hear the reporting parties

9  indicate -- go ahead.

10          Did you hear the reporting parties indicate

11  whether or not the decedent had any weapons on his

12  person?

13     A.    They said that he could have access to scissors

14  and sharp objects.

15     Q.    Okay.  So they said there are scissors or sharp

16  objects in their store or their unit?

17     A.    Yes, sir.

18     Q.    Okay.  But did they ever specifically say

19  whether or not he had them in his hands or on his

20  person?

21     A.    Just based off the comments of the call with

22  the stick and the scissors, they said that he did not

23  have scissors or any sharp objects on his person, that

24  they observed.

25     Q.    Okay.  But they told you that they observed him

1          A.    No.

2          Q.    Okay.  So the less-lethal options would be the

3    40-millimeter and the bean bag; correct?

4          A.    Yes, sir.

5          Q.    Okay.  But you at least had a Taser on you;

6    correct?

7          A.    Yes, sir.

8          Q.    And you also had your handgun or your pistol?

9          A.    Yes, sir.

10         Q.    Okay.  At some point when you approached this

11   warehouse space that you -- or -- strike that.

12               Let me ask you a little bit about your training

13   with regards to tactical plans.  Did you receive

14   training at the academy with regards to tactical plans?

15   Formulating them?  Following them?  Things of that

16   nature?

17         A.    Yes, sir.

18         Q.    Okay.  And are you trained on the importance of

19   both formulating tactical plans and following them?

20         A.    Yes, sir.

21         Q.    And is part of the reasons for the importance

22   in the tactical plan is to protect the safety of both

23   the officers and the suspect being arrested?

24         A.    Yes, sir.

25         Q.    Okay.  Part of it is a safety issue.  Would you

1    agree?

2        A.    Yes, sir.

3        Q.    And -- I'm sorry.  My allergies are killing me.

4    So I'm sneezing and sounding stuffed up during this

5    thing...

6              So at some point you locate the decedent when

7    you're approaching the warehouse space; correct?

8        A.    Yes.

9        Q.    And you -- a tactical plan has been formulated.

10   And you already told me about the different roles in the

11   tactical plan; correct?

12       A.    Yes, sir.

13       Q.    And when you're approaching this location, are

14   you kind of in the front of the stack, because of your

15   less-lethal weapon?

16       A.    Yes, sir.

17       Q.    Okay.  And the hands-on or the arresting would

18   probably be further back in the stack; is that correct?

19       A.    I don't recall.  I was looking forward.

20       Q.    Are you the far-most forward officer in the

21   stack?

22       A.    I am not.

23       Q.    Would it be -- who would be in front of you, if

24   recall?

25       A.    It would be the contact or the -- the lethal

1      Q.    Okay.  And did he match the description that

2   you were given?

3      A.    Yes.

4      Q.    Okay.  And when you first see him, are you

5   looking at his front?  His back?  His side?  What part

6   of his body would you be looking at?

7      A.    The front of his body.

8      Q.    And do you recall what he was wearing?

9      A.    He -- the biggest thing, he had a beanie on.

10      Q.    Okay.  Other than a beanie, do you recall any

11   other articles of clothing he had?

12      A.    Shirt, pants.  Nothing oddly specific.

13      Q.    Okay.  When you first saw him, was there

14   anything about his appearance that -- strike that.

15           When you first saw him, was there anything

16   about his appearance and/or behavior that led you to

17   think this person might be mentally ill or under the

18   influence of drugs?

19      A.    Yes.

20      Q.    And what was that?

21      A.    He was almost like, fidgety.  Possibly --

22   like -- that's the only way I can really describe it.

23   Like, possibly -- he was fidgety and appeared

24   disheveled.

25      Q.    And that led you to believe this person

1    potentially could be mentally ill and/or under the

2    influence of drugs?

3        A.    That, combined with the totality of the radio

4    call, the area, my training and experiences, the

5    statements that were made by the -- the person's

6    reporting.

7        Q.    Do you recall the statements made by the person

8    reporting, including that the decedent said words to the

9    effect that it was "the end of the world, where

10    "everything was coming to an end"?  Something along

11    those lines?

12        A.    No, sir.

13        Q.    You don't recall that?

14        A.    I -- I don't recall hearing that.  I don't

15    believe I heard that.

16        Q.    All right.  When you first see the decedent, do

17    you see a weapon on him?

18        A.    I saw what I believed to be a screwdriver that

19    he was holding.

20        Q.    What hand -- do you recall if that was in the

21    right or the left hand?

22        A.    It was in the right hand.

23        Q.    Okay.  And where was his hand in relation to

24    his body when you first saw it?

25        A.    When I first saw him, they were down at his

1      Q.   Okay.  At some point, does he begin approaching

2  the direction of the officers while facing them?

3      A.   Yes.

4      Q.   And is he still holding this white -- what you

5  believe to be a screwdriver?

6      A.   Yes.

7      Q.   Did you ever see him with it above his head?

8      A.   Initially, yes, when he put his hand above his

9  head.

10      Q.   Was that when he was still turned around, with

11  his back towards you?

12      A.   Yes.

13      Q.   Okay.  Did you ever see him with it above his

14  head when he was facing towards you, in your direction?

15      A.   No.

16      Q.   Did you ever see him make, like, a stabbing or

17  a slashing motion with this screwdriver in his hand?

18      A.   Yes.

19      Q.   You did see that?

20      A.   Yes.

21      Q.   And when did that occur in the sequence of

22  events?

23      A.   It was after -- it was after I used a

24  40-millimeter on him.

25      Q.   So at some point you use a 40-millimeter?

1          A.    Yes, sir.

2          Q.    How many rounds did you fire from the

3     40-millimeter?

4          A.    One.

5          Q.    Okay.  Did that round appear to strike him?

6          A.    It did.

7          Q.    Okay.  And what part of his body did it appear

8     to strike him?

9          A.    His abdomen.

10         Q.    Okay.  And then at some point after that, are

11    some bean bag rounds fired?

12         A.    Yes.

13         Q.    Okay.  And did -- did you, yourself -- sorry if

14    I asked this.

15              Did you, yourself, give a verbal warning before

16    shooting the 40-millimeter at him?

17         A.    I was not able to, due to how quickly it

18    happened.

19         Q.    Generally, are you trained to give a verbal

20    warning before firing the 40-millimeter, when feasible?

21         A.    The policy states to give the officers -- to do

22    it, when feasible, or based on the tactical situation.

23         Q.    Okay.  And did you ever hear a verbal warning

24    given prior to the bean bags being fired?

25         A.    No.

```
 1   passed between your 40-millimeter and you hearing the
 2   first bean bag round?
 3       A.   It could not have been more than a second.
 4       Q.   Okay.  And then at some point after -- are the
 5   two bean bag rounds also in rapid succession?
 6       A.   No.
 7       Q.   How much time would you estimate between the
 8   two bean bag round deployments?
 9       A.   Probably five seconds.
10       Q.   Okay.  And then after that, do you hear a -- a
11   gunshot?
12       A.   Yes.
13       Q.   How long after the second bean round -- bean
14   bag round do you hear the gunshot?
15       A.   Probably within the next five seconds.
16       Q.   Within the next five seconds.  And I understand
17   these are just estimates and you're not staring at a
18   watch or anything.
19       A.   Uh-huh.
20       Q.   Just so you know, that.  Okay.
21            And initially, decedent has his back towards
22   you, walking towards the officers, but he then turns
23   around; correct?
24       A.   Yes.
25       Q.   And then he begins walking towards the area of
```

1    the officers?

2         A.    Yes.

3         Q.    Was he still walking at that point, or how

4    would you describe the gait or the pace that he was

5    moving?

6         A.    He was walking.

7         Q.    Okay.  And then at some point, you fire the

8    bean bag -- I mean -- strike that.

9              At some point you fire the 40-millimeter;

10   correct?

11        A.    Yes, sir.

12        Q.    Do you have an estimate as to how far away you

13   were from him when you fired your 40-millimeter?

14        A.    Ten feet.

15        Q.    You were ten feet away?

16        A.    Yes, sir.

17        Q.    Okay.  And then after you fire yours, does he

18   continue to walk in the area towards the officers?

19        A.    Yes.

20        Q.    And then at some point, one bean bag round is

21   deployed; correct?

22        A.    Yes, sir.

23        Q.    And then you said it was some seconds later

24   that a second bean bag round is deployed; correct?

25        A.    Yes, sir.

1     Q.   And during that time, does he continue to walk

2  towards the direction of the officers?

3     A.   Yes, sir.

4     Q.   Okay.  And I might have asked this, and I'm

5  sorry if I did.  Did you ever hear the decedent verbally

6  threaten any of the officers?

7     A.   No.

8     Q.   Okay.  Did you ever see the decedent try to

9  punch anyone?

10     A.   Punching, no.

11     Q.   Did you ever see him try to kick anyone?

12     A.   No.

13     Q.   Or strike anyone?

14     A.   I mean, when you say "strike," he grabbed an

15  officer's bean bag and slammed her to the wall, if that

16  class- -- fortifies as a strike.

17     Q.   Okay.  So you saw him grab the bean bag

18  shotgun?

19     A.   Yes.

20     Q.   Was this after both rounds had been shot?

21     A.   To my recollection, yes.

22     Q.   At some point -- what part of the shotgun did

23  he grab?

24     A.   He grabbed the -- the -- the barrel of the

25  shotgun.

1    Q.   Do you have an estimate as to how long he was

2  physically touching that for, before he let go of it?

3    A.   I'm sorry?  One more time.

4    Q.   Yeah.  How long was he touching the barrel of

5  the shotgun before he was no longer physically

6  touching -- how much time would you say that was?

7    A.   A few seconds.

8    Q.   At some point, does he let go of the barrel of

9  the shotgun?

10    A.   Yes.

11    Q.   And does he let go of the barrel of the shotgun

12  prior to you hearing that gunshot?

13    A.   Yes.

14    Q.   In other words, he wasn't grabbing the barrel

15  of the shotgun at the time you heard the gunshot?

16    A.   No.

17    Q.   Was that -- okay.

18        At some point, do you see the officers ever go

19  physically hands-on with the decedent?

20    A.   Yes.

21    Q.   Okay.  And is it one officer or more than one

22  officer that you see do that?

23    A.   I primarily saw one officer.

24    Q.   And which officer was that?

25    A.   That was Sergeant Punzalan.

1    Q.   Okay.  That was the Sergeant?

2    A.   Yes, sir.

3    Q.   Do you ever see -- you indicated that you saw a

4    female -- that he -- what did you say?  When he grabbed

5    the barrel of the shotgun, he pushed the female up

6    against the wall?  Could you say that part again?

7    A.   Yes, sir.  He grabbed the shotgun and pressed

8    or -- he slammed the -- the female officer against the

9    wall.

10   Q.   Did you have ever see the decedent get slammed

11   up against the wall?

12   A.   I did.

13   Q.   Was that after the female officer got slammed

14   against the wall?

15   A.   Yes.

16   Q.   Okay.  And is there, like, some metal or a

17   metal gate as part of the wall?

18   A.   Yes, sir.

19   Q.   Okay.  And did you see the decedent get slammed

20   up against this metal wall before that gunshot?

21   A.   It was -- it was all fast.  I'm sorry.  Can you

22   repeat the question?

23   Q.   Sure.  What I'm trying to get at is, did the

24   slamming of the decedent up against the metal wall occur

25   before or after the gunshots or during the gunshot?

1         A.    It was during.

2         Q.    Okay.  So as he's getting slammed up against

3    the wall, you hear the gunshot?

4         A.    From my recollection, yes.

5         Q.    Okay.  And when you hear that gunshot, is

6    any -- are any of the officers physically touching the

7    decedent when you hear the gunshot?

8         A.    I believe Sergeant Punzalan was.

9         Q.    Okay.  And do you recall what part of the

10   decedent's body Sergeant Punzalan was touching when you

11   heard the gunshot?

12        A.    I believe it was his chest area.

13        Q.    Okay.  Did you ever see Punzalan having his

14   hand on decedent's back area around the time of the

15   gunshot?

16        A.    I -- I don't recall.

17        Q.    Okay.  How about on decedent's arm around the

18   time of the gunshot?  Did you see Punzalan in that area?

19        A.    I -- I don't recall.

20        Q.    Did you hear -- strike that.

21              Do you know did you know who fired the gunshot

22   at that moment?

23        A.    I did not.

24        Q.    Did you hear any of the officers give a verbal

25   warning before that gunshot was fired?

1    A.    No.

2    Q.    With regards to the two bean bag rounds that

3  were fired, did those appear to strike the decedent?

4    A.    Yes.

5    Q.    Okay.  And I think you said Punzalan was

6  physically touching the decedent when you heard the

7  gunshot; correct?

8    A.    Yes.

9    Q.    Was the decedent physically touching anybody

10 when you heard that gunshot?

11   A.    I don't recall.

12   Q.    Okay.  After hearing the gunshot, do you see

13 the decedent taken down to the ground?

14   A.    Yes.

15   Q.    Do they attempt to handcuff him?

16   A.    Yes.

17   Q.    You didn't take part in this, did you?

18   A.    I did.

19   Q.    You were part of the handcuffing?

20   A.    Yes, sir.

21   Q.    Okay.  Did you place the cuffs behind his back?

22   A.    I brought both of his hands together and cuffed

23 them behind his back, yes.

24   Q.    Okay.  So at some point after that, is medical

25 aid given to the decedent?

1        A.    Yes.

2        Q.    Okay.  Did the decedent appear to have been

3    struck by the gunshot?

4        A.    Yes.

5        Q.    While you're handcuffing the decedent, do you

6    hear him making any noises?

7        A.    Just grunting.  Just grunting noises.

8        Q.    He -- did he appear to you to still be alive

9    when you're hearing these grunting noises?

10       A.    Yes, sir.

11       Q.    You didn't hear him say any actual words?

12       A.    No.

13       Q.    Okay.  And then at some point, were you part of

14   the medical aid also provided?

15       A.    I was not.

16       Q.    Okay.  Did you do a pat-down of the decedent?

17       A.    I did not.

18       Q.    Okay.  At some point after the incident, do you

19   see a white fork on the ground?

20       A.    I do.

21       Q.    Okay.  How long after the decedent was

22   handcuffed did you observe the fork?

23       A.    Several minutes.

24       Q.    It was several minutes after you cuffed him

25   that then you saw the fork?

1      A.    To my recollection, yes, sir.

2      Q.    Have you seen your body cam from the date of

3  the incident?

4      A.    Yes, sir.

5      Q.    Do you recall yourself mentioning a screw

6  driver, "Where's the screw driver," or words to that

7  effect?

8      A.    Yes.

9      Q.    Do you recall, I believe, Officer Quintero

10  pointing you to the fork and saying, "I think it was the

11  fork" or "the fork he had," or words to that effect?

12      A.    I do.

13      Q.    When you saw that fork on the ground, did that

14  look at least consistent with what the decedent had in

15  his hand earlier?

16      A.    Yes.

17      Q.    Okay.  Do you hear a, "Shots fired" call go out

18  after the shooting?

19      A.    I broadcasted, yes.

20      Q.    Okay.  Did you also request medical?

21      A.    So I -- no.  That was done by a -- a

22  supervisor.

23      Q.    Okay.  You did the, "Shots fired" broadcast,

24  but a different supervisor did the request for medical?

25      A.    I broadcasted, "Officer needs help," which is

1        A.    Yes.

2        Q.    Okay.   Other than the fork on the ground, did

3   you ever see any other weapon around?

4        A.    No, sir.

5        Q.    Did you see any blood on or around the decedent

6   after the shooting?

7        A.    Yes.

8        Q.    At some point, like, do the paramedics arrive,

9   or the fire department?

10       A.    Yes.

11       Q.    Are you still there when that happens?

12       A.    I was still there -- I believe I was still

13   there when the -- when -- I -- I don't recall.

14       Q.    Okay.   At some point you leave; you just don't

15   recall if the fire department or ambulance had arrived

16   at that point?  Is that fair?

17       A.    Correct.

18       Q.    Okay.   Were you able to distinguish the sounds

19   from the bean bag and the live gunfire?

20       A.    Yes, sir.

21       Q.    Does the bean bag sound different than your

22   40-millimeter round?

23       A.    The bean -- yes.

24       Q.    Like, is yours louder or the other one is?

25             MR. FORD:  Calls for speculation.

1    called, like, the "MEU"?

2         A.   We do, sir.

3         Q.   Is that made up of, like, a police officer and,

4    like, a mental health professional?

5         A.   Yes, sir.

6         Q.   Okay.  What was that unit ever requested during

7    this incident?

8         A.   No.

9              MR. VALENZUELA:  You want to take around a

10   five-minute break or so?

11             Ty, I don't have much left.  I'm going to go

12   over a couple points from his interview and maybe show

13   him his video, but we should be done pretty quick.

14             MR. FORD:  All right.  Very well.  Off the

15   record.

16             (Break taken.)

17   BY MR. VALENZUELA:

18        Q.   And you indicated you were assigned the

19   40-millimeter as part of the tactical plan; correct?

20        A.   Yes, sir.

21        Q.   And at least you, yourself, did not deviate

22   from the tactical plan prior to the gunshot being fired;

23   correct?

24        A.   No, sir.  I did not.

25        Q.   After the shooting, did you hear Officer Garcia

1    say that he had fired?

2        A.    Yes.

3        Q.    How long after the gunshot did he say that he's

4    the one that fired?

5        A.    Approximately, eight seconds.

6        Q.    Okay.  Shortly after.

7            Did you ask out loud, "Hey, who fired?"

8        A.    Yes.

9        Q.    And then he responded?

10       A.    Yes.

11       Q.    Okay.  When you fired your 40-millimeter, did

12   you make sure that you had a clear backdrop?

13       A.    Yes.

14       Q.    Is that part of your training, to make sure you

15   have a clear backdrop before you fire even a less

16   lethal, like a 40-millimeter?

17       A.    Yes.

18       Q.    Okay.  Let me ask you a little bit about the

19   training, with regards to the 40-millimeter.

20           You have training, obviously, with regards to

21   it; correct?

22       A.    Yes.

23       Q.    And what kind of conduct does a suspect have to

24   be displaying in order to use the 40-millimeter against

25   them?  In other words, is it assaultive conduct?

1    A.   It's if there's an imminent threat of -- of

2  danger or serious bodily injury.

3    Q.   Is that the same for the use of deadly force?

4    A.   Deadly force is -- no.

5    Q.   What's the training with regards to the use of

6  deadly force?  Is it to justify the use of deadly force,

7  there needs to be an immediate or imminent threat of

8  death or serious bodily injury?

9    A.   Yes.

10   Q.   With regards to the 40-millimeter or the bean

11  bag, it's like a lower level of resistance, isn't it?

12  Isn't it like assaultive intent to harm conduct?

13   A.   Yes.

14   Q.   Okay.

15   A.   And there -- that was the policy at the time of

16  the incident.  However, there have been changes to the

17  policy since; but, yes, those -- those are also -- it

18  still remains the same.

19   Q.   Okay.  So just to clarify, what was the policy

20  at the time of the incident with regards to -- are the

21  40-millimeter and the bean bag kind of the same

22  immediate use of force category?

23   A.   Yes, same immediate use of force category.

24   Q.   So what was the policy with regards to the

25  level of resistive behavior that a suspect must display

1   to justify the use of the bean bag or the 40-millimeter?

2       A.   Violently resisting or posing threat of injury.

3       Q.   And that's conduct that's lower than the

4   conduct for the use of deadly force; correct?

5       A.   Correct.

6       Q.   The use of deadly force has a higher standard,

7   which is immediate or imminent threat of death or

8   serious bodily injury?  Would you agree?

9       A.   Yes, sir.

10      Q.   And at least -- sorry.

11           At least based on what you observed, you

12  thought it was appropriate to shoot with the

13  40-millimeter; correct?

14      A.   Yes, sir.

15      Q.   Okay.  I'm going to ask you just a couple

16  things about your interview.  Okay?  And if you need

17  me -- do you have a copy of your interview in front of

18  you?

19      A.   Yes.  I'm opening to it right now, sir.

20      Q.   Okay.  And while we're waiting, let me just

21  show you something, just so I can put it on the record.

22           This is -- I'm not going to attach it, but this

23  has been identified as Defendant's 2504.  I just want to

24  see if this is your video or not.  So one second.

25           Can you see my screen share?

1        A.    Yes, sir.

2              (Video being played.)

3    BY MR. VALENZUELA:

4        Q.    Does that appear to be your body-worn camera?

5        A.    Yes, sir.

6        Q.    You've seen this video before; correct?

7        A.    Yes, sir.

8        Q.    All right.  Okay.  So going back to your

9    interview, does it appear you gave it on 2/4/24?

10       A.    Yes, sir.

11       Q.    That would have been the day after the

12   incident; correct?

13       A.    Yes, sir.

14       Q.    And you only gave one interview; correct?

15       A.    Correct.  Yes, sir.

16       Q.    Okay.  Your interview was not voluntarily

17   given.  Would you agree?

18       A.    Yes, sir.

19       Q.    Okay.  And I'm looking at page 11, if it'll

20   help refresh your recollection.  You make a reference to

21   "discussing mental illness during the roll call."  Do

22   you see that on page 11?

23       A.    I -- I noticed that.

24       Q.    So what were you describing there?  During the

25   roll call, what about mental illness was discussed?  And

1    this is the roll call the morning the date of the

2    incident; correct?

3       A.   Yes, sir.  I'm just finding that specific

4    section.

5       Q.   Sure.

6       A.   So I can --

7            (Pause.)

8            THE WITNESS:  You said this is page 11, sir?

9    BY MR. VALENZUELA:

10      Q.   Yeah.  I have it marked as page 11.  Is it on

11   there, or maybe I might be looking at some --

12           (Simultaneous speakers.)

13      A.   Oh, yes.  I see that, sir.  Give me just a

14   moment to make sure I'm --

15      Q.   Sure.  Read it to yourself and whenever you're

16   ready.

17           (Pause.)

18           THE WITNESS:  Okay.  Sorry, sir.

19   BY MR. VALENZUELA:

20      Q.   So what were you describing with regards to

21   mental illness and the roll call the morning of the

22   incident?

23      A.   We -- in roll call each day, we have roll call

24   training, which the probationary officers talk about

25   best practices, tactics, and departmental policy.  One

1    of the frequent things, as you mentioned earlier, is

2    individuals who either are under the influence or

3    suffering from mental health.  Just ways to deal with --

4    deal with radio calls to get the most effective and

5    safest outcome.

6         So things such as if someone's experiencing a

7    mental health crisis, having multiple people yelling

8    different directions and whatnot, can become -- can

9    become confusing to them, or when multiple people are

10   saying different things, they could not know which

11   person to listen to, or which person to react to and

12   comply with.

13        So speaking clearly -- speaking clearly,

14   giving, you know, precise directions.  Also, to having

15   multiple less-lethal options, such the 40-millimeter and

16   the bean bag.  I believe that's what I'm speaking of in

17   this interview, sir.

18   Q.   Okay.  And I'm looking at page 15.  You make a

19   reference to, "Skid Row and mental illness," again "not

20   giving multiple commands."  Do you see that?

21   A.   Give me just a moment to find this.

22        Yes.

23   Q.   And did you think you may be dealing with the

24   mentally ill person, in part, because of the nature of

25   the call and the location of the area?

1        A.    Yes, sir.

2        Q.    And is that what you were trying to describe

3   right there?

4        A.    Yes, sir.

5        Q.    Okay.  Let me show you one other video.  This

6   is Defendant's 2513.

7              (Video being played.)

8   BY MR. VALENZUELA:

9        Q.    Do you see this video?

10       A.    Yes, sir.

11       Q.    Okay.  Where are you -- let me back it up a

12   little bit.  Where are you in this stack?  Is this you

13   right here?

14       A.    Yes, sir, with the green sling.

15       Q.    Okay.  So where my cursor is right here, that's

16   you?

17       A.    Yes.  Yes, sir.

18       Q.    Like you said, with the green sling on.  Okay.

19             While you were at the scene and you heard that

20   gunshot, did you have a cross-fire concern?

21       A.    Yes.

22       Q.    Did you yell out something about having --

23   being concerned about potential cross-fire?

24       A.    Yes, sir.

25       Q.    What is "cross-fire"?

 1    A.    "Cross-fire" is -- it deals with the

 2  background, the foreground, the position where the

 3  weapon is pointed, and the potential for multiple -- for

 4  other people, other than the intended target, could be

 5  struck by gunfire.

 6    Q.    And is that part of the training, that it's

 7  important to have a clear backdrop or background before

 8  you fire, whether it's a lethal weapon or a less lethal,

 9  like the 40-millimeter or the bean bag?

10    A.    Yes, sir.

11    Q.    And we're just about done.

12    A.    Okay.

13    Q.    I'm just going over my last part of the notes.

14  I'm just close to done, just to give you the heads-up.

15         I'm looking at page 63 of your interview.  I'm

16  looking towards line 18 to 22.  Do you see the lines on

17  the left-hand side?

18    A.    Yes, sir.

19    Q.    Okay.  Read that to yourself.

20         (Pause.)

21         THE WITNESS:  Yes, sir.

22  BY MR. VALENZUELA:

23    Q.    Okay.  This is what you described already;

24  right?  Because in the Skid Row area, a lot of times

25  it's common to deal with people with mental illness or

```
 1   suffering mental health episodes, and it's important to

 2   only have one person give commands.  Is that what you're

 3   describing?

 4        A.   Yes, sir.

 5        Q.   Okay.  Now, can you go to page 71?

 6        A.   Yes, sir.

 7        Q.   And like lines, let's say, 14, to 21.  Read it

 8   to yourself.

 9             (Pause.)

10   BY MR. VALENZUELA:

11        Q.   You may need to start a little earlier.

12        A.   Yeah.  Just a moment.  I'll start a little

13   earlier, sir.

14        Q.   Yeah.

15             (Pause.)

16             THE WITNESS:  Okay.  Yes, sir.

17   BY MR. VALENZUELA:

18        Q.   Okay.  So in this part, you're describing

19   seeing the female officer pointing the bean bag at the

20   decedent, then seeing the shotgun pointed in a different

21   direction.  But you said that you didn't see how the

22   shotgun moved.

23             Do you see that?  And I'm looking specifically

24   now at 71, lines 15 through 18.

25        A.   Uh-huh.
```

```
 1   STATE OF CALIFORNIA)
                        ) ss:
 2   COUNTY OF BUTTE    )

 3
              I, KIMBERLY E. D'URSO, do hereby certify:
 4

 5            That the witness named in the foregoing

 6   deposition was present remotely and duly sworn to testify

 7   to the truth in the within-entitled action on the day and

 8   date and at the time and place therein specified;

 9            That the testimony of said witness was reported

10   by me in shorthand and was thereafter transcribed through

11   computer-aided transcription;

12            That the foregoing constitutes a full, true and

13   correct transcript of said deposition and of the

14   proceedings which took place;

15            Further, that if the foregoing pertains to the

16   original transcript of a deposition in a federal case,

17   before completion of the proceedings, review of the

18   transcript [ ] was [ ] was not requested.

19            That I am a certified stenographic reporter and

20   a disinterested person to the said action;

21            IN WITNESS WHEREOF, I have hereunder subscribed

22   my hand this 21st day of November, 2025.

23   _____

24   KIMBERLY D'URSO, CSR NO. 11372, RPR

25
```