# EXHIBIT M

1                    UNITED STATES DISTRICT COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3                            --oOo--

4

5    ALEXANDRA RASEY-SMITH;
     GORDON GENE MACCANI; and
6    JANET MACCANI,

7            Plaintiffs,

8    v.                                Case No.
                                       2:24-cv-03265-PSG-SSC
9

     CITY OF LOS ANGELES; CALEB
10   GARCIA ALAMILLA; and DOES
     2-10, inclusive,
11

12           Defendants.
     _____/

13

14

15              STENOGRAPHIC REPORTER'S TRANSCRIPT OF

16                    REMOTE DEPOSITION OF

17                      GABRIEL QUINTERO

18               MONDAY, NOVEMBER 10, 2025

19

20

21

22   Reported Stenographically by:

23   KIMBERLY D'URSO, CSR 11372, RPR

24   Job No.  21082

25

1         A.    Not in the comments, no.

2         Q.    For example, there was no mention of a gun or a

3     knife; would you agree?

4         A.    No.

5         Q.    Okay.  Did the 911 call indicate that anyone

6     had been physically injured?

7         A.    No.

8         Q.    Okay.  Was part of the call also that an

9     individual was trespassing?

10        A.    Yes, sir.  He was trespassing into the

11    location.

12        Q.    Okay.  And do you recall the address of the

13    location?

14        A.    I don't recall.  I believe it was somewhere

15    around 6th.  I can't remember the main street, though.

16        Q.    That's in downtown Los Angeles?

17        A.    Yes, sir.

18        Q.    Would you also consider that to be the Skid Row

19    area of Los Angeles?

20        A.    Yes, sir.

21        Q.    Okay.  Had you been to prior calls in the Skid

22    Row area of Los Angeles in your career as a law

23    enforcement officer?

24        A.    Yes, sir, but not at that location.

25        Q.    But generally, you've been to Skid Row area

1    occurred before you guys went to go locate the

2    individual?

3        A.    It was approximately five minutes, like, I

4    would say, sir.

5        Q.    Okay.  A few minutes or so?

6        A.    Yes, sir.

7        Q.    Okay.  And then at some point did you guys ask

8    the reporting party whether they wanted the decedent

9    either removed from the premises or arrested?

10       A.    I believe so, sir.

11       Q.    And did they indicate that they did want that?

12       A.    I don't recall, sir.

13       Q.    Okay.  Usually in a situation like this, does

14   the individual have to, like, sign some kind of piece of

15   paper or something indicating that they want, like, a

16   trespass to either remove or arrested?

17       A.    Yes, sir; a private person's arrest.

18       Q.    Okay.  And do you recall whether any such

19   document like that was signed in this particular

20   incident?

21       A.    I don't recall, sir.

22       Q.    Okay.  At some point after speaking with the

23   reporting party, do you guys then attempt to go locate

24   the decedent?

25       A.    Yes, sir.

1    Q.   Okay.  And describe to me a little bit -- and I

2    don't expect you to tell me every single thing.  But

3    what are some of the main concepts that you're trained

4    on with regards to tactical plans?

5    A.   So normally we're trained on tactical planning

6    before engaging, we -- we decide who's going to be

7    contact, cover, who's going to be less lethal, and who's

8    going to be the arrest team, and who's going to be

9    communications.  And then we talk about how we're going

10   to address the situation.

11   Q.   And based on your training, is it important to

12   formulate a tactical plan prior to contacting a suspect,

13   if it's feasible to do so?

14   A.   Yes, sir.

15   Q.   I understand sometimes time will not permit it,

16   but if it's feasible, that's usually an important thing

17   that should happen first; correct?

18   A.   Yes, sir.

19   Q.   Okay.  And were you also trained on the

20   importance of following your role in a tactical plan and

21   not deviating from it, if safety allows?

22   A.   Yes, sir.  But if we have to deviate, then

23   we're able to.

24   Q.   Correct.  The training is you should follow

25   your tactical plan unless the situation dictates you

1    have to deviate; is that fair?

2         A.    Yes, sir.

3         Q.    Okay.  And is your understanding that tactical

4    plans, part of the reason for their importance is for

5    the safety of both the officer and the suspect being

6    arrested?

7         A.    Yes, sir.

8         Q.    Was anybody designated a Taser in this tactical

9    plan, if you know?

10        A.    I don't recall, sir.

11        Q.    Okay.  You recall a bean bag being designated;

12   correct?

13        A.    Yes, sir.

14        Q.    And you recall a 40-millimeter being

15   designated; correct?

16        A.    Yes, sir.

17        Q.    But you don't recall whether a Taser had --

18   anybody had been designated the role of Taser in this

19   particular tactical plan.  Is that correct?

20        A.    Correct, sir.

21        Q.    Okay.  Did you -- let me step away now from

22   your training a little bit.  Did you, yourself -- strike

23   that.

24             Can you tell me what kind of weapons you had on

25   you, both lethal and non-lethal, during in the incident?

1    A.   I had my firearm for -- and I had -- for less

2   lethal I had my -- my ASP.

3         (Reporter clarification.)

4         THE WITNESS:   My ASP.

5   BY MR. VALENZUELA:

6    Q.   A-S-P.  Is that a baton?

7    A.   Yes.  And I had my pepper spray and my Taser.

8    Q.   So you, at least, did have a Taser on you?

9    A.   Yes, sir.

10   Q.   Do you recall what model of Taser you had on

11  you, like an X26, or something different?

12   A.   I don't recall.  I believe it was the orig- --

13  the older model from the Taser 10.

14   Q.   Okay.  Now, we had discussed tactical plans a

15  little bit and, you know, whether you could deviate from

16  them or not, depending on the circumstances.

17         In this particular tactical plan, you were

18  designated as part of the arrest team; correct?

19   A.   Yes, sir.

20   Q.   Did you, yourself, ever deviate from that

21  tactical plan and take on another role?

22   A.   No, sir.  I mean, at the time -- well, after

23  the incident, I broadcast it, so I guess I could say I

24  was comms.

25   Q.   Okay.  Prior to the shooting, did you,

1    yourself, deviate at all from the tactical plan?

2        A.    No, sir.

3        Q.    Okay.  And at least for you, did you believe it

4    was important for you to stick to your role in the

5    tactical plan, at least based on what you observed?

6        A.    Correct, sir.

7        Q.    Okay.  Now, at some point after the tactical

8    plan is formulated, you then go looking for the decedent

9    in the property?

10       A.    Yes, sir.

11       Q.    Okay.  Do you eventually find him?

12       A.    Yes, sir.

13       Q.    Okay.  Do you recall how long, approximately,

14   you searched for him before you found him?

15       A.    It was, like, within the minute that we got to

16   the door.

17       Q.    Okay.  So you only searched for him for a short

18   period of time before you found him?

19       A.    Yes, sir.

20       Q.    Okay.  Does LAPD -- strike that.

21            Did the reporting party tell you anything about

22   what the decedent had said?

23       A.    I don't recall, sir.

24       Q.    Do you recall the reporting party ever making a

25   comment that the decedent said something about, "The

1    there's, like, seven of them; right?

2        A.    Yes, sir.  I was in the -- the very back, sir.

3        Q.    Okay.  You're at the very, like, rear of the

4    configuration?

5        A.    Yes, sir.

6        Q.    And is that, in part, because of your role as

7    the arresting officer; generally, you guys would be in

8    the back?

9        A.    Yes, sir.

10       Q.    The different uses of force, such as the

11   40-millimeter, the bean bag, those would be positioned

12   more towards the front; is that correct?

13       A.    Correct, sir.

14       Q.    Okay.  Were you given a description of the

15   decedent, prior to making a contact with him -- strike

16   that.

17             Were you given the description of the decedent,

18   prior to visually seeing the decedent?

19       A.    I don't recall, sir.

20       Q.    Okay.  So you don't know if the decedent

21   matched a prior description given, is what I'm getting

22   at?

23       A.    I don't remember the description, but I know

24   that the description was given, sir.

25       Q.    And did you believe that this individual

1    A.   I believed he was under -- he's taken some

2  substance or mental illness.  There was multiple factors

3  that could have happened.

4    Q.   Okay.  So if I understand you correctly, based

5  on at least his physical appearance and behavior, you

6  thought he might be either under the influence of drugs

7  or mentally ill, or a combination of both?  Is that

8  accurate?

9    A.   Correct, sir.

10    Q.   Okay.  When you first saw him, did you see any

11  weapons on him when you first observed him?

12    A.   I saw a white object in his hand.  I believe it

13  was in his left hand.

14    Q.   And you saw this white object when you first

15  visually saw him?

16    A.   Yes, sir.

17    Q.   And how was he holding this white object?

18    A.   In an aggressive manner.  He had his, like -- I

19  don't remember if he had his hands crossed or, like, in

20  front of him with his hands closed in a fist.  And

21  that's how they -- they were.

22    Q.   Okay.  At any point during the incident, did

23  you ever see him put his hand above his head, holding

24  this white object?

25    A.   No, not to my recollection, sir.

1    Q.   At any time during the incident, while he was

2    holding this white object, did you ever see him making

3    any stabbing or slashing motions while holding this

4    white object?

5    A.   I don't recall, sir.

6    Q.   You remember seeing the white object in his

7    hand, but you don't remember him making any actions like

8    that; is that fair?

9    A.   Is this before or after he charged at --

10   Q.   At any time?

11   A.   No, sir.

12   Q.   You don't recall that; is that fair?

13   A.   I don't recall, sir.

14   Q.   Okay.  And you're talking about at any time

15   during the incident, just so we're on the same page;

16   correct?

17   A.   Correct, sir.

18   Q.   Okay.  When you first saw him, were some

19   commands given to him?

20   A.   Yes, sir.

21   Q.   What were the commands, if you recall?

22   A.   They -- the contact officers advised him to,

23   "Face away" and to "Walk back." And then they continued

24   to give commands once he turned back around.

25   Q.   You said the initial two commands were, "Face

Gabriel Quintero

1    Q.   Okay.  What initially did you think that the

2    object was, this white object?

3    A.   It appeared to be a sharp object.  I wasn't 100

4    percent sure what to make -- make it out to be.

5    Q.   Did it appear to be made of plastic?

6    A.   I don't recall at the time, sir.

7    Q.   You could recall it was white in color, but you

8    couldn't make out if it was plastic or metal or some

9    other hard material?

10   A.   Correct, sir.

11   Q.   Okay.  Did it at least appear to be consistent

12   with what the handle of a fork looks like?  In other

13   words, I'm not saying that's what you thought it was,

14   but did it at least look consistent with the handle of a

15   fork?

16   A.   I wouldn't say so, sir.

17   Q.   You've eaten with a plastic fork before?

18   A.   Yes, sir.

19   Q.   And generally, the handle part of the fork is

20   not sharpened; would you agree?

21   A.   Correct, sir.

22   Q.   Okay.  But in this particular incident, you

23   thought it might be a -- what did you say you thought it

24   might be?

25   A.   I didn't -- I didn't know what it was at the

1    Rodriguez that fired the bean bags; correct?

2        A.    Correct, sir.

3        Q.    Did you hear Officer Rodriguez give a verbal

4    warning prior to firing her bean bags -- or strike

5    that -- prior to firing the bean bags?

6        A.    I don't recall, sir.

7        Q.    Did you hear just one 40-millimeter round being

8    fired or more than one?

9        A.    Just one 40-millimeter.

10       Q.    Okay.  And how many bean bag rounds did you

11   hear being fired?

12       A.    At the time, two.

13       Q.    Two?

14       A.    Uh-huh.

15       Q.    Okay.  Did you say that you also had your,

16   like, handgun lethal firearm on you?

17       A.    Correct, sir.

18       Q.    What kind of firearm do you carry?

19       A.    Smith & Wesson, 9-millimeter, M&P.

20       Q.    Okay.  At any time prior to -- strike that.

21            At any time prior to the actual gunshot being

22   fired, did you, yourself, ever unholster your weapon?

23       A.    I did, sir.

24       Q.    Okay.  And when did you first unholster your

25   weapon?

```
 1    the decedent now closer in proximity to the officers?

 2         A.    Yes, sir.

 3         Q.    Okay.  Did you ever see the decedent try to

 4    punch any of the officers?

 5         A.    I don't recall, sir.

 6         Q.    You don't recall that, as you sit here today?

 7         A.    Yes, sir.

 8         Q.    Do you remember the decedent ever trying to

 9    kick any of the officers?

10         A.    I don't recall, sir.

11         Q.    Do you remember if the decedent ever tried to

12    push any of the officers?

13         A.    He -- he did push one officer, sir.

14         Q.    Which officer did he push?

15         A.    Officer Rodriguez.

16         Q.    Okay.  And where did -- is Officer Rodriguez a

17    woman?

18         A.    Yes, sir.

19         Q.    And where did he push her at?  Like, in what

20    part of her?

21         A.    Like, the front part.

22         Q.    Like, her -- the front part of her body?

23         A.    Yes, sir.

24         Q.    Okay.  And so you remember him pushing one

25    officer, but you don't remember him ever punching or
```

```
 1    kicking any of the officers; do I have that correct?

 2         A.   Correct, sir.  I don't recall.

 3         Q.   Okay.  At some point, you hear a live gunshot;

 4    correct?

 5         A.   Correct, sir.

 6         Q.   Okay.  Was the decedent pushing Officer

 7    Rodriguez when you heard that gunshot?

 8         A.   I don't recall the time frame of -- of that

 9    part, sir.

10         Q.   Did he push Officer Rodriguez before or after

11    you heard the gunshot?

12         A.   It was after, I would say.

13         Q.   Okay.  So you believe he pushed Officer

14    Rodriguez after you heard the gunshot?  Do I have you

15    correct?

16         A.   Yes, sir.

17         Q.   Okay.  At some point, is the decedent ever

18    pushed up against, like, a metal gate or a wall?

19         A.   Yes, sir.

20         Q.   Was he pushed up against that metal gate or

21    wall before or after you heard that gunshot?

22         A.   I believe it was after, but I don't recall,

23    sir.

24         Q.   You remember him being pushed up against the

25    metal gate or the wall, but you just don't recall if it
```

1    was before or after the gunshots?  Do I understand you

2    correctly?

3        A.   It was before -- before he was pushed against

4    the wall.

5        Q.   What was "before he was pushed against the

6    wall"?

7        A.   The -- the firearm round.

8        Q.   Okay.  So if I understand you correctly, you

9    heard the gunshot round go off prior to the decedent

10   being pushed up against this metal gate or wall.  Do I

11   understand you correctly?

12       A.   Correct, sir.

13       Q.   Okay.  At some point do you ever see the

14   officers physically go hands-on with the decedent, prior

15   to the hearing the gunshot?

16       A.   We -- the officers attempted to gain control of

17   him prior to the gunshot.

18       Q.   And did they do that by, in part, going

19   physically hands-on with him?

20       A.   Yes, sir.

21       Q.   Okay.  And while the officers are physically

22   going on hands-on with the decedent, is the decedent

23   physically touching anybody with his hands?

24       A.   I don't recall, sir.

25       Q.   Do you recall if he was still pushing Officer

1    Rodriguez when the officers were going hands-on with the

2    decedent?

3         A.    I don't recall the time frame, sir.

4         Q.    Okay.  But you do recall officers going

5    hands-on with the decedent prior to hear the gunshot; is

6    that correct?

7         A.    To the best of my knowledge, yes, sir.

8         Q.    Okay.  And where were they physically touching

9    the decedent?  Do you recall?

10        A.    I -- I -- I don't recall, sir.  I believe it

11   was his arms and, like, his -- his torso.

12        Q.    Okay.  Did you ever see any of the officers

13   have a hand on the decedent's back and arm?

14        A.    No, sir.  I -- I don't recall.

15        Q.    It sounds like you recall one of the officers

16   touching the decedent's arm, but you don't recall any of

17   the officers touching his back?  Is that accurate?

18        A.    I know that officers went hands-on, but I'm not

19   sure what -- what placement they -- they did, sir.

20        Q.    I thought I heard you say that you saw them at

21   least touch the arm area.  Did I hear that wrong?

22        A.    Well, like, they -- they went hands-on, and

23   they were all around him, so I -- I believe that they

24   were gripping on to his arms, his torso area.

25        Q.    Okay.  So you recall them going hands-on with

1   his arms and torso area, and this would be before the

2   gunshot; is that correct?

3       A.   I believe so, to the best of my knowledge.

4       Q.   Okay.  And is that what they were doing when

5   you heard the gunshot, going hands-on with him in his

6   arms and torso area, when you heard that gunshot?

7       A.   I know that -- I know that the supervisor was

8   attempting to gain control when I heard the -- the fire

9   from the handgun.

10      Q.   Okay.  When say "gain control," do you mean by

11  physically going hands-on with the decedent?

12      A.   Yes, sir.

13      Q.   Did you ever hear a verbal warning prior to

14  hearing that gunshot?

15      A.   I don't recall, sir.  It was just constant

16  yelling from the suspect.

17      Q.   You recall hearing the yelling from the

18  suspect, but you don't recall a verbal warning prior to

19  hearing the gunshot; is that fair?

20      A.   Correct, sir.  I don't recall.

21      Q.   Okay.  I forgot if I asked you this or not, but

22  did you ever hear the decedent verbally threaten any of

23  the police officers?

24      A.   I don't recall, sir.

25      Q.   You recall him yelling, but you don't recall

1    him actually, like, verbally threatening them; is that

2    fair?

3        A.    Correct, sir.

4        Q.    Okay.  Had you ever met the decedent prior to

5    the date of the incident?  Like, do you recall ever

6    dealing with him before?

7        A.    No, sir.

8        Q.    Okay.  After hearing the gunshot -- strike

9    that.

10            Was there police officers between you and the

11   decedent at the time you heard the gunshot?

12       A.    Yes, sir.

13       Q.    Like, approximately how many would you say were

14   between you and the decedent when you heard the gunshot?

15       A.    I would -- I would say maybe, like, five or

16   four.

17       Q.    And after you hear the gunshot, do you see the

18   officers take the decedent down to the ground?

19       A.    After our supervisor puts him against the wall,

20   then they take him to the ground.

21       Q.    Do they handcuff him?

22       A.    I believe so.

23       Q.    You were not part of the arrest team at this

24   point, were you?

25       A.    At this point, no, sir.

1    Q.    Okay.  The other officers had taken over

2    conducting the arrest at this point?

3    A.    Correct, sir.

4    Q.    Okay.  After the shooting, do you ever see the

5    white fork on the ground?

6    A.    Yes, sir.

7    Q.    Okay.  How long after the shooting do you see

8    the fork on the ground?

9    A.    Well, when he was on the ground, officers are

10   attempting to put him in handcuffs; and that's when I

11   see the fork, off to the side.

12   Q.    After seeing the fork off to the side, did you

13   put two and two together in your mind, that that was the

14   white thing that he had in his hand?

15   A.    I did, sir.

16   Q.    At some point -- I think it was you, and

17   correct me if I'm wrong -- I'll show you video later --

18   but at some point, did you hear a police officer say

19   something along the lines he had a screw driver or

20   something like that?

21   A.    Yes.  Officer Chomuk stated that it was a screw

22   driver.

23   Q.    And did you correct him and say, "No, it's that

24   fork over there," or words to that effect, and point him

25   to the fork?

1    A.    I -- I advised him it was possibly the fork

2  that he had, because I wasn't sure what -- what he saw.

3    Q.    And when you were having this discussion with

4  Officer Chomuk, did you kind of show Officer Chomuk

5  where the fork was?

6    A.    Yes, sir.

7    Q.    Okay.  Did you hear the decedent make any

8  noises -- strike that.

9        Did you hear the decedent say anything after he

10  was shot?

11    A.    I don't recall, sir.

12    Q.    Do you recall him making any noises?

13    A.    I don't recall, sir.

14    Q.    Okay.  Do you remember or -- strike that.

15        Did you, yourself, make -- you said you made a

16  radio communication after the shooting?

17    A.    Yes, sir.  I put out a broadcast that there was

18  a shooting.

19    Q.    Okay.  Did you also request medical in that?

20    A.    I did not request medical.  It was another

21  officer that requested medical.

22    Q.    Was that requested before or after you made

23  your radio communication, if you recall?

24    A.    I don't recall, sir.  I believe it was before.

25    Q.    Okay.  Did you see the officers performing,

1    voluntary statement?

2        A.    Yes, sir.

3        Q.    Okay.   I won't get into why and all that stuff.

4    I just wanted to see if that was the case.

5              I'm just going over my notes of your interview

6    really quick.

7        A.    Yes, sir.

8        Q.    Did you recall stating in your interview that

9    the officers were obstructing your view as to what was

10   occurring at the time of the gunshot?

11       A.    Yes, sir.

12       Q.    Do you recall stating in your interview that

13   you saw Sergeant Punzalan wrapped his arms around the

14   decedent?

15       A.    Yes, sir.

16       Q.    Okay.   Do you recall when you were speaking

17   with the reporting parties that they had made mention

18   that the decedent stated something about, "The end of

19   the world," "Was acting very erratic and strange."

20       A.    I don't recall, sir.

21       Q.    Here, let me show you and see if it will help

22   refresh your recollection.

23       A.    Thank you.

24              (Reporter clarification.)

25   BY MR. VALENZUELA:

1    Q.   Let me try my screen share over here.

2         Do you see this on your screen, Officer?

3    A.   Yes, sir.

4    Q.   Okay.  I'm going to refer you to page 12.  Let

5    me see.

6         Okay.  Look around lines 5 through 11, and read

7    it to yourself.  And then let me know when you've had a

8    chance to read it.

9         (Pause.)

10        THE WITNESS:  Okay.  Yes, sir.  I do recall.

11   BY MR. VALENZUELA:

12   Q.   Okay.  So the reporting party had basically

13   indicated that the decedent stated, "It's the end of the

14   world.  It's the end.  We need to leave."

15        "Acting very erratic."

16        Do you see that?

17   A.   Yes, sir.

18   Q.   Based on these statements being the end of the

19   world and whatnot, did you believe that the decedent may

20   be mentally ill or under the influence of drugs?

21   A.   Yes, sir.

22   Q.   Okay.  Do you recall giving an estimate in your

23   interview, that it was about a half a second or a second

24   after the less-than-lethal, that you heard the real

25   gunfire?

1    heard the 40-millimeter first, and then, like, half a

2    second or a second pause, then heard the other rounds,

3    "Bang.  Bang.  Bang."  Do you see that?

4        A.   Yes, sir.

5        Q.   So it sounds like you hear the 40-millimeter,

6    there's a half a second to second pause, and then you

7    hear the bean bags and the real shot, all in pretty

8    quick succession?  Is that accurate?

9        A.   Correct, sir.

10       Q.   Okay.  And I think you indicated that you could

11   not see the actual shooting officer or where the round

12   fired because your view was obstructed; is that correct?

13       A.   Yes, sir.

14       Q.   And other than the fork that you saw on the

15   ground, you didn't find any other weapons on the ground;

16   correct?

17       A.   Correct, sir.

18       Q.   Okay.  Okay.  Let me stop this.  I'm just about

19   done.  I just want to show you a video just to confirm

20   this is your video.  And I think we're just about done.

21   One second.

22            MR. VALENZUELA:  And you don't need to attach

23   this, Kim.  I just want to confirm whether this is his

24   video or not.

25            THE CERTIFIED STENOGRAPHER:  Thank you.

```
1   STATE OF CALIFORNIA)
                       ) ss:
2   COUNTY OF BUTTE    )

3
            I, KIMBERLY E. D'URSO, do hereby certify:
4

5           That the witness named in the foregoing

6   deposition was present remotely and duly sworn to testify

7   to the truth in the within-entitled action on the day and

8   date and at the time and place therein specified;

9           That the testimony of said witness was reported

10  by me in shorthand and was thereafter transcribed through

11  computer-aided transcription;

12          That the foregoing constitutes a full, true and

13  correct transcript of said deposition and of the

14  proceedings which took place;

15          Further, that if the foregoing pertains to the

16  original transcript of a deposition in a federal case,

17  before completion of the proceedings, review of the

18  transcript [ ] was [ ] was not requested.

19          That I am a certified stenographic reporter and

20  a disinterested person to the said action;

21          IN WITNESS WHEREOF, I have hereunder subscribed

22  my hand this 21st day of November, 2025.

23  _____

24  KIMBERLY D'URSO, CSR NO. 11372, RPR

25
```