# EXHIBIT N

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                            --oOo--

4

5    ALEXANDRA RASEY-SMITH;
     GORDON GENE MACCANI; and
6    JANET MACCANI,

7            Plaintiffs,

8    v.                              Case No.
                                     2:24-cv-03265-PSG-SSC
9
     CITY OF LOS ANGELES; CALEB
10   GARCIA ALAMILLA; and DOES
     2-10, inclusive,
11
12           Defendants.
     _____/

13

14

15              STENOGRAPHIC REPORTER'S TRANSCRIPT OF

16                    REMOTE DEPOSITION OF

17                      JEFFREY PUNZALAN

18                 FRIDAY, NOVEMBER 7, 2025

19

20

21

22   Reported Stenographically by:

23   KIMBERLY D'URSO, CSR 11372, RPR

24   Job No.  21081

25

1     A.   Yes.

2     Q.   How many times, approximately?

3     A.   Over 50 times.

4     Q.   Were you trained as a police officer you can

5  shoot someone merely for seeing gun in their hand?

6     A.   No.

7     Q.   Before you became a sergeant, had you seen

8  suspects with knives in their hands before?

9     A.   Yes.

10    Q.   How many times, approximately?

11    A.   Approximately, the same amount, 50.

12    Q.   Were you trained as a law enforcement officer

13 you can shoot someone merely for seeing a knife in their

14 hand?

15    A.   No.

16    Q.   After you became a sergeant, but before this

17 incident with Mr. Maccani -- so during that

18 approximately ten months -- had you seen any suspect's

19  with guns or knives in their hand?

20    A.   Guns, no.   Knives and other weapons, yes.

21    Q.   Okay.

22         (Sound interruption.)

23         (Pause.)

24 BY MR. GALIPO:

25    Q.   Sergeant, how many other incidents, after you

 1    were a sergeant but before this incident with

 2    Mr. Maccani, did you see someone with a knife or other

 3    weapon in their hand?

 4        A.    I would say, 10 to 15, approximately.

 5        Q.    These approximate 50 or so people that you saw

 6    with guns in their hands, prior to being a sergeant, did

 7    you shoot any of those people?

 8        A.    No.

 9        Q.    These approximate 50 people or so that you saw

10    with knives in their hands, before becoming a sergeant,

11    did you shoot any of those people?

12        A.    No.

13        Q.    And the 10 to 15 people you saw with weapons in

14    their hands, after becoming a sergeant but before this

15    incident, did you shoot any of those people?

16        A.    No.

17        Q.    In addition to the knives that you saw, what

18    other types of weapons did you see in people's hands,

19    after becoming a sergeant?

20        A.    A lot was poles, shovels, chains, long chains,

21    heavy chains.  Obviously, the knives.  Machetes.

22        Q.    Okay.  Had you been ever present before for an

23    officer-involved shooting, where you actually were on

24    scene when shots had been fired?

25        A.    No.

1    reporting?

2         A.    Yes.

3         Q.    And was that one individual or more than one

4    that you spoke to?

5         A.    I spoke to one individual.

6         Q.    Was that a male or female, if you recall?

7         A.    It was a male.

8         Q.    And if you know, was that conversation captured

9    on someone's body-worn camera?

10        A.    Yes.

11        Q.    What information do you recall receiving from

12   the male individual?

13        A.    I specifically asked him if he wanted a

14   trespass, a private person's arrest signed, if the

15   suspect was still at the location and refusing to leave.

16        Q.    And what did the person say?

17        A.    He said "yes."

18        Q.    Is that a misdemeanor trespass?

19        A.    Yes.

20        Q.    Did you ask the individual whether the person

21   had any weapons that he saw?

22        A.    From what I recall, I did not ask, but one of

23   the officers at scene did.

24        Q.    And do you recall the response?

25        A.    Yes.  They said that there's a -- scissors and

1    Q.    Did anyone say he had verbally threatened to

2    harm anyone?

3    A.    Not that I recall.

4    Q.    Did you have any information that the person

5    had a criminal record or history?

6    A.    No.

7    Q.    Any information they were under the influence

8    of drugs or alcohol?

9    A.    No.  But the person reporting did state that

10   the subject was a little "off."

11   Q.    Like, not in their right state of mind?

12   A.    Yes.

13   Q.    You consider the possibility that the person

14   could have a mental illness or be having a mental health

15   crisis?

16   A.    Yes, possibly.  But on top of that, I mean, I

17   work Skid Row area, and it's a mixture of mental

18   illnesses and drug abuse, so --

19   Q.    So you considered those possibilities?

20   A.    Yes.

21   Q.    At some point, did you learn the person was on

22   the fourth floor?

23   A.    Yes.

24   Q.    And you were the supervisor on scene?

25   A.    Yes.

1    Q.   At some point, did you make assignments, as far

2    as lethal, less lethal, and arrest team?

3    A.   Yes, I did.

4    Q.   And where did you make the assignments?  Were

5    you on the fourth floor or somewhere else when you

6    initially made the assignments?

7    A.   I was on the floor --

8         (Reporter clarification.)

9         THE WITNESS:  -- below the third floor landing.

10   BY MR. GALIPO:

11   Q.   How many officers were with you, approximately,

12   at that time on the third floor?

13   A.   Approximately, I believe it was eight, on the

14   third floor with me.

15   Q.   How many officers did you assign lethal cover,

16   if you remember?

17   A.   One.

18   Q.   Do you recall who that was?

19   A.   Yes, Officer Orozco.

20   Q.   And my understanding from reviewing your

21   statement is that when you got to the scene, you noticed

22   the one officer had a bean bag shotgun; is that right?

23   A.   Yes.

24   Q.   Do you recall who that was?

25   A.   Officer Rodriguez.

1      Q.   So did you assign less lethal to Officer

2   Rodriguez?

3      A.   Well, since she had it out, she was already

4   assigned it.

5      Q.   Okay.

6      A.   It was implied.

7      Q.   And then did you see someone with a

8   40-milimeter launcher?

9      A.   I did, yes.

10      Q.   And who was that?

11      A.   Officer Chomuk.

12      Q.   I think we have the spelling, but do you recall

13   how to spell that?

14      A.   Yes.  C-H-O-M-U-K.

15      Q.   Thank you.

16           Did you assign anyone else less lethal?

17      A.   No.

18      Q.   How about the arrest team?  Who did you assign

19   to the arrest team?

20      A.   I assigned Officer Garcia and Officer Quintero.

21      Q.   Were there any other assignments of the other

22   officers?

23      A.   Officer Jauregui, which was our contact

24   officer.

25      Q.   Was she going to be giving some of the verbal

1    commands?

2        A.    Yes.

3        Q.    Any other assignments you can recall?

4        A.    No, other than the Officer Klimek and his

5    probationary officer, Melgar, I advised him to stay down

6    with the victims to get the private person's arraign- --

7    private person's arrest started.

8            (Reporter clarification.)

9            THE WITNESS:  Yeah.  The first one is Officer

10   Klimek, and his partner was Officer Melgar.

11   BY MR. GALIPO:

12       Q.    So if I'm understanding you correctly,

13   Sergeant, they stayed outside with the reporting party?

14       A.    Yes, they stayed on the third floor.

15       Q.    Third floor.

16            So in a situation like this, you're potentially

17   going to arrest the person for trespassing; is that the

18   idea?

19       A.    Yes.

20       Q.    And as we discussed before, that's a

21   misdemeanor?

22       A.    Yes.

23       Q.    Is there paperwork you need to have filled out

24   to do the misdemeanor arrest, under these circumstances?

25       A.    I -- can you clarify that question?  I'm not

 1   understanding that.

 2        Q.   Yeah.   That's not a good question.

 3             Does the reporting party have to sign something

 4   for you to make a misdemeanor arrest, in a situation like

 5   this?

 6        A.   In this situation, yes.

 7        Q.   And did they sign something, if you know,

 8    before you entered the fourth floor?

 9        A.   That, I don't know, if they signed it before

10   or -- before I went up there.

11        Q.   Do you recall any conversation with respect to,

12   if the person leaves, or is willing to leave, and law

13   enforcement escorts them out, then they don't want to

14   make an arrest?

15        A.   I don't recall.

16        Q.   So I take it, as a supervisor in this type of

17   scenario, you want to safely take the person in custody,

18   if possible?

19        A.   Of course.

20        Q.   With the minimal amount of force?

21        A.   Yes, of course.

22        Q.   And as a supervisor, you're concerned for

23   everyone's safety:  the officers, the suspect, and the

24   community?  Is that fair?

25        A.   Yes.

1     A.    Yes.

2     Q.    Could you tell if it struck Mr. Maccani?

3     A.    I could not.

4     Q.    And after the 40-milimeter was deployed, did

5  you hear any bean bag shotgun rounds being deployed?

6     A.    I did.

7     Q.    How many of those did you hear?

8     A.    One.

9     Q.    And did you know who was firing that?

10    A.    Yes.  Officer Rodriguez.

11    Q.    And could you tell how far the bean bag shotgun

12  was from Mr. Maccani when that was deployed?

13    A.    About the same time -- the same approximation,

14  8 to 10 feet.

15    Q.    Did you have a firearm on you?

16    A.    I did.

17    Q.    Did you ever pull it out at any time prior to

18  having physical contact with Mr. Maccani?

19    A.    I did not.

20    Q.    Do you know if Officer Orozco fired his lethal?

21    A.    At that time?

22    Q.    Yes.

23    A.    No.

24    Q.    Did you -- other than Officer Orozco having his

25  firearm out, did you see any other officer with his

Jeffrey Prosan

1   firearm out prior to handcuffing Mr. Maccani?

2       A.   No.

3       Q.   You, at some point, had physical contact with

4   Mr. Maccani?

5       A.   Yes.

6       Q.   You grabbed his arm at some point; is that

7   correct?

8       A.   Yes.

9       Q.   You were trying to control him and pin him

10  against the wall?

11      A.   Yes.

12      Q.   And one of the reasons you were doing that is

13  to try to overt the need for any additional force or any

14  high use of force?

15      A.   Correct.

16      Q.   At some point, you took him to the ground?

17      A.   Yes.

18      Q.   And at some point, handcuffs were placed on him

19  by other officers?

20      A.   Yes.

21      Q.   Up until the time he was handcuffed, did you

22  know that any of the officers had used lethal force?

23      A.   Right after handcuffing.

24      Q.   So it was after he was handcuffed, shortly

25  after that, that you found that out?

1      A.    Yes.

2      Q.    And how did you discover that, if you remember?

3      A.    The officers stated it.

4      Q.    At any point in time prior to you having

5  physical contact with Mr. Maccani, did you hear anybody

6  give a warning that less lethal was going to be used?

7      A.    No.

8      Q.    Did you hear anybody give a warning that deadly

9  force was going to be used?

10     A.    No.

11     Q.    Did you hear anyone yell, "Drop it," or words

12  to that effect?

13     A.    Not that I recall.

14     Q.    Did you hear anyone yell, "Knife" or "He has a

15  knife" at any time before you had physical contact with

16  him?

17     A.    No, not that I recall.

18     Q.    Did you inquire as to who fired the lethal

19  shot?

20     A.    I did.

21     Q.    And were you told?

22     A.    Yes, I was.

23     Q.    And what were you told?

24     A.    I was told that Officer Garcia fired one round.

25     Q.    Did you see any injury on Mr. Maccani?

1    A.    Yes.  And I see that it says that I said

2    "effective," but it should have read "ineffective."

3    Q.    Oh, okay.

4    A.    Yeah.

5    Q.    Just so I'm not going crazy, you did see the

6    part where you --

7    A.    I did.

8    Q.    -- said you thought it was effective?

9    A.    Yes.  Those statements should have been

10   "ineffective," if we review the actual audio of that --

11   that --

12   Q.    You think that it is a mis-transcription?

13   A.    Yes, definitely.

14   Q.    When you grabbed Mr. Maccani and pinned him

15   against the wall, was he resisting?

16   A.    Yes, still, at that time, against the wall.

17   Q.    Okay.  And how was he resisting you at that

18   time?

19   A.    He was trying to pull away from me, from my

20   grasp.

21   Q.    Any other way that he was resisting you at that

22   time?

23   A.    No.  He just -- I felt him trying to pull away

24   from my grasp.

25   Q.    Did you ever see Mr. Maccani punch anyone?

Jeffrey Prutsman

```
 1          A.    No.

 2          Q.    Did you see him attempt to punch anyone?

 3          A.    Punch?  No.

 4          Q.    Did you hear him use any profanity?

 5          A.    No, just yelling.

 6          Q.    Did you hear him verbally threaten to harm

 7   anyone?

 8          A.    No.

 9          Q.    Did you see him kick or attempt to kick anyone?

10          A.    No.

11          Q.    At some point, did you realize you had some

12   type of injury to one of your hands?

13          A.    Yes.

14          Q.    Which hand was that?

15          A.    It was my right hand.

16          Q.    And where was the injury, if you recall?

17          A.    It was on the webbing between my thumb and

18   pointing finger.

19          Q.    Is it your understanding now that there may

20   have been a graze wound or something from the bullet?

21          A.    Yes.

22          Q.    I take it you didn't realize that -- initially,

23   that you had been struck with one of the bullets?  You

24   learned that later or realized that later?

25          A.    Yes.
```

1      Q.    When you initially heard the 40-millimeter

2    being deployed, did it sound like a loud bang?

3      A.    Yes.

4      Q.    And then with the bean bag rounds, you heard

5    two consecutive bangs?

6      A.    Yes.

7      Q.    Do you know how much time passed between the

8    40-millimeter and the bean bag round?

9      A.    I don't; but it was -- it was within seconds.

10     Q.    Pretty quick?

11     A.    Yeah, real quick.

12     Q.    The reporting party told you something to the

13   effect that the individual did not seem to be in his

14   right state of mind?

15     A.    Yes.

16     Q.    Other than your physical injury from getting

17   grazed by the bullet, were you aware of any other

18   physical injuries any of the officers had in this

19   incident?

20     A.    No.

21     Q.    Do you recall any commands given to Mr. Maccani

22   after he started advancing towards the officers?

23     A.    No.

24     Q.    Was there a reason why you didn't designate

25   someone to be a Tasing officer?

1    A.    No.   I mean, I believe at that time, we had

2    enough resources.

3    Q.    Obviously, if someone felt it was necessary to

4    deploy their Taser, they could do that?

5    A.    Absolutely.

6    Q.    When you grabbed Mr. Maccani, did he have his

7    back towards you, initially?

8    A.    Yes.

9    Q.    And essentially, you would have bear-hugged him

10   and pinned him against the wall?

11   A.    Yes.

12   Q.    So are you saying that, initially, you thought

13   it was just one bean bag round because -- or are you

14   saying that you heard two bean bag rounds, initially?

15   A.    So I heard two bangs.  So from my assumption at

16   the time, the bean bag and the 40 -- the first round of

17   the bag and the 40 went off.  And then the second round

18   of the bean bag went off, and that's what I heard.

19         So it was bean bag and the first -- the 40 and

20   the first bean bag round came off at the same time.  But

21   obviously, the 40's a lot louder, so it kind of, I

22   guess, muffled the bean bag; and then I heard the second

23   bean bag round go off.

24   Q.    I see.

25   A.    Yeah.

Jeffrey Pasillan

1    Q.    So the first -- the 40 and the bean bag were
very close in time with each other?

3    A.    Correct.  Yes.

4    Q.    And then there was a slight pause, and then you
heard the bean bag round?

6    A.    Yes.

7    Q.    So you're saying initially you thought it was
one, because the first bean bag round was kind of
covered up, to some extent, by the 40?

10   A.    Yes.

11   Q.    But you didn't realize there had been a lethal
round fired until after he was handcuffed?

13   A.    Yes.  Correct.

14   Q.    Did you ever see Mr. Maccani grab any of the
officers?

16   A.    No, just charge towards them.

17   Q.    And I think you've already told me this, but
you took him to the ground at some point?

19   A.    I did, yes.

20   Q.    At any time, did you assign PO1 Garcia to be a
designated lethal cover officer?

22   A.    No, I did not.

23   Q.    Were you aware that he was on probation at the
time?

25   A.    Yes.

1      Q.    Would you generally, as a supervisor, assign a

2  probationary officer to be lethal cover?

3      A.    Generally, no.

4            MR. FORD:    Objection.    Incomplete hypothetical.

5  Calls for speculation.

6            Go ahead and answer.

7  BY MR. GALIPO:

8      Q.    You may answer, Sergeant.

9      A.    Generally, no.

10     Q.    You would want someone more experienced with

11  that assignment, generally?

12     A.    Yes.

13     Q.    And if I'm understanding correctly, you

14  assigned Garcia to be on the arrest team?

15     A.    Yes.    Correct.

16     Q.    And what does that assignment entail, being on

17  the arrest team?

18     A.    Well, once the suspect is compliant, those

19  officers will go ahead and approach the suspect or

20  subject and place him in handcuffs.

21     Q.    Did you have any question in your mind that

22  when you gave the assignment to Garcia to be on the

23  arrest team -- were you convinced that he understood the

24  assignment?

25     A.    Of being an arrest team member?

1          Q.    Yes.

2                MR. FORD:  I'm going to object that it calls

3    for speculation.

4                But go ahead and answer.

5    BY MR. GALIPO:

6          Q.    Let me ask it in a better way.

7                Did you communicate to Garcia that he was going

8     to be part of the arrest team?

9          A.    Yes, I did.

10         Q.    And did you have the impression that he

11    understood the assignment?

12         A.    Yes.

13         Q.    And what did you observe that gave you

14    impression that he understood his assignment to be on

15    the arrest team?

16         A.    So when I assigned him and Officer Quintero to

17    be part of the arrest team, both officers nodded, yes,

18    that they understood.

19         Q.    Is that one of the things you do, sometimes as

20    a sergeant, make sure your officers are understanding

21    their assignments?

22         A.    Not "sometimes," all the time.

23         Q.    And is it important, from your perspective as a

24    sergeant, that your officers understand their

25    assignments?

1     A.    Yes, of course.

2     Q.    And that they "follow their roles," so to

3    speak?

4     A.    Yes.  But like I said, tactics change, and, you

5    know, that dictates what officers see and -- and react

6    to.

7     Q.    Did you take some photographs on the -- at the

8    scene, afterwards, with your phone?

9     A.    I did.

10     Q.    What were you taking photographs of, if you

11    recall?

12     A.    Well, they used my phone to take photographs of

13    my injuries.

14     Q.    Oh, I see.

15     A.    It's a city cell phone.

16     Q.    Okay.  So do you know if photographs with your

17    phone were taken of anything other than your injury?

18     A.    My personal phone?

19     Q.    Yes, or your City phone.  I guess it's a City

20    phone?

21     A.    Yeah.  The city phone, yes, they took pictures

22    of my -- my injuries.  That's all I recall.

23     Q.    Okay.  Was there some roll call that day where

24    you were discussing the use of less-lethal items, when

25    feasible, rather than lethal, like the bean bag round

Jeffrey Pearson

1    and the 40-milimeter?

2         A.    Yes.

3         Q.    Were you part of that roll call?

4         A.    I was.  I gave that roll call.

5         Q.    Okay.  And were the officers that were involved

6    in this incident with Mr. Maccani at that roll call?

7         A.    Yes.

8         Q.    I take it part of the goal is to use less

9    lethal rather than lethal, when feasible?

10        A.    Yes.

11        Q.    And that's because of the training on the

12   reverence for human life?

13        A.    Correct.  But that also includes the life of

14   officers.

15        Q.    Understood.  Does -- LAPD, obviously, has

16   training with respect to the use of the deadly force;

17   correct?

18        A.    Correct.

19        Q.    And part of that training is there needs to be

20   immediate or imminent threat of death or serious bodily

21   injury?

22        A.    Yes.

23        Q.    And is part of the training that there has to

24   be the ability, opportunity, and apparent intent to

25   immediately cause death or serious bodily injury?

1    A.   I don't recall, no, seeing anything.

2    Q.   And you don't recall anyone pointing it out to

3    you?

4    A.   I don't recall, no.

5    Q.   Did you, yourself, at any time, see a knife on

6    Mr. Maccani?

7    A.   A knife, no.

8         MR. GALIPO:  Okay.  I think we've been going

9    almost an hour.  But is this a good time to take our

10   first ten-minute break?  I'm hoping I can get done by

11   2:30, no later than 2:45.

12        MS. COLEMAN:  Works for me.

13        MR. FORD:  Yes.  It's a good time.

14        MR. GALIPO:  Okay.  Thank you, all.

15        (Break taken.)

16   BY MR. GALIPO:

17   Q.   Are you ready to continue, Sergeant?

18   A.   Yes, sir.

19   Q.   When Mr. Maccani was on the ground, after you

20   took him to the ground, were you or other officers

21   holding him down for some period?

22   A.   Yes, to place the handcuffs on him.

23   Q.   And when he was handcuffed, he would have been

24   in a prone or chest-down position?

25   A.   Yes.

1    Q.    Do you know who handcuffed him or assisted you?

2    A.    I don't.

3    Q.    Could you tell whether he was struck by the

4    40-millimeter round?

5    A.    At that time, no.

6    Q.    Could you tell whether he was struck by

7    either -- by the bean bag shotgun round?

8    A.    No.

9    Q.    Do you have an estimate as to how long it took

10   the paramedics to get there?

11   A.    I -- if I have to have an approximate, maybe

12   five to seven minutes.

13   Q.    Do you know if Mr. Maccani was still alive when

14   the paramedics got there?

15   A.    I don't know.

16   Q.    Did you have any discussion with any of the

17   reporting parties, after the shooting?

18   A.    No, I did not.

19   Q.    Did you talk at all to Officer Garcia after the

20   shooting?

21   A.    Like, immediately after, or?

22   Q.    At any time after you learned that he fired?

23   A.    No.  He was monitored by another sergeant at

24   that time.

25   Q.    So in dealing with people in that area that may

1    have a mental health -- may have mental health issues,

2    is part of the training de-escalation?

3         A.   Yes.

4         Q.   And what, in your opinion, was done, from your

5    perspective as a supervisor, to de-escalate the

6    situation with Mr. Maccani?

7         A.   Giving him verbal commands and giving him the

8    opportunity to comply.

9         Q.   And it sounds like the verbal commands were to

10   put his hands -- to come out, initially, to put his

11   hands up, and to turn around?

12        A.   Yes.  Correct.

13        Q.   Were there any other verbal commands that you

14   heard?

15        A.   Well, yeah, "Turn around."  "Keep turning

16   around."  Yeah.

17        Q.   Anything else?

18        A.   Not that I -- I remember, no.

19        Q.   Anything else that you believe was done to

20   de-escalate the situation with Mr. Maccani?

21        A.   Yes.  The use of the -- the 40 and the bean

22   bag.

23        Q.   Okay.  How do you feel that de-escalated it?

24        A.   Because they -- officers and myself felt

25   threatened by his actions, you know, with what we

```
 1    perceived to be a sharp object in his hand, and we

 2    didn't go straight to -- to lethal.  We used our force

 3    options, just to try and stop him, which obviously were

 4    ineffective.

 5         Q.   And was that part of the training, to try to

 6    use less lethal, when you can?

 7         A.   Generally, it's, you know -- using the totality

 8    of circumstances, yeah, generally, yeah, we would have

 9    to.  But, like I said, every cir- -- every incident is

10    different.

11         Q.   But you believe, as a supervisor, that using

12    the 40-millimeter was a form of de-escalation?

13         A.   It's a -- a form, yes.

14         Q.   Trying to use that rather than lethal force?

15         A.   Correct.

16         Q.   And you feel that using the bean bag shotgun

17    was also a form of de-escalation?

18         A.   Yes.

19         Q.   Again, using that rather than lethal force?

20         A.   Right.  Correct.

21         Q.   Anything else that you can think of that you

22    think was de-escalation?

23         A.   Me grabbing him, preventing him from escaping.

24         Q.   Okay.  Just going hands-on with him rather than

25    using force?
```

```
1          A.    Correct.

2          Q.    And it sounds like you were able to get him up

3   against the wall and get him to the ground?

4          A.    Yes.

5          Q.    Anything else you can think of, in terms of

6   de-escalation?

7          A.    For this situation, no.  No.

8          Q.    Since this incident, have you been present for

9   any other officer-involved shootings?

10         A.    Yes.

11         Q.    How many others, since this incident?

12         A.    Oh, since this incident?  So you're talking

13  about after?

14         Q.    Afterwards, yes.

15         A.    No, none.

16         Q.    Is this the only time you've been present for

17  an officer-involved shooting?

18         A.    With me directly involved, yes.

19         Q.    And how long have you been a law enforcement

20  officer altogether?

21         A.    Eighteen years.

22         Q.    And it sounds like -- just doing the math on

23  people you've seen with guns in their hands, knives in

24  their hands, other weapons, it sounds like it's probably

25  been over a hundred times if you added it altogether?
```

```
 1   STATE OF CALIFORNIA)
                        ) ss:
 2   COUNTY OF BUTTE    )

 3
             I, KIMBERLY E. D'URSO, do hereby certify:
 4

 5           That the witness named in the foregoing

 6   deposition was present remotely and duly sworn to testify

 7   to the truth in the within-entitled action on the day and

 8   date and at the time and place therein specified;

 9           That the testimony of said witness was reported

10   by me in shorthand and was thereafter transcribed through

11   computer-aided transcription;

12           That the foregoing constitutes a full, true and

13   correct transcript of said deposition and of the

14   proceedings which took place;

15           Further, that if the foregoing pertains to the

16   original transcript of a deposition in a federal case,

17   before completion of the proceedings, review of the

18   transcript [ ] was [ ] was not requested.

19           That I am a certified stenographic reporter and

20   a disinterested person to the said action;

21           IN WITNESS WHEREOF, I have hereunder subscribed

22   my hand this 20th day of November, 2025.

23   _____

24   KIMBERLY D'URSO, CSR NO. 11372, RPR

25
```