# EXHIBIT P

**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Eric Valenzuela (SBN 284500)
evalenzuela@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California, 91367
Telephone: (818) 347-3333 / Facsimile: (818) 347-4118

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT FOR THE
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDRA RASEY-SMITH; GORDON GENE MACCANI; and JANET MACCANI,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF LOS ANGELES; CALEB GARCIA ALAMILLA; and DOES 2-10, inclusive<br><br>Defendants. | Case No. 2:24-cv-03265-MWC-SSC<br><br>**DECLARATION OF JEFFREY NOBLE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Case No. 2:24-cv-03265-MWC-SSC
DECLARATION OF JEFFREY NOBLE

## DECLARATION OF JEFFREY NOBLE

I, Jeffrey Noble, declare as follows:

1. I am an expert specializing in the procedures of police practices and proper police tactics, including proper procedures for the detention and arrest of individuals and the type and degree of force, if any, appropriate under different circumstances.

2. I am a competent adult and personally familiar with the facts contained herein and would and could competently testify thereto if called upon to do so.

3. I was retained in this action to render opinions regarding the incident that occurred February, 3, 2024 that resulted in the officer-involved shooting of death of Jason Maccani.

4. The opinions I formed are made within a reasonable degree of certainty within the field of police practices based on over 35 years of professional law enforcement experience and scholarship.

5. I was a police officer for 28 years. I retired in July 2012 as the Deputy Chief of Police with the Irvine Police Department. As a Deputy Chief, I was directly responsible for all police operations including Patrol, Traffic, Criminal Investigations, Emergency Management, Crime Prevention, DARE, K9s, Training, and SWAT. The City of Irvine encompasses over 70 square miles with a population of over 218,000. I served in a wide range of assignments as an Officer, Senior Officer, Sergeant, Lieutenant, Commander and Deputy Chief, including Patrol, Traffic, Detective, SWAT, Training, Internal Affairs, Emergency Management and Crime Prevention. The Irvine Police Department had over 200 police officers and over 100 civilian employees during my employment with the department.

6. In April 2014, I was hired by the Westminster, California Police Department as an interim Deputy Chief of Police. My employment with the Westminster Police Department was by means of a temporary contract, and I was asked to review the department's Internal Affairs unit; department policies relating to

1 Internal Affairs investigations, discipline and police officer conduct; conduct department audits and inspections; and act as a liaison with a civilian oversight monitor who was hired during the same period. My employment was at the request of the Chief of Police, was ratified by the City Council and was sought due to the arrest of a police officer for an off-duty criminal sexual assault, the arrest of an on-duty officer for extortion and a lawsuit filed by three Latino officers alleging discrimination and retaliation. I concluded this interim position in January 2015. The Westminster Police Department had 87 police officers and 40 civilian employees during my temporary contracted employment.

7.   As a police supervisor and manager, I have extensive experience conducting internal administrative investigations on a wide range of issues including use of force, vehicle pursuits, officer misconduct, criminal interrogations and interviews, harassment and sexual assaults.

8.   My areas of expertise in policing include, but are not limited to: police use of force; pursuits; police administration; training; police operations; criminal investigations; interviews and interrogations; civil rights violations and investigations; internal/administrative investigations; criminal investigations; police discipline; citizen complaints; and police policies and procedures.

9. In forming my opinions, I reviewed the following documents: (1) First Amended Complaint; (2) Autopsy Report; (3) November 20, 2024, Memorandum from Chief McDonnell to the Board of Pollice Commissioners; (4) LAPD Reports (DEF 0001-1484); (5) Files From DOJ – BWC Videos-
a. Extraction1_3_ch08_20240203142157_avi.mp4, b. Extraction_1_5_Desiree_Rodriguez_BB_4-02-03_1417_X60A8152N.mp4,
c. Extraction_2_4_Gabriel_Quintero_2024-02-03_1423_X60A8695L.mp4,
d. Extraction_1_3_ch03_20240203142348_avi.mp4,
e. Extraction_1_3_ch03_20240203142348_avi.mp4,
f. Extraction_1_2_Sandra_Jauregui_Villegas_2024-02-03_1417_X60A8191L.mp4,

g. Extraction_1_4_Colin_Chomuk_2024-02-03_1419_X60A8449L.mp4, h. Extraction_1_2_Michael_Orozco_2024-02-03_1420_X60A8681K.mp4; (6) Critical Incident Community Briefing Video (DEF 001493); (7) 911 Call (DEF 001485); (8) Fire Department (DEF 001486); (9) MTA Broadcast (DEF 001487); (10) Call DOT (DEF 001488); (11) Call Fire Department (DEF 001489); (12) Call DOT Broadcast (DEF 001490); (13) Call DOT Broadcast (DEF 001491); (14) Incident Broadcast (DEF 001492); (15) Body Worn Camera Videos- a. DEF 2507 – Klimek, b. DEF 2508 - Melgar_Galdamez, c. DEF 2509 – Orozco, d. DEF 2510 – Punzalan, e. DEF 2511 – Quintero, f. DEF 2512 - Rodriguez, g. DEF 2513 - Cam8_Surveillance, h. DEF 2514 - HOZX1056-WM, i. DEF 2515 - DICV Rodriguez Villegas, j. DEF 2516 - Videolink No.1-WM, k. DEF 2517 - Videolink No.2-WM, l. DEF 2518 - Videolink No.3-WM, m. DEF 2519 - Videolink No. 4-WM, n. DEF 2520 - Videolink No.5-WM, DEF 2521 - Videolink No.6-WM, o. DEF 2522 - Videolink No.7-WM, p. DEF 2523 - Videolink No.8-WM, q. DEF 2504 – Chomuk, r. DEF 2505 – Garcia, s. DEF 2506 – Jauregui Villegas; (16) Transcripts of Officer Interviews- a. Jeffrey Punzalan (DEF 002497), b. Jeffrey Punzalan 2 (DEF 002496), c. Colin Chomuk (DEF 002491), d. Desiree Rodriguez (DEF 002487), e. Desiree Rodriguez 2 (DEF 002503), f. Michael Orozco (DEF 002490), g. Gabriel Quintero (DEF 002494), Sandra Jauregui (DEF 002495), h. Caleb Garcia (DEF 002502), i. Gabriel Quintero 2 (DEF 002493); and (17) Depositions- a. Officer Collin Chomuk, b. Officer Gabriel Quintero, c. Officer Caleb Garcia Alamilla, d. Sergeant Jeffrey Punzalan, e. Officer Sandra Jauregui Villegas.

10. The opinions I formed are made within a reasonable degree of certainty within the field of police practices based on over 35 years of professional law enforcement experience and scholarship.

11. Police officers are trained and prepared to assess dangerous situations and respond accordingly. Police officers are trained that for their force to be appropriate the level and manner of force must be proportional to the level of

resistance and threat with which they are confronted. Proportionality is best understood as a range of permissible conduct based on the totality of the circumstances, rather than a set of specific, sequential, predefined force tactics arbitrarily paired to specified types or levels of resistance or threat.

12. Officers are trained that subjective fear or a hunch will not justify the use of force by police. Police officers are trained that in order to justify the use of deadly force, the suspect must objectively present an immediate or imminent threat of death or serious bodily injury. The reasonableness is judge under the totality of the circumstances known to the officer at the time of the use of force.

13. Officers are trained that to use deadly force, the threat of death or serious bodily injury must be immediate or imminent. Officers are trained that a threat of death or serious bodily injury is "imminent" when, based on the totality of the circumstances known to the officer, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but one that, from appearances, must be instantly confronted and addressed.

14. Officers are trained to control their emotions and to not panic when encountering situations similar this incident. Officers are trained that their subjective fear cannot be a justification for the use of deadly force and that there must be objective facts that show that the subject posed an immediate or imminent threat of death or serious bodily injury at the time of the use of deadly force. Officers are trained that an overreaction in using force is excessive force.

15. Officers are trained that deadly force is a last resort that should only be used in an immediate defense of life situation and when no other reasonable alternatives are available.

16. It is well-recognized that an officer's use-of-force decisions (that is,

whether, when, and how to use force) are predicated to a significant degree on events that occurred prior to the use of force itself. In most incidents, including the interaction in this case, an officer's use of force is the result of "a contingent sequence of decisions and resulting behaviors—each increasing or decreasing the probability of an eventual use of…force." Put differently, "[a]n officer's use-of-force decision…will almost always be affected by events that occur prior to the use of force itself, and often prior to the subject's noncompliance, resistance, or other physical actions upon which the use of force is immediately predicated." It follows that the use of force cannot be properly evaluated without considering the preceding actions of officers, subjects, or bystanders.

17. The evidence supports that Officer Garcia believed that Mr. Maccani may be in the midst of a mental health crisis or under the influence of a drug based on the statements of the reporting parties (Mr. Mascarro and Mr. Magana) who said Mr. Maccani was being "bizarre," and "out of the norm." Officer Garcia said when he saw Mr. Maccani he was initially complying, but he was acting "very bizarre," and probably going through some mental illness due to being in Skid Row.

18. Officer Garcia said there was nothing between him and Mr. Maccani when he fired his handgun, but the evidence shows that Sgt. Punzalan was between Officer Garcia and Mr. Maccani, that Punzalan had already grabbed Mr. Maccani and Punzalan was struck by Officer Garcia's round.

19. According to Chief McDonnell, the majority of the LAPD Use of Force Review Board found that "Officer Garcia was the only officer who reacted by employing lethal force and pointed to the lack of other officers unholstering their service pistols in response to Maccani's actions, and Sgt. Punzalan going hands on with Maccani, to bolster their argument that Maccani was not an imminent threat. The Majority opined the other officers at scene, all more tenured than Officer Garcia, did not perceive the threat or respond to it as Officer Garcia did and highlighted the lack of unholstered firearms or that no other officer attempted to address Maccani's attack

-5-  
Case No. 2:24-cv-03265-MWC-SSC  
DECLARATION OF JEFFREY NOBLE

with lethal force. Furthermore, the Majority repeated Officer Garcia's foreground was not clear as Sgt. Punzalan sustained a graze wound and opined his discharged round placed the officers at greater risk of injury and/or death than the perceived threat posed by Maccani. The Majority opined they would have drawn the same conclusion had Maccani been armed with an actual knife and not a plastic fork. The Majority concluded the imminency of the threat articulated by Officer Garcia was not present and his decision to use lethal force, as based on the preponderance of the evidence, was not objectively reasonable, proportional or necessary."

20. It is my opinion that Officer Garcia's use of deadly force was excessive, objectively unreasonable and inconsistent with generally accepted police practices. Mr. Maccani held his hands above his head when he exited the business suite with his fingers spread and his palms toward the officers. He held the plastic fork in his right hand and while several officers claim they saw something in his hand, none of the officers ordered Mr. Maccani to drop the object or warned other officers that Mr. Maccani was holding a weapon or sharp object. Moreover, a reasonable police officer would not believe that a common plastic fork was a knife or an edged weapon. The white portion of the plastic fork that was protruding from Mr. Maccani's right hand did not appear to be sharp, pointy, an edged weapon or a knife and a reasonable officer with situational awareness would have realized that it was not a pointy or sharp-edged weapon.

21. It is my opinion that Officer Garcia's use of deadly force was excessive, objectively unreasonable and inconsistent with generally accepted police practices because there were less than lethal alternatives such as firing additional 40mm or beanbag rounds or going hands-on with Mr. Maccani just as Sgt. Punzalan had already begun to do prior to the shot being fired, especially since the officers significantly outnumbered Decedent. The officers also had tasers and baton's on their person that they could have used, they could have given additional commands and time to comply with those commands and they could have given a verbal warning that force would

be used, both deadly and non-deadly.

22. Under these circumstances, Officer Garcia should never have deviated from the tactical plan and a reasonable officer under similar circumstances would not have deviated from the tactical plan. Officer Garcia was not assigned or designated as the lethal officer and instead was assigned to the arrest team who were tasked with going hands-on with the subject and handcuffing him. Due to his inexperience and not having completed his probationary period, Officer Garcia would not have been designated as the lethal cover officer and if an officer was going to shoot—which they should not have—it should have been the officer who was actually designated as the lethal option. Officer Garcia's deviation from the tactical plan was a significant factor in causing Mr. Maccani's death.

23. Mr. Maccani did move toward Officer Rodriguez, and he did momentarily grab at her less-lethal beanbag shotgun, but Officer Rodriguez was able to spin away in less than one second and Sgt. Punzalan grabbed Mr. Maccani before he was shot by Officer Garcia.

24. Contrary to Officer Garcia's statements, Mr. Maccani was not holding the fork over his head, he did not come down in a striking motion toward Officer Rodriguez with the fork, and Mr. Maccani was not in a "serious fight" or would not let go of Officer Rodriguez as she spun away from him in less than a second. Moreover, Officer Garcia never saw Mr. Maccani make a stabbing with the white object.

25. It is my opinion that a reasonable police officer in these circumstances would not have used deadly force as Mr. Maccani did not present an imminent threat of death or serious bodily injury and a reasonable police officer in Officer Garcia's position would not have fired their handgun at Mr. Maccani when Sgt. Punzalan was in his line of fire.

I declare under penalty of perjury of the laws of the United States of America, that the foregoing is true and correct. Executed on December 5, 2025, at Rancho Santa Margarita, California.

_____  12/18/25
Jeffrey Noble