# EXHIBIT 1

# Bennet Omalu
## PATHOLOGY

| | | |
|---|---|---|
| Phone: 279-345-1300<br>Fax: 866-402-6875<br>bennetomalu@bennetomalu.com | **Autopsy and Anatomic Pathology**<br>**Clinical Pathology and Toxicology**<br>**Forensic Pathology** | **Neuropathology**<br>**Epidemiology**<br>**Medico-Legal Consultations** |

Dale Galipo, Esq.                                                               December 5, 2025
The Law Offices of Dale K. Galipo
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367


Dear Mr. Galipo,


      Re:    Jason Lee Maccani, Deceased
               Medico-Legal Report


**Summary of Education, Training and Experience**
I completed medical school in 1990 at the University of Nigeria, Enugu, Nigeria. Upon graduating from medical school, I completed a one-year clinical housemanship at the University of Nigeria Teaching Hospital in the fields of Pediatrics, Internal Medicine, General Surgery, Obstetrics, and Gynecology. After housemanship, I worked as an emergency room physician at a university hospital in Nigeria for approximately three years. I sat for and passed my United States Medical Licensing Examinations [USMLE] while I worked as an emergency room physician. I came to the United States in 1994 through a World Health Organization scholarship to become a visiting research scholar for eight months at the Department of Epidemiology, Graduate School of Public Health, University of Washington, Seattle, Washington.

In 1995, I proceeded to the College of Physicians and Surgeons of Columbia University, New York, at Harlem Hospital Center, to complete residency training in Anatomic Pathology and Clinical Pathology. In 1999, I proceeded to the University of Pittsburgh in Pittsburgh, Pennsylvania, to complete residency training in Forensic Pathology and Neuropathology. I hold four board certifications in Anatomic Pathology, Clinical Pathology, Forensic Pathology and Neuropathology. I also hold a Masters in Public Health [MPH] in Epidemiology from the Graduate School of Public Health at the University of Pittsburgh in Pittsburgh, Pennsylvania. I also hold a Masters in Business Administration [MBA] degree from the Tepper School of Business at Carnegie Mellon University in Pittsburgh, Pennsylvania, one of the leading business schools in the world. I am a Certified Physician Executive and an Honorary Fellow of the American Association of Physician Leadership [AAPL]. I also hold a fifth board certification in Medical Management from the AAPL. I am currently licensed to practice Medicine and Surgery in the State of California.

I am currently the President and Medical Director of Bennet Omalu Pathology [BOP], a California medico-legal consulting firm, and a Clinical Professor at the Department of Medical

Jason Lee Maccani, Deceased
Medico-Legal Report

Page 3 of 18

been honored by the United States Congress, and I have appeared on multiple occasions before committees of the United States Congress and committees of State Legislatures across the Unites States, advising them on matters relating to trauma. In 2019 and 2020, I was appointed to the Traumatic Brain Injury Board of the State of California to advise the state on matters relating to traumatic brain injuries.

Since 1999, I have testified as an expert witness in matters relating to all types of injuries and deaths in over 800 court proceedings across the United States. I have attached a copy of my curriculum vitae, which enumerates my body of work and experience in greater detail. The cases I have testified in, beginning in 2009, are enumerated at the end of my curriculum vitae.

Pursuant upon your request, I have reviewed the following materials sent to me on the case of Jason Lee Maccani, Deceased:

1. Interdepartmental correspondence from the Chief of Police to the Honourable Board of Police Commissioners on Officer-Involved shooting FRD No. 033-24 dated November 20, 2024.
2. Certificate of records from the department of medical examiner, County of Los Angeles.
3. Department of medical examiner, County of Los Angeles, death investigation summary (autopsy report).
4. Department of medical examiner, County of Los Angeles, investigator's summary.
5. First Amended Complaint for Damages, United State, District Court, Central District of California.
6. Medical records from Los Angeles County + USC Medical Center
7. Transcript of officer interviews of officers:
    a. Gabriel Quintero
    b. Desiree Rodriguez
    c. Caleb Garcia
    d. Sandra Jauregui
    e. Michael Orozco
    f. Colin Chomuk
    g. Jeffery Punzalan
8. Production documents
    a. Critical incident communication briefing video
    b. Incident broadcast audio
    c. Broadcast audio (Call 1- 7)
    d. Incident recall from the Los, Angeles, Police Department
9. Department of Justice Public Records Act request; DOJ No. 2024-02250
10. California Department of Justice – AB 1506 Investigation – Video Release of officers bodycam videos.
11. Officers bodycam videos and audios.



Jason Lee Maccani, Deceased
Medico-Legal Report

Page 7 of 18

**Medico-Legal Questions**

1. **What were the characteristics and trajectory of the bullet of the gunshot wound Jason Maccani sustained?**
   a. **What was Jason Maccani's body positioning while he was being shot?**
   b. **What was the trajectory of the bullet that entered Jason Maccani's body?**
   c. **What injuries or damages were caused to Jason Maccani by the gunshot?**

Medicine is a life science, which is evidence based. The practice of medicine is guided by established standards and generally accepted principles, which certified physicians must adhere to. The specialties and the categories of physicians who are proficiently trained, specialized, and competent in the accurate determination of the cause, mechanism and manner of death and the mechanisms of sustenance of lethal trauma are the forensic pathologists, especially for deaths involving all types of trauma and bodily injury. The death of Jason Maccani involved serious bodily injury.

It is a generally accepted principle and common knowledge in medicine and forensic pathology, that specific traumatic events generate predictable, reproducible, and specific patterns of traumas and injuries. Applying the clinico-pathologic method of differential diagnosis, a specific documented pattern of trauma can be evaluated, translated, and applied to the determination of the mechanisms of generation, causation, and sustenance of the specified trauma pattern, with a reasonable degree of medical and scientific certainty; based on the established common knowledge and generally accepted principles of trauma patterns and their mechanisms of generation, causation, and sustenance.

The patterns of injuries generated by gunshots, firearms and ballistics weapons, and the mechanisms of generation, causation, and sustenance of these patterns of injuries are very well-established in the medical literature and are common knowledge. Based on the prevailing forensic scenario, and on the generally accepted principles and common knowledge of medicine and science, and based on the global constellation, configurations and anatomic conformations of the gunshot wounds sustained by Jason Maccani, the mechanisms of generation, causation and sustenance of his fatal injuries can be determined with a reasonable degree of medical certainty.

Based on the physical characteristics and physics of ballistics, partially burnt and hot residues of the gunpowder and soot travel behind the bullet when it exits the muzzle, and due to gravitational forces and the differential densities of the bullet, soot, and residues of gunpowder in the gravitational field, the bullet can travel longest, followed by the partially burnt gunpowder residues, which travel longer than soot. Soot will travel for about 1 foot, before it is pulled down by gravitational forces, and the partially burnt gunpowder residue will travel for about 2-3 feet before it is pulled down by gravitational forces. Therefore, if the muzzle of the gun were closer to the skin by less than 1 foot, you would expect to find marginal soot deposits around the gunshot wound of entrance [close range shot]. If the muzzle of the gun were closer to the skin by less than 2-3 feet, you would expect to find powder stippling around the gunshot wound of entrance [intermediate range shot]. If the muzzle of the gun were located greater than 2-3 feet away from the skin ad infinitum, you would expect to find only marginal abrasions around the wound without soot deposits or powder stippling [distant range shot]. If there is an eccentric accentuation of the width of the marginal abrasion, it may suggest that the muzzle of the gun was not located perpendicularly to the skin when it was fired but rather located in the direction of the eccentric accentuation of the marginal abrasion.



Jason Lee Maccani, Deceased
Medico-Legal Report

Page 10 of 18

Given the anatomic locations and configurations of the gunshot wounds of entrance and re-entrance, the anatomic pathway of the bullet, and the trajectory of the bullet in the body, the officer who fired the life round and bullet that hit Jason Maccani was located at the right back of Jason Maccani when the bullet was fired. Jason Maccani was not facing the officer who shot him, he was not charging at the officer when he was shot with a life round. The officer was not located in the front of Jason Maccani. The officer was located in his back, to the right of his back for the bullet to enter the body through the right postero-lateral proximal arm. The bullet upon entering the body traveled in a linear downward trajectory, and for such a trajectory the gun that fired the bullet must have been located at a level slightly higher or higher than the level of the gunshot wound of entrance both from the ground. Since the gunshot wound of entrance was located at a high rostral anatomic level of the body, and since the trajectory was very acutely inclined inside the body, it would be less likely that Jason Maccani was standing erect on his feet when a life round was fired at him. More likely than not he was held down or bent over, was falling to the ground or was close to the ground or on the ground[6] when a life round was fired at him from his back. The level of the gun that fired the life round from the ground was higher than the level of his proximal arm from the ground. More likely than not, therefore, the officer who fired the bullet was standing on his feet when he fired the bullet. Jason Maccani was not standing erect on his feet, and was not facing the officer who shot him with a life round.

The manner of Jason Maccani's death was a homicide. He was shot and killed by another person or other persons. He died in the hands of another. A medical homicide may be deemed as a death that occurs, directly or indirectly, as a result of another person's actions.

2. **Did Jason Maccani experience pain and suffering when he was shot and killed on February 3, 2024 and for how long?**

It is a generally accepted principle and common knowledge in medicine and forensic pathology, that specific traumatic events generate predictable, reproducible, and specific patterns of traumas and injuries. The patterns of traumas/injuries generated by blunt force impacts, gunshots, firearms and ballistics weapons, and the mechanisms of sustenance of these patterns of traumas/injuries are very well established in the medical literature and have become common knowledge.

**Patho-physiology of conscious pain and suffering**
Conscious pain and suffering are initiated by widespread free nerve endings situated in the skin, soft tissues, and organs. Pain can be elicited by multiple types of stimuli classified into three broad categories: mechanical, thermal, and chemical pain stimuli. Nerve endings for pain sensations generate electrical action potentials following contact of any part of the body with an impacting surface and following all types of mechanical tissue damage caused by kinetic energy and blunt force trauma. Similarly, nerve endings for pain and heat sensations generate electrical action potentials following contact of any part of the body with flames and heat and following all types of tissue damage caused by flames and heat. The fundamental mechanism of injury sustenance for gunshots is kinetic energy transference, which causes mechanical destruction of tissues. Action

---

[6] Because medicine is not an absolute science indices or integers are typically and routinely presented in medicine in a continuum of ranges and not absolute indices or integers. For example, the normal blood glucose level is 60-100 mg/dL. The range of indices and integers in this instance would the continuum which has been stated accordingly.



physiological consequences, cascades, and sequelae of his wounds, which culminated in irreversible brain damage, coma, and eventual death.

In spite of his gunshot wounds, Jason Maccani's brain and neural axis remained functionally intact. His spinal nerves and nerve roots, and spinal reflexes remained intact. His subcortical ganglia and brainstem nuclei of the cranial nerves remained intact. His reticular activating system remained electrochemically intact. The distinctive anatomy of his injuries enabled him to continue to experience increasingly higher levels of somatic pain and suffering, mental pain and suffering, biochemical pain, and suffering.

As he received medical and surgical treatments and interventions, the secondary traumatic sequences of his injuries progressed as he lost blood. Traumatic shock, hemorrhagic shock, acute cardio-respiratory arrest, and hypoxic-ischemic cerebral injury persisted. As he continued to suffer the sequelae of his injuries, he progressed into deeper levels of traumatic and hypovolemic shock, as he developed more severe and advanced stages of acute respiratory arrest, acute cardiac arrest, cerebral hypoperfusion and cerebral hypoxic-ischemic injury. Traumatic shock and composite biochemical acute responses to injury progressed to multi-organ-system failure before he died.

As has been stated above, the human body continues to experience debilitating trauma-induced and physiologic chemical pain and suffering until there is a complete cessation of all bodily functions and death. The patient who suffers a disorder of consciousness remains in a state of high human suffering especially due to biochemical pain and suffering because of the ongoing biochemical and molecular responses and systems in the body, especially in response to traumatic shock.

In fact, one of the clinical tests for the evaluation of the depth of disorders of consciousness is to intentionally inflict somatic pain to an extremity of the unconscious patient and observe the patient to see if he withdraws his extremity from the source of pain, moans, or grimaces. Again, this is one of the medical reasons why the majority of comatose patients in the intensive care unit of hospitals are on strong pain medications and narcotic analgesics like Morphine and Fentanyl although they are in a coma. This is also why the lowest score for the Glasgow Coma Scale is 3/15 and not 0/15, and in part why analgesics and narcotic analgesics are given to patients who are under anesthesia and are components of drug panels and cocktails used for anesthesia.

As the case of Jason Maccani shows, although loss of consciousness and death are frequently immediate, they are rarely instantaneous since loss of consciousness and death are processes that involve cascades of patho-physiologic events. The adjective "immediate," within a forensic context, and within the prevailing forensic scenario in this case should be interpreted as death occurring as a result of gunshot wounds without the intervention of another novel or independent object, cause, or factor. It should not be forensically construed as instantaneous.

Based on the global prevailing forensic scenarios in this case and based on the generally accepted principles and common knowledge of medicine and science, including the central limit theorem, Jason Maccani experienced the highest levels of high-scale conscious somatic, mental, and biochemical pain and suffering which correspond with, and were caused by the serious bodily injuries he suffered. His conscious mental, somatic and biochemical pain and suffering began at about 14:28 hours when he first encountered the police, continued through the time he was shot with less lethal and lethal rounds and through the onset and sustenance of his traumatic shock, and global hypoxic-ischemic brain injury, for a composite mean, mode and median period of less



than 3-5 minutes[8,9]. He was transferred to the hospital and was eventually pronounced dead at about 15:15 hours on February 3, 2024. He suffered pre-death pain and suffering for a mean, mode, and median period of less than 47 minutes beginning from 14:28 hours and ending at 15:15 hours[10,11].

I have provided all my opinions and conclusions with a reasonable degree of medical certainty.

I reserve the right to amend, supplement, revise and/or modify my opinions and report, up and to the time of trial, should additional information become available.

Thank you.

Very truly yours,

Bennet I. Omalu, MD, MBA, MPH, CPE, DABP-AP,CP,FP,NP
Clinical Pathologist, Anatomic Pathologist, Forensic Pathologist, Neuropathologist, Epidemiologist
President and Medical Director, Bennet Omalu Pathology

---

[8] Medicine is not an absolute science, and these estimated ranges should not be interpreted as absolute quantitative estimations of time. Quantitative ranges of any measurable index are common practice and are the standard of practice in pathology and medicine in part based on the principles of the central limit theorem.

[9] Human events like loss of consciousness and death involve a continuum of pathophysiological events on the cellular and gross functional levels without any identifiable rigid transitions or demarcations. Therefore, the determination of the time of occurrence of these events are guided by the time the events have been reproducibly and quantifiably confirmed. For example, the time of death of any individual is determined by the time the individual was pronounced dead by a designated medical professional who has clinically assessed the patient and confirmed the patient to be dead based on prevailing, reproducible and quantifiable clinical evidence that the patient was dead.

[10] Medicine is not an absolute science, and these estimated ranges should not be interpreted as absolute quantitative estimations of time. Quantitative ranges of any measurable index are common practice and are the standard of practice in pathology and medicine, in part based on the principles of the central limit theorem.

[11] Human events like loss of consciousness and death involve a continuum of pathophysiological events on the cellular and gross functional levels without any identifiable rigid transitions or demarcations. Therefore, the determination of the time of occurrence of these events are guided by the time the events have been reproducibly and quantifiably confirmed. For example, the time of death of any individual is determined by the time the individual was pronounced dead by a designated medical professional who has clinically assessed the patient and confirmed the patient to be dead based on prevailing, reproducible and quantifiable clinical evidence that the patient was dead.

